No. 23-1135

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

DARLENE GRIFFITH,
*Plaintiff-Appellant*,
v.

EL PASO COUNTY, COLORADO; BILL ELDER, in his individual and official capacities; CY GILLESPIE, in his individual capacity; ELIZABETH O'NEAL, in his individual capacity; ANDREW MUSTAPICK, in his individual capacity; DAWNE ELLISS, in her individual capacity; TIFFANY NOE, in her individual capacity; BRANDE FORD, in her individual capacity,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Colorado
No. 1:21-cv-00387-CMA-NRN
The Honorable Christine M. Arguello

**PLAINTIFF-APPELLANT'S OPENING BRIEF**

Andrew McNulty
Mari Newman
KILLMER, LANE & NEWMAN
1543 Champa St., Suite 400
Denver, CO 80202
amcnulty@kln-law.com
(303) 571-1000

Devi M. Rao
Meghan Palmer
RODERICK & SOLANGE
MACARTHUR JUSTICE CENTER
501 H St. NE, Suite 275
Washington, DC 20002
devi.rao@macarthurjustice.org
(202) 869-3449

*Counsel for Plaintiff-Appellant Darlene Griffith*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STATEMENT OF RELATED CASES ........ 3

STATEMENT OF JURISDICTION ........ 3

STATEMENT OF ISSUES ........ 3

STATEMENT OF THE CASE ........ 4

I. Factual Background ........ 4

II. Procedural Background ........ 11

SUMMARY OF ARGUMENT ........ 17

STANDARD OF REVIEW ........ 20

ARGUMENT ........ 21

I. Ms. Griffith plausibly alleged that defendants' denial of appropriate housing, clothing, and grooming products on the basis of her biological sex and transgender status violated her Equal Protection rights (Claim 1). ........ 21

A. El Paso County's sex-based housing, clothing, and grooming product policies are subject to intermediate scrutiny, regardless of Ms. Griffith's gender identity. ........ 21

B. This Court should clarify that *Brown* does not control this case. ........ 24

C. Viewed under the appropriate level of scrutiny, Ms. Griffith stated a plausible claim. ........ 31

II. Ms. Griffith plausibly alleged that Defendant Mustapick's abusive and invasive strip search violated her Fourth and Fourteenth Amendment rights (Claims 3 and 4). ........ 34

A. Ms. Griffith stated a plausible violation of the Fourth and Fourteenth Amendments. .... 34

B. Ms. Griffith's right to be free from an abusive, cross-gender strip search is clearly established. .... 41

III. Ms. Griffith plausibly alleged that housing her in a men's unit and treating her as a man subjected her to unconstitutional conditions of confinement (Claim 2). .... 46

IV. The district court erred in dismissing Ms. Griffith's claims under the ADA and RA (Claims 10 and 11). .... 52

A. Ms. Griffith plausibly alleged a violation. .... 52

B. The district court erred in dismissing Ms. Griffith's ADA claim for failure to show intentional discrimination. .... 55

C. *Cummings* does not affect Ms. Griffith's claim. .... 61

V. Ms. Griffith sufficiently alleged municipal liability. .... 64

CONCLUSION .... 64

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

CERTIFICATE OF DIGITAL SUBMISSION

10th CIR. R. 28.2(A) ATTACHMENT TO BRIEF

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adams v. Sch. Bd.*,
57 F.4th 791 (11th Cir. 2022) (en banc) .......... 22

*Adkins v. City of New York*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015) .......... 29

*Asabedo v. Kan. State Univ.*,
559 F. App'x 668 (10th Cir. 2014) .......... 56

*Barber ex rel. Barber v. Colo. Dep't of Revenue*,
562 F.3d 1222 (10th Cir. 2009) .......... 56

*Barney v. Pulsipher*,
143 F.3d 1299 (10th Cir. 1998) .......... 43

*Bearchild v. Cobban*,
947 F.3d 1130 (9th Cir. 2020) .......... 44

*Bell v. Wolfish*,
441 U.S. 520 (1979) .......... 35, 39, 43

*Berry v. Oswalt*,
143 F.3d 1127 (8th Cir. 1998) .......... 44

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020) .......... 27

*Brandt v. Rutledge*,
47 F.4th 661 (8th Cir. 2022) .......... 29

*Brooks v. Colo. Dep't of Corr.*,
12 F.4th 1160 (10th Cir. 2021) .......... 53

*Brown v. Zavaras*,
63 F.3d 967 (10th Cir. 1995) .......... *passim*

*Burke v. Regalado*,
935 F.3d 960 (10th Cir. 2019) .......... 37

*Byrd v. Maricopa Cnty. Sheriff's Dep't*,
629 F.3d 1135 (9th Cir. 2011) .................................................. 37, 38, 43

*Cadena v. El Paso Cnty.*,
946 F.3d 717 (5th Cir. 2020) .................................................. 57

*Calhoun v. DeTella*,
319 F.3d 936 (7th Cir. 2003) .................................................. 39, 44

*Canedy v. Boardman*,
16 F.3d 183 (7th Cir. 1994) .................................................. 36, 38

*Coates v. Adams Cnty. Sheriff's Office*,
631 F. Supp. 3d 976 (D. Colo. 2022) .................................................. 6

*Colbruno v. Kessler*,
928 F.3d 1155 (10th Cir. 2019) .................................................. *passim*

*Conley v. McKune*,
529 F. App'x 914 (10th Cir. 2013) .................................................. 51

*Couser v. Gay*,
959 F.3d 1018 (10th Cir. 2020) .................................................. 6

*Crane v. Utah Dep't of Corr.*,
15 F.4th 1296 (10th Cir. 2021) .................................................. 52

*Crowder v. Diaz*,
No. 2:17-cv-1657-TLN-DMC, 2019 WL 3892300 (E.D. Cal. Aug. 19, 2019) .................................................. 30

*Cumbey v. Meachum*,
684 F.2d 712 (10th Cir. 1982) .................................................. 36, 42

*Cummings v. Premier Rehab Keller*,
142 S. Ct. 1562 (2022) .................................................. 61, 62, 63

*Dekker v. Weida*,
No. 4:22-cv-325-RH-MAF, 2023 WL 4102243 (N.D. Fla. June 21, 2023) .................................................. 27

*DeSpain v. Uphoff*,
264 F.3d 965 (10th Cir. 2001) ........ 46, 52

*District of Columbia v. Wesby*,
138 S. Ct. 577 (2018) ........ 42

*Diversey v. Schmidly*,
738 F.3d 1196 (10th Cir. 2013) ........ 20

*Dodds v. Richardson*,
614 F.3d 1185 (10th Cir. 2010) ........ 41, 50, 51

*Doe v. Massachusetts Dep't of Corr.*,
No. 17-12255-RGS, 2018 WL 2994403 (D. Mass. June 14, 2018) ........ 22, 33, 53

*Druley v. Patton*,
601 F. App'x 632 (10th Cir. 2015) ........ 25

*Duvall v. Cnty. of Kitsap*,
260 F.3d 1124 (9th Cir. 2001) ........ 57, 58, 59

*Escobar v. Mora*,
496 F. App'x 806 (10th Cir. 2012) ........ 46

*Est. of Booker v. Gomez*,
745 F.3d 405 (10th Cir. 2014) ........ 42

*Evancho v. Pine-Richland Sch. Dist.*,
237 F. Supp. 3d 267 (W.D. Pa. 2017) ........ 29

*Farmer v. Perrill*,
288 F.3d 1254 (10th Cir. 2002) ........ 34, 35, 42

*Fisher v. Federal Bureau of Prisons*,
484 F. Supp. 3d 521 (N.D. Ohio 2020) ........ 49

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
503 U.S. 60 (1992) ........ 63

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*,
916 F.3d 792 (10th Cir. 2019) ........ 21, 31, 32

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ........................................................ 23

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) .................................................... *passim*

*Gundy v. United States*,
139 S. Ct. 2116 (2019) ..................................................................... 63

*Hampton v. Baldwin*,
No. 3:18-cv-550-NJR-RJD, 2018 WL 5830730 (S.D. Ill. Nov. 7, 2018) ....................................................................... 22, 32

*Harris v. City of Circleville*,
583 F.3d 356 (6th Cir. 2009) ........................................................... 42

*Hayes v. Marriott*,
70 F.3d 1144 (10th Cir. 1995) .......................................... 34, 36, 37, 42

*Hejmej v. Peconic Bay Med. Ctr.*,
No. 17-cv-782-JMA-SIL, 2022 WL 4551696 (E.D.N.Y. Sept. 29, 2022) ................................................................................. 63

*Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*,
962 F.3d 1204 (10th Cir. 2020) ........................................................ 35

*Holloway v. Arthur Andersen & Co.*,
566 F.2d 659 (9th Cir. 1977) .......................................... 23, 25, 26, 28

*Iglesias v. Fed. Bureau of Prisons*,
No. 19-cv-415-NJR, 2021 WL 6112790 (S.D. Ill. Dec. 27, 2021) ................................................................................................ 22

*Phillips ex rel. J.H. v. Prator*,
No. 20-30110, 2021 WL 3376524 (5th Cir. Aug. 3, 2021) ................... 59

*Jones v. Hansen*,
No. 20-cv-3548-PAB-SKC, 2022 WL 4467243 (D. Colo. Sept. 26, 2022) ................................................................................. 51

*Jordan v. Gardner*,
986 F.2d 1521 (9th Cir. 1993) (en banc) .......... 47

*Kapinski v. City of Albuquerque*,
964 F.3d 900 (10th Cir. 2020) .......... 45

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) .......... 28

*Kent v. Johnson*,
821 F.2d 1220 (6th Cir. 1987) .......... 36, 44

*Kilman v. Brown*,
833 F. App'x 474 (10th Cir. 2021) .......... 7

*Kolstad v. American Dental Association*,
527 U.S. 526 (1999) .......... 59, 60

*Lee v. Downs*,
641 F.2d 1117 (4th Cir. 1981) .......... 37

*Levoy v. Mills*,
788 F.2d 1437 (10th Cir. 1986) .......... 35

*Loeffler v. Staten Island Univ. Hosp.*,
582 F.3d 268 (2d Cir. 2009) .......... 57

*Lowe v. Raemisch*,
864 F.3d 1205 (10th Cir. 2017) .......... 25, 26

*Memphis Cmty. Sch. Dist. v. Stachura*,
477 U.S. 299 (1986) .......... 63

*Norsworthy v. Beard*,
87 F. Supp. 3d 1104 (N.D. Cal. 2015) .......... 28

*Porter v. Clarke*,
923 F.3d 348 (4th Cir. 2019) .......... 46

*Powers v. MJB Acquisition Corp.*,
184 F.3d 1147 (10th Cir. 1999) .......... 56

*Robertson v. Las Animas Cnty. Sheriff's Dep't*,
500 F.3d 1185 (10th Cir. 2007) .......... 52, 55

*Romer v. Evans*,
517 U.S. 620 (1996) .......... 33

*Schwenk v. Hartford*,
204 F.3d 1187 (9th Cir. 2000) .......... 28

*Shaw v. District of Columbia*,
944 F. Supp. 2d 43 (D.D.C. 2013) .......... 49

*Shroff v. Spellman*,
604 F.3d 1179 (10th Cir. 2010) .......... 35

*Simpson v. Little*,
16 F.4th 1353 (10th Cir. 2021) .......... 42

*Tay v. Dennison*,
457 F. Supp. 3d 657 (S.D. Ill. 2020) .......... 22

*Thompson v. Lengerich*,
798 F. App'x 204 (10th Cir. 2019) .......... 51

*Tyler v. City of Manhattan*,
118 F.3d 1400 (10th Cir. 1997) .......... 55, 56

*United States v. Brooks*,
751 F.3d 1204 (10th Cir. 2014) .......... 27

*United States v. Salazar*,
987 F.3d 1248 (10th Cir. 2021) .......... 27

*United States v. Windsor*,
570 U.S. 744 (2013) .......... 33

*Updike v. Multnomah Cnty.*,
870 F.3d 939 (9th Cir. 2017) .......... 57

*Vondrak v. City of Las Cruces*,
535 F.3d 1198 (10th Cir. 2008) .......... 41

*West v. Radtke*,
48 F.4th 836 (7th Cir. 2022) .................................................................. 36

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
858 F.3d 1034 (7th Cir. 2017) ................................................................ 22

*Williams v. Kincaid*,
45 F.4th 759 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2414 (2023) .................................................................................... 53, 54

*L.W. ex rel. Williams v. Skrmetti*,
No. 3:23-cv-00376, 2023 WL 4232308 (M.D. Tenn. June 28, 2023) .................................................................................... 28

*Windsor v. United States*,
699 F.3d 169 (2d Cir. 2012) .................................................................. 26

**Statutes**

Colo. Rev. Stat. § 30-10-511 ..................................................................... 50

**Other Authorities**

10TH CIR. R. 28.2(C)(2) ............................................................................. 1

FED. R. APP. P. 34(a)(2) ............................................................................. 1

Jody L. Herman, et al., Williams Institute, UCLA School of Law, *How Many Adults and Youth Identify as Transgender in the United States?* (June 2022) ................................ 31

U.S. Department of Justice, Bureau of Justice Statistics, *PREA Data Collection Activities, 2015* (June 2015) ............................ 6

U.S. Department of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12* (May 2013) .................................................................. 6

## INTRODUCTION

Darlene Griffith is a transgender woman who has lived in the community as a woman for over twenty years. But when she arrived at the El Paso County Jail as a pretrial detainee, defendants refused to house her in a women's unit. El Paso County, by official policy, sends all transgender individuals to the facility associated with their sex assigned at birth. So defendants ignored Ms. Griffith's pleas—and the well-known risks of suffering and victimization associated with such a policy—and housed her in an all-male unit.

El Paso County's decision had immediate, and serious consequences. In the male unit, Ms. Griffith endured sexual harassment, sexual assault, and severe emotional distress. She was subjected to excessive pat-down searches and an abusive strip search, all by male deputies. One male officer, Defendant Mustapick, taunted and harassed her while he conducted an already-humiliating cross-gender strip search—and her breasts were regularly touched by male deputies. Daily life in the men's unit was intolerable, and Ms. Griffith sought help persistently, but went ignored. She experienced mounting suicidal thoughts and ultimately attempted self-castration.

The district court dismissed Ms. Griffith's entire, 16-count complaint. It recognized, however, that many of her claims had merit. As to her Equal Protection claim challenging El Paso County's sex-based housing policy, the court believed that, were the standard of review intermediate scrutiny, the claim would easily survive dismissal. But it reluctantly applied rational basis review, believing itself bound by this Court's outlier, decades-old decision in *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995)—a decision that does not apply to Ms. Griffith's claim of sex-based discrimination and urgently requires reconsideration as to her claim of discrimination based on transgender status. And despite finding that Ms. Griffith had plainly alleged the elements of a disability discrimination claim, the court dismissed this claim based on a misinterpretation of an additional legal hurdle to relief. As to Ms. Griffith's several other constitutional claims, the court overlooked caselaw that clearly prohibits what defendants subjected Ms. Griffith to: an unnecessary, abusive cross-gender strip search, and conditions of confinement that caused her ongoing, severe psychological distress.

Ms. Griffith has plausibly stated several claims and, at this early stage of litigation, deserves a chance at factual development.

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

Darlene Griffith filed this action pursuant to 42 U.S.C. § 1983 in the United States District Court for the District of Colorado. The district court had jurisdiction under 28 U.S.C. § 1331 and § 1343. Final judgment was entered on March 27, 2023. A.147. Ms. Griffith timely filed a notice of appeal on April 25, 2023. A.149. This Court has jurisdiction to review the district court's final order under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the district court erred in dismissing Ms. Griffith's claim that El Paso County's sex-based and transgender-status-based housing policy violated her Equal Protection rights, despite observing that she had plainly stated a claim if intermediate scrutiny applied, because it erroneously held that only rational basis review applied?

2. Whether the district court erred in dismissing Ms. Griffith's claims that defendants violated her Fourth and Fourteenth Amendment rights by subjecting her to a harassing, invasive, cross-gender strip search, despite the fact that a female deputy was present and able to conduct the search?

3. Whether the district court erred in dismissing Ms. Griffith's claim that defendants subjected her to unconstitutional conditions of confinement by housing her in a men's unit where she was subject to non-routine cross-gender searches, sexual assault, sexual harassment, and extreme emotional distress?

4. Whether the district court erred in dismissing Ms. Griffith's claims under the Americans with Disabilities Act and the Rehabilitation Act for failure to accommodate her gender dysphoria, even after it found she successfully alleged the elements of a claim, on the ground that she failed to show intentional discrimination?

5. Whether the district court erred in dismissing Ms. Griffith's municipal liability claims solely on the ground that it believed none of her constitutional claims survived?

## STATEMENT OF THE CASE

### I. Factual Background

Darlene Griffith is an openly transgender woman with a feminine appearance who has been living in the community as a woman for over twenty years. A.32, 36. She has changed her name and altered her physical appearance to conform to her female gender identity: she dresses

in feminine attire and takes feminizing hormones, which has caused her to develop feminine traits like breasts. A.27–28, 32.

Ms. Griffith also suffers from gender dysphoria, a clinically-diagnosed psychological condition that many, but not all, transgender individuals have. A.31. The condition is defined as the significant distress that may accompany the incongruence between a transgender person's gender identity and sex assigned at birth. *Id.* The accepted course of medical treatment to alleviate these symptoms is allowing the individual to live as her chosen gender, including dressing, grooming, and otherwise outwardly presenting in a manner consistent with one's gender identity. *Id.* When untreated, the condition causes Ms. Griffith intense emotional suffering. A.32–34. She has a history of self-harm and past suicide attempts. A.32. When she is treated as a man, including being called by her name assigned at birth, or male pronouns, Ms. Griffith's symptoms get worse. A.34.

It is well-known that transgender women are at significant risk of victimization when housed in men's facilities. A.34. In fact, an estimated 35% of transgender people held in prisons like those in Colorado report experiencing one or more incidents of sexual victimization each year,

nearly ten times the rate of sexual victimization for the rest of the incarcerated population.[1] The World Professional Association for Transgender Health ("WPATH"), which provides the authoritative standards for the treatment of transgender individuals, instructs that placing transgender individuals in single-sex housing facilities on the sole basis of their biological sex places them at risk of victimization, and that institutions should instead take into account their gender identity. A.34–36.

El Paso County[2], as a matter of official policy, refuses to place transgender women in female housing facilities at its jail. A.37. It also

---

[1] Bureau of Just. Stat., U.S. Dep't of Just., *PREA Data Collection Activities, 2015*, at 2 (June 2015); Bureau of Just. Stat., U.S. Dep't of Just., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, at 9 (May 2013).

[2] Ms. Griffith is not appealing the district court's ruling that the County was not properly named. A.96. However, Ms. Griffith also sued Sheriff Bill Elder in his official capacity, and she does appeal several of those claims. Official capacity suits are "deemed to be against the . . . entity the official represents." *Couser v. Gay*, 959 F.3d 1018, 1022 (10th Cir. 2020). This brief will refer to the County for purposes of these official capacity claims. *See, e.g.*, *Coates v. Adams Cnty. Sheriff's Office*, 631 F. Supp. 3d 976, 997–98 (D. Colo. 2022) (explaining courts are split as to whether the proper municipal defendant is the sheriff's office or the county); *Kilman v. Brown*, 833 F. App'x 474, 475 (10th Cir. 2021) (holding county proper defendant).

considers them as men and treats them uniformly with men in the facility. A.46. Transgender women are searched—including strip searched—by male deputies, like male detainees are. A.41, 44. Transgender women are also denied access to feminine clothing and grooming items that are available to cisgender[3] women. A.48, 49.

When Ms. Griffith first entered El Paso County Jail as a pre-trial detainee, she asked Defendant Tiffany Noe, who conducted her intake screening, to be placed in a women's facility. A.37. Ms. Griffith was previously housed in two women's facilities in Colorado prisons. A.37, 38. She communicated her fears to Defendant Noe that if she were to be placed in a men's facility, she would be at risk of sexual harassment, assault, and severe emotional distress. A.37. She also alerted Defendant Noe that she suffers from gender dysphoria. *Id*. Nonetheless, Defendant Noe denied her request to be housed in a female unit. *Id*.

Ms. Griffith's fears of victimization were quickly realized. Upon arrival at the jail, she was subjected to a visual body-cavity search. A.41. A male and a female deputy, Defendants Andrew Mustapick and Dawne

[3] Cisgender describes an individual whose gender identity matches their sex assigned at birth.

Elliss, arrived to conduct Ms. Griffith's visual body-cavity search. *Id*. Ms. Griffith immediately requested that the male officer leave before she be required to remove her clothes. A.41–42. Citing official policy, defendants refused, and ordered Ms. Griffith to remove her shirt. *Id.* Defendant Elliss examined Ms. Griffith's breasts. A.42. She then left the room, misgendering Ms. Griffith on the way out, saying to Defendant Mustapick, "he is all yours now to strip out." *Id.* Defendant Elliss left Defendant Mustapick to conduct the rest of the search of Ms. Griffith unsupervised. *Id.*

Defendant Mustapick ordered Ms. Griffith to remove the rest of her clothing and stand fully naked with her hands on the wall. A.42. He then ordered her to step back, bend over, and "spread [her] sexy cheeks." *Id.* After she complied, Defendant Mustapick told her that he was "going to go balls deep in that ass" while grabbing his own penis in view of Ms. Griffith. *Id*. He then aggressively searched her genitals. *Id.*

After assaulting her, Defendant Mustapick told Ms. Griffith that if she told anyone what he had done to her, he would make sure that she was brutalized by the guards at the jail. *Id.*

In the jail, Ms. Griffith lived in a constant state of fear and distress. She was subjected to continuous pat-down searches by male deputies, who would regularly touch her breasts and groin during the searches, making her feel violated and humiliated. A.37, 44–45. Those searches happened on a daily basis, and officers singled her out for non-routine searches. A.44, 45. She was sexually and verbally harassed: One officer referred to her as "the blind faggot";[4] others routinely mis-gendered her. A.46. Officers also treated her as a man: they referred to her as "sir" and used the male name she was assigned at birth. A.39, 46. It was not just the officers Ms. Griffith had to contend with; detainees groped and assaulted her on at least four occasions. A.43–44.

Ms. Griffith persistently sought relief from these conditions. During an initial interview days after entering the jail, Ms. Griffith told Defendant Brande Ford that she is a transgender woman and wished to be placed in housing that corresponded with her gender identity. A.37–38. Defendant Ford refused. *Id.* She filed a grievance on October 29, 2020, requesting transfer to a female unit, and noting that she had previously been housed in the Denver Women's Prison Facility. A.38. Defendant

---

[4] Ms. Griffith is legally blind. A.37.

O'Neal reviewed the grievance and denied it. *Id.* Over the following six months, Ms. Griffith filed seven additional grievances requesting that she be moved to a female unit and treated as a female within the Jail. A.38–40. She also regularly informed mental health providers that she was suffering extreme anxiety from her housing and lack of accommodations for her gender dysphoria, concerns that the medical providers communicated to jail officials. *Id.* All of her requests were denied. *Id.*

Ms. Griffith sought lesser accommodations than a housing transfer. She asked for relief from the cross-gender pat-down searches. A.44–45. She also asked that she be allowed to purchase female underwear and lipstick, items that are regularly available to cisgender women at the jail. It took nearly three months for defendants to provide her with a sports bra. A.48. She was never allowed to purchase lipstick or women's underwear. A.49–50. The explanation provided for why she was denied women's underwear was that she does not need to hold menstrual products, and therefore she does not need women's underwear. A.48. It is unclear what menstrual products have to do with underwear style—defendants do not, at any rate, require post-menopausal and other non-

menstruating women in their custody to wear men's underwear. A.49. Ms. Griffith filed five grievances and requests about the issue, including one to Defendant Cy Gillespie. Defendant Gillespie responded that Ms. Griffith would never get women's underwear. *Id.*

These living conditions sent Ms. Griffith's anxiety "through the roof." A.44. She became depressed and thoughts of self-harm mounted. She informed one mental health provider that she wanted to cut off her penis on a daily basis, and told another that she would remove her penis as soon as she could figure out how to do so. A.32–33. Ultimately, she attempted to self-castrate by wrapping a rubber band extremely tightly around her genitals. A.33.

## II. Procedural Background

Ms. Griffith filed suit in February 2021, initially proceeding pro se. ECF 1. Shortly after, the district court appointed counsel. ECF 28. In the operative complaint, she brought 16 claims against six officers in their individual capacities, Commander Cy Gillespie, Officer Elizabeth O'Neal, Officer Andrew Mustapick, Officer Dawne Elliss, Officer Tiffany Noe, and Officer Brande Forde, as well as Sheriff Bill Elder in his individual and official capacities, and the municipal entity El Paso County. A.26–82.

Several of these claims were federal constitutional claims brought under 42 U.S.C. § 1983. First, Ms. Griffith alleged that defendants discriminated against her, in violation of the Equal Protection Clause, by housing her in a men's unit and denying her clothing and products permitted to female prisoners. A.50–52 (Claim 1). Second, she alleged that defendants subjected her to unconstitutional conditions of confinement by housing her in an all-male unit where she was subjected to sexual harassment, sexual assault, and extreme emotional distress. A.53–54 (Claim 2). Third, she alleged that Defendant Mustapick's visual body-cavity search of her was an unreasonable, invasive search in violation of her Fourth and Fourteenth Amendment rights to bodily privacy. A.55–56 (Claims 3 and 4).

In addition to these constitutional claims, Ms. Griffith also alleged disability discrimination under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). A.68–74 (Claims 10 and 11). She alleged that defendants refused, even in response to repeated requests, to provide her any accommodation for her gender dysphoria, either by housing her differently, granting her an exception to being

routinely searched by male deputies, or allowing her access to women's underwear or lipstick. *Id.*[5]

Defendants filed a motion to dismiss all claims. ECF 132. A magistrate judge reviewed the complaint and recommended dismissal in full. A.83–125. Beginning with the Equal Protection claim (Claim 1), the magistrate judge first considered the appropriate level of scrutiny for assessing the County's policy of housing all detainees in the facility associated with their biological sex, regardless of whether they are transgender. A.100–04. The magistrate judge stated that if intermediate scrutiny applied, it would not hesitate to deny defendants' motion to dismiss on this claim. A.106. However, the court believed itself bound to apply rational basis review by this Court's decision in *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995), in which this Court relied on a since-overruled Ninth Circuit decision, without additional analysis, to hold that the transgender plaintiff in that case was not a member of a protected class. *Id.*

[5] Ms. Griffith does not appeal the dismissal of her claim for defendants' failure to protect her, in violation of the Fourteenth Amendment. A.76–78. Additionally, she alleged several state constitutional and statutory claims that the district court declined to exercise jurisdiction over, and that are not at issue in this appeal. A.124.

After reviewing the relevant law, the magistrate judge "ha[d] little trouble stating that the Tenth Circuit needs to revisit [*Brown*'s] holding," observing that the case is "out-of-step" with its sister circuits and "the many district courts" that have analyzed the question in the nearly 30 years since *Brown* and concluded that transgender people are at least a quasi-suspect class. A.102. The magistrate judge agreed with the reasoning of those other cases, noting that if it "were to apply the four-factor test used to determine whether a group constitutes a suspect or quasi-suspect class, in this Court's view, transgender people easily check all the boxes." A.103. Nonetheless, the magistrate judge considered itself bound to apply rational basis review, and held that the housing policy passed muster under that standard. A.104–07. The magistrate judge did not analyze whether the policy and treatment of Ms. Griffith was sex-based discrimination. A.100–07.

The magistrate judge also recommended dismissal of Ms. Griffith's conditions of confinement claim (Claim 2). A.107–11. The court believed that Ms. Griffith's claims that defendants' policies placing her in a men's facility and forcing her to endure incessant cross-gender pat-down

searches and harassment were too generalized to adequately allege the basis of each defendant's personal liability. A.110–11.

As to the claims related to Defendant Mustapick's harassing, invasive strip search (Claims 3 and 4), the magistrate judge acknowledged that the search was "undeniably invasive," that Defendant Mustapick's made "abhorrent statements" while he searched Ms. Griffith, and that Defendant Mustapick's behavior was "sickening" and "reprehensible." A.110, 114–15. Nonetheless, the magistrate judge thought Defendant Mustapick was entitled to qualified immunity on Ms. Griffith's Fourteenth Amendment claim (Claim 4) on the ground that it is not clearly established that cross-gender searches of transgender women, "even ones accompanied by odious verbal harassment," violate a constitutional right. A.110. The magistrate judge also rejected Ms. Griffith's Fourth Amendment claim (Claim 3) since, in its view, the alleged conduct did not rise to the level of a constitutional violation, nor did it implicate a clearly established right. A.112–16.

The magistrate judge also recommended dismissing Ms. Griffith's municipal liability claims—those against Defendant Elder in his official

capacity—because she had failed to allege facts demonstrating she suffered a constitutional injury. A.116–17.

Finally, the magistrate judge considered Ms. Griffith's disability discrimination claims. Rejecting defendants' arguments to the contrary, it held that Ms. Griffith had stated a plausible prima facie case for a violation of the ADA and RA. A.117–21. Crucially, the magistrate judge concluded that gender dysphoria is a covered disability under these statutes and that failing to provide reasonable accommodations for that condition violates the ADA and RA. A.118–19. However, the magistrate judge thought that Ms. Griffith failed to allege intentional discrimination, which it believed necessary to obtain compensatory damages. A.122–23. In the magistrate judge's view, it would be impossible to intentionally discriminate against an individual on the basis of a disability that some courts have held is not covered by the statute. *Id.* The magistrate judge therefore recommended dismissing these claims. *Id.*

Ms. Griffith filed comprehensive objections to the magistrate judge's report and recommendation. ECF 169. The district court reviewed the report and recommendation de novo. A.126. The court echoed the

magistrate judge's concerns about *Brown*'s vitality, "agree[ing] with Plaintiff that *Brown* should be reconsidered," and affirming that it would find for Ms. Griffith at this stage "if [it] were to consider the issue untethered by *Brown*." A.143. But it agreed with the magistrate judge that it was bound by *Brown* to apply rational basis review to Ms. Griffith's claim, and agreed that dismissal was appropriate under that level of scrutiny. A.141–44. It rejected the remainder of her objections and adopted the report and recommendation in full. A.146.[6]

Ms. Griffith filed a timely notice of appeal. A.149.

## SUMMARY OF ARGUMENT

The district court erred in dismissing Ms. Griffith's entire complaint at this early stage of litigation. Beginning with her Equal Protection claim, Ms. Griffith's allegations are plainly sufficient to state a claim. Defendants housed Ms. Griffith in an all-male unit and denied her women's underwear and lipstick solely on the basis that her biological sex is male. Ms. Griffith plausibly alleged that these actions were unjustified: Ms. Griffith has been living in the community as a woman

[6] Since the district court adopted in full the magistrate judge's report and recommendation, and for ease of reference, this brief will refer to the report and recommendation as the opinion of the district court.

for over 20 years, has a feminine appearance, and has previously been housed in the Colorado Department of Corrections with other incarcerated women.

The district court held that, if intermediate scrutiny applied, it would easily find that these allegations stated a plausible Equal Protection claim. A.106. Nonetheless, it believed that intermediate scrutiny did *not* apply, relying on a more than 20-year-old case, now an aberration among court of appeals, refusing to recognize transgender individuals as a suspect or quasi-suspect class. *See* A.102–07 (citing *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995)).

This determination was error. The challenged policies all involve a classification based on biological sex: people are housed, by default, in units corresponding to their sex assigned at birth, and feminine clothing and grooming products are permitted solely to people assigned female at birth. It has long been true that such sex-based classifications are subject to intermediate scrutiny, and *Brown* did not disturb that well-established rule. Though *Brown* does not control this case, courts both in and out of this Circuit have continued to construe it as mandating rational basis review of Equal Protection claims by transgender plaintiffs, and this

Court should take this opportunity to dispel that overreading of the decision.

The district court also erred in dismissing Ms. Griffith's other constitutional claims. This Court—and numerous others—have long recognized the severe privacy invasion caused by a cross-gender strip search. Under a robust body of caselaw, Ms. Griffith had a clearly established right to be free from being strip searched by a male deputy absent emergency circumstances, especially when conducted in a harassing and abusive manner. And by consigning Ms. Griffith to a men's unit, and then treating her unrelentingly like a man—conditions she grieved and objected to persistently—defendants subjected her to unconstitutional conditions of confinement.

Finally, the district court erred in dismissing Ms. Griffith's disability discrimination claims for failure to accommodate her gender dysphoria. After correctly holding she had alleged all the elements of these claims, the court nonetheless dismissed both claims in full on the grounds that she had not established intentional discrimination, a prerequisite to obtaining compensatory damages. But this Court has never required that a plaintiff *plead* intentional discrimination, and even

if that were a requirement, the district court's reasoning was flawed. The court thought it would be impossible to show intentional discrimination when some courts have held that gender dysphoria is not a covered disability—in other words, compensatory damages are unavailable for a particular condition unless and until the courts are in unison that that condition constitutes a disability. That result makes little sense, and contradicts Supreme Court precedent explicating the meaning of intentional in this context.

This Court should reverse the dismissal of all Ms. Griffith's claims, and remand for further proceedings.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's Rule 12(b)(6) dismissal. *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013). This Court liberally construes pleadings, accepts the factual allegations in the complaint as true, and resolves all reasonable inferences in Ms. Griffith's favor. *Id.*

## ARGUMENT

### I. Ms. Griffith plausibly alleged that defendants' denial of appropriate housing, clothing, and grooming products on the basis of her biological sex and transgender status violated her Equal Protection rights (Claim 1).

#### A. El Paso County's sex-based housing, clothing, and grooming product policies are subject to intermediate scrutiny, regardless of Ms. Griffith's gender identity.

Under the Equal Protection Clause any government classification based on "suspect" characteristics—those "(often immutable) characteristics" that "seldom provide a 'sensible ground for differential treatment'"—is subject to heightened scrutiny. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 799 (10th Cir. 2019) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). Sex is a suspect characteristic. *Id.*

El Paso County, as a matter of official policy, houses transgender women solely on the basis of their biological sex. A.37. This is plainly a sex-based classification subject to intermediate scrutiny. *See Free the Nipple-Fort Collins*, 916 F.3d at 799.

Courts have routinely found that where entities require individuals to use facilities associated with their biological sex—and, as a result, bar transgender individuals from using facilities associated with their gender

identity—these policies constitute sex-based classifications subject to intermediate scrutiny. *See Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (holding that when a "School District decides which bathroom a student may use based upon the sex listed on the student's birth certificate," such a policy "is inherently based upon a sex-classification"); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (same); *Adams v. Sch. Bd.*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc) (same).

Similarly, district courts around the country have found that prison housing policies that automatically assign transgender individuals to the facility associated with their sex assigned at birth are sex-based classifications subject to intermediate scrutiny. *See, e.g.*, *Iglesias v. Fed. Bureau of Prisons*, No. 19-cv-415-NJR, 2021 WL 6112790, at *24 (S.D. Ill. Dec. 27, 2021); *Tay v. Dennison*, 457 F. Supp. 3d 657, 680–81 (S.D. Ill. 2020); *Hampton v. Baldwin*, No. 3:18-cv-550-NJR-RJD, 2018 WL 5830730, at *11 (S.D. Ill. Nov. 7, 2018); *Doe v. Massachusetts Dep't of*

*Corr.*, No. 17-12255-RGS, 2018 WL 2994403, at *10 (D. Mass. June 14, 2018).[7]

Contrary to this case law, the district court believed itself bound by this Court's decision in *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995), and thought that *Brown* required it to apply rational basis review. A.101-4. In *Brown*, this Court considered a transgender prisoner's claim that the prison was denying him hormone treatment on the basis of his transgender *status*.[8] 63 F.3d at 970. In determining the level of scrutiny to apply, this Court decided to follow the since-overruled Ninth Circuit decision in *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659 (9th Cir. 1977), that transgender individuals are not a protected class. *Brown*, 63 F.3d at 971. Applying rational basis review, it found Mr. Brown's "conclusory allegations simply do not state a cause of action." *Id.* at 972.

---

[7] Other courts have reached the same result by different reasoning, finding that discrimination against transgender individuals amounts to sex discrimination subject to intermediate scrutiny because it punishes transgender people for failing to conform to gender stereotypes, a well-established form of sex discrimination. *See, e.g.*, *Grimm*, 972 F.3d at 608; *Glenn v. Brumby*, 663 F.3d 1312, 1316–17 (11th Cir. 2011).

[8] Although the plaintiff in *Brown* identified his true gender as female, he apparently preferred to use male pronouns. *See Brown*, 63 F.3d at 968 n.1.

Crucially, in *Brown*, the plaintiff never alleged that the prison's hormone treatment practices amounted to a sex-based classification. That is, he never suggested that the prison was deciding who could receive hormone treatment based solely on biological sex. Therefore, the case does not control Ms. Griffith's claims. Even if *Brown* dictated that Ms. Griffith is not a member of a suspect class on the basis of her transgender *status*, the challenged policies still trigger heightened scrutiny for the independent reason that they are sex-based *classifications*—regardless of the identity of the plaintiff.

As the district court held, that makes this an easy case. Ms. Griffith has clearly stated a plausible claim under intermediate scrutiny. *See infra* I.C; *see also* A.106 (district court would "not hesitate to conclude" that "Plaintiff's placement as a transgender woman in an all-male unit was not substantially related to an important governmental interest").

### B. This Court should clarify that *Brown* does not control this case.

As explained above, *Brown* does not actually resolve the level of scrutiny applicable in this case. But the district court in this case was not alone in its misguided belief that *Brown* requires rational basis review for any Equal Protection claim involving a transgender plaintiff. *See, e.g.*,

*Druley v. Patton*, 601 F. App'x 632, 635–36 (10th Cir. 2015) (citing *Brown*, and applying rational basis review to claims brought by transgender plaintiff). This Court should therefore take the opportunity to clarify *Brown*'s lack of significance for the dual reasons that it does not constitute precedent, and in any event, it has been subsequently invalidated by intervening Supreme Court law.

**1. *Brown* does not have stare decisis effect.**

"If an issue is not argued, or though argued is ignored by the court, or is reserved, the decision does not constitute a precedent to be followed." *Lowe v. Raemisch*, 864 F.3d 1205, 1209 (10th Cir. 2017) (citation omitted).

This limitation is applicable to *Brown*. In *Brown*, this Court noted that "Mr. Brown's allegations are too conclusory to allow proper analysis of" whether transgender individuals are a protected class. 63 F.3d at 971. Rather than analyze the question from first principles, the *Brown* court looked to the Ninth Circuit's since-overruled decision in *Holloway*. *See Brown*, 63 F.3d at 971. The Court expressed its doubt about *Holloway*'s holding: "Recent research concluding that sexual identity may be biological suggests reevaluating *Holloway*." *Id.* But it held that this was

not the case to do so because Mr. Brown had not adequately presented the issue. *Id.*

In following *Holloway*, this Court narrowly limited its holding to the case in front of it: Rather than hold that transgender people are not a quasi-suspect class in general, it held that "*Mr. Brown* is not a member of a protected class *in this case*." *Id.* (emphasis added). Consistent with this limited holding, it did not conduct the analysis that would be necessary to decide the larger question. That is, the Court did not apply the four-factor test that courts use to decide whether a new classification qualifies as a quasi-suspect class. *See Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012). Therefore, the issue whether transgender people are a quasi-suspect class was both "not argued" by the pro se plaintiff, and also "reserved" by the Court, which means it does not carry the force of precedent. *See Lowe*, 864 F.3d at 1209.

#### 2. To the extent *Brown* was a binding decision about the level of scrutiny on gender identity claims, it has been subsequently invalidated by *Bostock* and this Court should overrule it.

Even if *Brown* were a precedential holding, that holding has been subsequently invalidated by a Supreme Court decision and this panel should overrule it. A panel can overrule a prior panel decision "when the

Supreme Court issues an intervening decision that is contrary to or invalidates our previous analysis." *United States v. Brooks*, 751 F.3d 1204, 1209 (10th Cir. 2014) (internal quotation marks omitted). "The question, however, is not whether an intervening Supreme Court case is on all fours with our precedent." *Id.* at 1209–10. "[W]e may overrule [a decision of a prior panel] if subsequent controlling law undermined its reasoning," "even if the Supreme Court case is not directly on point," *United States v. Salazar*, 987 F.3d 1248, 1254 (10th Cir. 2021).

*Brown*'s suggestion that gender identity discrimination claims are subject to only rational basis review has been resoundingly invalidated by the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). *Bostock* held that discrimination on the basis of gender identity inherently involves discrimination on the basis of sex. *Id.* at 1742. As the Court explained, "transgender status [is] inextricably bound up with sex" and therefore "to discriminate on [that ground] requires" one to "intentionally treat" someone "differently because of their sex." *Id.* Under *Bostock*, an official action that treats people differently because of their gender identity also treats them differently because of their sex. *See id.*; *see also, e.g.*, *Dekker v. Weida*, No. 4:22-cv-325-RH-MAF, 2023 WL

4102243, at *11 (N.D. Fla. June 21, 2023) ("If one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex."). Recognizing that, *Brown*'s holding that a gender identity discrimination claim is subject to rational basis review cannot stand because such a claim inherently involves sex discrimination, and thus requires intermediate scrutiny.

As further evidence that *Brown*'s reasoning has been invalidated, the Ninth Circuit case that it relied on, *Holloway*, has been overruled. *See Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000); *see also Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1118 (N.D. Cal. 2015) (recognizing that *Holloway* "is no longer good law"). The Ninth Circuit now recognizes that transgender people are a quasi-suspect class. *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019) (affirming the district court's reasoning as to why transgender people are a quasi-suspect class).

Many other courts agree, including the Fourth Circuit, *see Grimm*, 972 F.3d at 610 ("[W]e conclude that heightened scrutiny applies because transgender people constitute at least a quasi-suspect class."), and a resounding chorus of district courts. *See, e.g.*, *L.W. ex rel. Williams v.*

*Skrmetti*, No. 3:23-cv-00376, 2023 WL 4232308, at *12–*13 (M.D. Tenn. June 28, 2023) (collecting cases and noting "overwhelming majority of courts" agree); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 140 (S.D.N.Y. 2015); *see also Brandt v. Rutledge*, 47 F.4th 661, 670 n.4 (8th Cir. 2022). And as the Fourth Circuit noted in *Grimm*, this Court stands alone in holding otherwise. 972 F.3d at 611.

This Court should abandon the unreasoned *Brown* decision and hold that transgender people are a suspect or quasi-suspect class. The test for a suspect class involves four factors: whether the class has historically been subject to discrimination; whether the class has a defining characteristic that bears a relation to its ability to perform or contribute to society; whether the class may be defined as a discrete group by obvious, immutable, or distinguishing characteristics; and whether the class is a minority lacking political power. *See Grimm*, 972 F.3d at 611.

These factors are easily satisfied. The district court noted that if it were to apply the four-factor test, "transgender people easily check all the boxes." A.103. It further acknowledged that "[o]ne would be hard-

pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people." A.143 (quoting *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018)). First, "[i]t is generally accepted that transgender individuals face an alarming rate of discrimination, harassment, and violence." *Crowder v. Diaz*, No. 2:17-cv-1657-TLN-DMC, 2019 WL 3892300, at *13 (E.D. Cal. Aug. 19, 2019). As the Fourth Circuit has catalogued, "[t]he transgender community . . . suffers from high rates of employment discrimination, economic instability, and homelessness." *Grimm*, 972 F.3d at 611 (citing the National Transgender Discrimination Survey).

As to the second and third factors, as the *Grimm* court found, citing an amicus brief of "[s]eventeen of our foremost medical, mental health, and public health organizations," transgender status bears no relation to ability to contribute to society, and also is an immutable characteristic. *Grimm*, 972 F.3d at 612. "[B]eing transgender is not a choice. . . . [I]t is as natural and immutable as being cisgender." *Id.* at 612–13.

Fourth and finally, transgender people constitute a minority lacking political power. Approximately 0.6% of the adult population of the United States identifies as transgender,[9] and "[e]ven considering the low percentage of the population that is transgender, transgender persons are underrepresented in every branch of government." *Grimm*, 972 F.3d at 613. This Court should join the growing consensus and hold that transgender people are a suspect or quasi-suspect class and that their Equal Protection claims are subject to intermediate scrutiny.

### C. Viewed under the appropriate level of scrutiny, Ms. Griffith stated a plausible claim.

Ms. Griffith's allegations are plainly sufficient to survive dismissal at this early stage of litigation when considered under the proper standard of review.[10] In fact, the district court agreed. A.106. "To survive intermediate scrutiny, a [sex-based] classification needs an exceedingly persuasive justification." *Free the Nipple-Fort Collins*, 916 F.3d at 799

---

[9] Jody L. Herman, et al., Williams Institute, UCLA School of Law, *How Many Adults and Youth Identify as Transgender in the United States?*, at 1 (June 2022).

[10] The analysis is the same regardless of whether one conceives of the discrimination as on the basis of sex or on the basis of gender identity. In either event, the question is whether there was sufficient justification for requiring Ms. Griffith to live in an all-male unit, and denying her products available to cisgender women.

(quoting *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994)). "The classification must serve important governmental objectives through means substantially related to achieving those objectives." *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

Ms. Griffith sufficiently alleged that there is no exceedingly persuasive justification for defendants' placing her in an all-male unit and denying her women's underwear and lipstick, especially given that she has lived in society as a woman for decades and has previously been housed in a female unit, as defendants knew. A.32, 38, 40. As courts have recognized, transgender prisoners do not generally pose a greater security threat than cisgender prisoners. *See Hampton*, 2018 WL 5830730, at *11. And there is no reason to deny someone products—here, underwear and lipstick—that are readily available to other individuals at the same facility. What's more, defendants gave her a pretextual reason when explaining why she wasn't allowed women's underwear, which was that she doesn't menstruate, even though they don't require the many post-menopausal and non-menstruating biological women to wear men's underwear. A.49. The district court was right to conclude these allegations are sufficient to state a claim under intermediate

scrutiny. A.106; *see also Doe,* 2018 WL 2994403, at *10 (denying defendants' motion to dismiss in light of plausible allegations that biological sex-based housing does not serve an important governmental interest).

Even if this Court concludes that rational basis review applies, Ms. Griffith has provided specific factual support for her claim that the jail's housing, clothing, and grooming product policies were not rational. *Cf. Brown*, 63 F.3d at 971–72. Indeed, defendants put her in a male unit despite knowing that this places transgender women at risk for victimization and severe emotional distress. That, coupled with the pervasive culture of harassment and defendants' pretextual reasons for denying her products to meet her needs supports an inference that defendants applied these policies to transgender individuals like Ms. Griffith out of a "bare . . . desire to harm a politically unpopular group," *United States v. Windsor*, 570 U.S. 744, 770 (2013) (quoting *U.S. Dep't. of Agriculture v. Moreno*, 413 U.S. 528, 534–35 (1973)), which "cannot constitute a legitimate governmental interest." *Romer v. Evans*, 517 U.S. 620, 634 (1996) (quoting *Moreno*, 413 U.S. at 534).

## II. Ms. Griffith plausibly alleged that Defendant Mustapick's abusive and invasive strip search violated her Fourth and Fourteenth Amendment rights (Claims 3 and 4).

### A. Ms. Griffith stated a plausible violation of the Fourth and Fourteenth Amendments.

"[P]risoners do retain a limited constitutional right to bodily privacy, particularly as to searches viewed or conducted by members of the opposite sex." *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995). To be sure, searches may be necessary for security reasons, but they must be conducted in a reasonable manner in order to comply with the Fourth and Fourteenth Amendments. *See Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002); *Colbruno v. Kessler*, 928 F.3d 1155, 1162–63 (10th Cir. 2019).

As the district court noted, the legal standards under the Fourth and Fourteenth Amendments are similar. A.112. Under either provision, the constitutionality of a search hinges on the severity of the privacy invasion on the person being searched, and whether it is justified by legitimate penological concerns.[11] The manner in which the search is

[11] Under the Fourteenth Amendment, this Court has said that a severe invasion of privacy like involuntary exposure of one's naked body violates the Constitution unless officers' conduct bears a rational relationship to

conducted is also central to the constitutional inquiry: even a legitimate search may violate constitutional rights if conducted in an abusive, humiliating manner. *Bell v. Wolfish*, 441 U.S. 520, 560 (1979).

"[I]t is axiomatic that a strip search represents a serious intrusion upon personal rights." *Shroff v. Spellman*, 604 F.3d 1179, 1191 (10th Cir. 2010) (quoting *Chapman v. Nichols*, 989 F.2d 393, 395 (10th Cir. 1993)); *see also Colbruno*, 928 F.3d at 1163 ("[A]ny reasonable adult in our society would understand that the involuntary exposure of an adult's nude body is a significant imposition on the victim."). Strip searches are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Levoy v. Mills*, 788 F.2d 1437, 1439 (10th Cir. 1986) (quoting *Blackburn v. Snow*, 771 F.2d 556, 564 (1st Cir. 1985)); *see also Hinkle v.*

---

a legitimate government objective and is not "excessive in relation to" that objective. *Colbruno*, 928 F.3d at 1162–63. Under the Fourth Amendment, courts evaluating the constitutionality of a search "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Farmer*, 288 F.3d at 1259–60. If the procedure is not "reasonably related to a legitimate penological interest," the search violates the constitutional standard. *Id.* at 1260.

*Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1239 n.41 (10th Cir. 2020).

The privacy invasion is particularly severe where the strip search is conducted by a member of the opposite sex. *Hayes*, 70 F.3d at 1146. "[W]hile all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex." *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994); *see also West v. Radtke*, 48 F.4th 836, 853 (7th Cir. 2022). Indeed, even outside the strip search context, courts have held for decades that officers may not unnecessarily view the naked bodies of prisoners of the opposite gender. *See, e.g.*, *Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982) (finding plausible violation of the constitutional right to privacy where male prisoner was viewed unclothed by female officers); *Kent v. Johnson*, 821 F.2d 1220, 1227–28 (6th Cir. 1987) (finding plaintiff stated Fourth and Eighth Amendment claims in challenge to policy of allowing female

guards to view male prisoners' naked bodies in the shower area);[12] *Lee v. Downs*, 641 F.2d 1117, 1120 (4th Cir. 1981) (similar).

Unless a severe invasion of personal privacy is justified by penological concerns, it transgresses the Fourth and Fourteenth Amendments. *See Colbruno*, 928 F.3d at 1164–65 (finding plausible violation of right to privacy where prisoner was marched naked through hospital lobby and "no vital urgency justified Defendants' actions"). In light of the constitutional concerns with cross-gender strip searches, courts—including this one—have sanctioned them only where necessitated by emergency. *See, e.g.*, *Hayes*, 70 F.3d at 1147–48 (finding plaintiff stated a plausible claim where he was forced to submit to a body-cavity search in view of members of the opposite gender). As the Ninth Circuit has observed, a "litany of cases" establish this same principle. *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1146 (9th Cir. 2011). It's not enough that there be justification for a strip search

---

[12] Eighth Amendment cases are relevant to Ms. Griffith's Fourteenth Amendment claims because this Court generally "appl[ies] an analysis identical to that applied in Eighth Amendment cases." *See Burke v. Regalado*, 935 F.3d 960, 991 (10th Cir. 2019). To the extent the analysis differs, the Eighth Amendment standard is "more favorable to the [defendants]," *see id.* at 991 n.9, so this Court can rely on those cases in assessing a Fourteenth Amendment claim.

generally. As the *Byrd* court explained when it held a cross-gender strip search unreasonable as a matter of law, "although valid reasons to search the inmates existed generally, there was no justification given for conducting a *cross-gender* strip search." *Id.* at 1143, 1146–47 (emphasis added).

Here, as Ms. Griffith plausibly alleged, there was no justification—let alone an emergency—for having a male guard conduct her strip search and see her naked body. *See* A.41–43, 55. In fact, a female guard, Defendant Elliss, was initially in the room and available to do the search—indeed, she was the one who searched Ms. Griffith's breasts. A.42. Ms. Griffith asked repeatedly for her to do the entire search and for Defendant Mustapick to leave so that he would not see her naked body. A.41–42. Instead, Defendant Elliss was the one who left, telling Defendant Mustapick, "*he* is all yours now to strip out." A.42. These factual allegations plausibly establish a severe invasion of personal privacy, not justified by any "vital urgency," *see Colbruno*, 928 F.3d at 1164. In similar circumstances, where guards of the same gender were available to conduct a search, courts have concluded that cross-gender strip searches are unreasonable. *See, e.g.*, *Canedy*, 16 F.3d at 184, 188.

What's more—and relevant to assessing the search under the Fourth Amendment—was the humiliating, abusive manner in which Defendant Mustapick proceeded to conduct the strip search. As the Supreme Court has said of abusive searches—even searches that are justified by security concerns—"[s]uch an abuse cannot be condoned. The searches must be conducted in a reasonable manner." *Bell,* 441 U.S. at 560. "A search conducted in a harassing manner intended to humiliate and inflict psychological pain" violates constitutional protections. *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003) (finding plausible Eighth Amendment violation where officers verbally harassed plaintiff during strip search and invited spectators of the opposite gender).

Here, Defendant Mustapick conducted the strip search in a "sickening," "reprehensible" manner. A.110, 115. After ordering Ms. Griffith to remove all of her clothing, he commanded her to bend over and "spread [her] sexy cheeks" before threatening that he was "going to go balls deep in that ass" while grabbing his own penis. A.42. He was then "extremely aggressive" while searching her genitals. *Id.* After finishing the search, he threatened Ms. Griffith to remain silent about his abusive conduct. *Id.* He warned her that if she did say something, he would make

sure the guards brutalized her. *Id.* Defendant Mustapick did all of this knowing that Ms. Griffith was deeply upset by being viewed naked by a male deputy. There is no plausible justification for conducting a search in this manner—rather, it appears calculated to inflict psychological pain on a vulnerable individual.

The district court dismissed this claim in part because it believed that the strip search was justified by the security concerns inherent in placing a detainee into the general prison population. A.114. It is surely true that searches, *generally*, may be necessary in these circumstances, but Ms. Griffith does not challenge the validity of strip searches generally; she challenges the fact that hers was conducted by a male deputy and in a harassing, abusive manner. She has plausibly alleged that, because of these aspects, the strip search lost any reasonable relationship to legitimate penological concerns.[13]

---

[13] Defendants Elliss and Elder are also liable for this constitutional violation, and this Court should reverse dismissal of the claims as to these defendants as well. The district court did not analyze any of these claims in detail, primarily concluding that because Defendant Mustapick was not liable for the search, neither could any of the other defendants be. *See* A.110. This was error. Defendant Elliss is liable for her failure to intervene. She left Ms. Griffith alone with Defendant Mustapick after

**B. Ms. Griffith's right to be free from an abusive, cross-gender strip search is clearly established.**

The district court held that, even if Ms. Griffith could establish a constitutional violation, her claims must be dismissed on qualified immunity grounds. A.110, 116. This was error. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Colbruno*, 928 F.3d at 1160 (citation omitted). In assessing whether the law is clearly established, the question is whether "it was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* The law can be clearly established by either "controlling authority" or "a robust consensus of cases of persuasive

---

Ms. Griffith begged for a woman to search her instead, and in doing so failed to prevent an unsupervised and wholly unnecessary cross-gender strip search. *See Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008).

Similarly, Ms. Griffith stated a plausible claim against Defendant Elder because he knowingly maintained the policy that transgender detainees must be searched—including strip searched—by deputies of the opposite gender. A.41. This policy foreseeably caused the violation of Ms. Griffith's constitutional rights, and Defendant Elder is therefore personally liable for this violation. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

authority." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018). "[A] case directly on point is not required so long as 'existing precedent has placed the statutory or constitutional question beyond debate.'" *Simpson v. Little*, 16 F.4th 1353, 1366 (10th Cir. 2021) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

Defendant Mustapick's conduct violates multiple strands of clearly established law.[14] First, as this Court stated in *Farmer*, it is "well established" that prisoners retain a right to privacy, and that "a strip search is an invasion of personal rights of the first magnitude." 288 F.3d at 1259. More specifically, it's been clearly established for decades that a cross-gender strip search is a particularly acute privacy invasion. *Hayes*, 70 F.3d at 1146–47; *see also Cumbey*, 684 F.2d at 714. Indeed, this Court held in *Hayes* that cross-gender strip searches without adequate justification can violate the Constitution. 70 F.3d at 1146, 1148. A robust

[14] Both Fourth and Fourteenth Amendment cases are relevant to the clearly established inquiry for each type of claim due to the overlap in the tests. *See Est. of Booker v. Gomez*, 745 F.3d 405, 424 n.26, 427–29 (10th Cir. 2014) (finding Fourth Amendment case law relevant to clearly established analysis for Fourteenth Amendment claim because the key question is whether "the legal norms underlying plaintiff's claims" were clearly established, regardless of which amendment applies); *see also Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009).

consensus of this Court's sister circuits agree. *See Byrd*, 629 F.3d at 1144–47 (cataloguing cases from five courts of appeals establishing this "recurring theme: cross-gender strip searches in the absence of an emergency violate an inmate's right under the Fourth Amendment to be free from unreasonable searches"). And if there were any doubt, this Court's recent decision in *Colbruno* made abundantly clear that involuntary exposure of a detainee's naked body requires some justification. 928 F.3d at 1164.

This case falls squarely within this clearly established law. Ms. Griffith objected to a male deputy conducting her strip search, and a female deputy was present and available, but they ignored her pleas. There was no justification at all for conducting the search in a cross-gender manner.

It is even *more* clear that conducting such a search in a harassing, humiliating, abusive manner violates the Constitution. *Bell* established that conducting a search in an abusive fashion "cannot be condoned." 441 U.S. at 560. Indeed, this Court has long held that "an inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards." *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th

Cir. 1998). In the same vein, many of this Court's sister circuits have held that sexual harassment by guards—whether part of a strip search or in another context—is sufficiently serious to violate the Constitution. *See, e.g.*, *Calhoun*, 319 F.3d at 940 (ribald comments, sexually explicit gestures, and coercion); *Kent*, 821 F.2d at 1227–28 (retaliatory, harassing surveillance of naked shower activities); *Berry v. Oswalt*, 143 F.3d 1127, 1133 (8th Cir. 1998) (nonroutine pat-downs and verbal harassment); *Bearchild v. Cobban*, 947 F.3d 1130, 1144–45 (9th Cir. 2020) (any "sexual conduct for the staff member's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the prisoner"). This caselaw clearly prohibited Defendant Mustapick from verbally and physically harassing Ms. Griffith during an invasive strip search and then threatening her with brutal violence to stay silent.

In any event, prior caselaw is not necessary in this situation to put defendants on notice that their conduct violated clearly established law. As this Court has acknowledged, "[w]e can occasionally rely on the general proposition that it would be 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted . . . even though existing precedent does not address similar circumstances.'" *Colbruno*,

928 F.3d at 1165 (quoting *Wesby*, 138 S. Ct. at 590). That applies here. As in *Colbruno*, common sense tells us that conducting a cross-gender strip search of a psychologically vulnerable transgender detainee, over vociferous protestations and requests for a female officer to do the search, and then doing it in a humiliating, demeaning, and threatening manner, violates the constitutional protections against punishment and unreasonable searches. As this Court pointed out in *Colbruno*, "[t]here is little subtlety in a standard requiring merely a rational relationship to a legitimate objective." *Id.* at 1166; *see also Kapinski v. City of Albuquerque*, 964 F.3d 900, 910 (10th Cir. 2020) ("Because there is 'little ambiguity as to what kind of conduct constitutes [an intentionally abusive search],' this general principle suffices to place the question beyond constitutional debate and put reasonable [corrections] officers on notice, even in the absence of factually analogous precedent." (quoting *Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1202 (10th Cir. 2017))). It would have been obvious to defendants here that they could not deny Ms. Griffith's pleas without justification, and equally obvious that they could not do so when a female deputy was standing right there and able to conduct the search in a way that lessened the extreme privacy invasion.

It would also have been obvious to Defendant Mustapick that his physically and verbally abusive search—combined with threats afterwards—violated clearly established law.

## III. Ms. Griffith plausibly alleged that housing her in a men's unit and treating her as a man subjected her to unconstitutional conditions of confinement (Claim 2).

Ms. Griffith plausibly alleged that her experience in the all-male housing unit—where she was subjected to daily cross-gender searches, sexual harassment, and extreme emotional distress—stated an Eighth Amendment violation. A conditions of confinement claim has two elements. First, a plaintiff must show that they were incarcerated under conditions that posed a substantial risk of serious harm to their health or safety. *DeSpain v. Uphoff*, 264 F.3d 965, 973 (10th Cir. 2001). The harm need not be physical; "[p]rison conditions or practices . . . that degrade, humiliate, or taunt inmates" and result in psychological harm "can give rise to actionable claims . . . if they are sufficiently egregious." *Escobar v. Mora*, 496 F. App'x 806, 811 (10th Cir. 2012); *see also Porter v. Clarke*, 923 F.3d 348, 364 (4th Cir. 2019) (finding "substantial risk of serious psychological and emotional harm" from prolonged solitary confinement violated the Eighth Amendment). Second, a pre-trial

detainee, like Ms. Griffith, must show that the challenged conditions were not rationally related to a legitimate governmental objective or were excessive in relation to that purpose. *Colbruno*, 928 F.3d at 1163.

Ms. Griffith's allegations satisfy both elements. Her living conditions in the all-male unit caused her significant psychological and emotional harm. She was subjected to daily cross-gender touching of her breasts and groin, causing her immense psychological and emotional pain. A.44–45. Deputies would single her out for non-routine pat-down searches, inflicting this cross-gender contact repeatedly, even after she explained how violated it made her feel. *Id.* Her gender dysphoria made this daily occurrence particularly intolerable: Being treated as a man, and sexually harassed, exacerbates the symptoms of her condition, including intense emotional suffering, anxiety and depression, suicidality, and thoughts of self-harm. A.33–34. Courts have found that routine cross-gender touching, especially where detainees have some heightened psychological vulnerability, is sufficiently serious to violate the Constitution. *See Jordan v. Gardner*, 986 F.2d 1521, 1526, 1530–31 (9th Cir. 1993) (en banc) (finding cross-gender pat-down searches unconstitutional where plaintiffs had "particular vulnerabilities that

would cause the cross-gender clothed body searches to exacerbate symptoms of pre-existing mental conditions”).

In addition to excessive cross-gender pat-down searches, Ms. Griffith was also subjected to continuous sexual harassment by both other detainees and jail guards, who routinely mis-gendered her and on one occasion referred to her as a “blind faggot.” A.43–48. She lived in a state of fear that male deputies or detainees would attack or harass her—a well-founded fear: she was sexually assaulted multiple times by other detainees. A.43–44.

Ms. Griffith’s condition deteriorated over the more than a year that she spent enduring continuous harassment and degrading pat-down searches. She ultimately attempted self-castration. A.32–34.

Ms. Griffith plausibly alleged that defendants’ insistence that she remain in these conditions was not rationally related to any legitimate government objective—or at least was excessive in relation to any objective. It is well-known that there are significant risks associated with housing transgender women in men’s facilities. A.34–36 (citing national standards and reports establishing that transgender women are at heightened risk of victimization in men’s facilities). This would have been

amply clear to any reasonably competent corrections professional. But what's more, Ms. Griffith repeatedly alerted defendants to her suffering and begged for relief or some accommodation, like a pat-search exception. A.32–33, 37, 39, 44–45. It is certainly plausible that these risks—and ongoing harm—were "excessive" in relation to any penological reason for forcing Ms. Griffith to remain in her living conditions without any accommodations. *See Colbruno*, 928 F.3d at 1163.

Indeed, other courts have previously allowed similar claims to go forward. In *Fisher v. Federal Bureau of Prisons*, 484 F. Supp. 3d 521 (N.D. Ohio 2020), a district court held that the transgender plaintiff's allegations were sufficient to state a conditions-of-confinement claim based on cross-gender pat searches where defendants were aware that "male-conducted searches exacerbate her PTSD symptoms, causing severe anxiety and panic attacks." *Id.* at 540; *see also Shaw v. District of Columbia*, 944 F. Supp. 2d 43, 57–60 (D.D.C. 2013) (denying motion to dismiss conditions claim based on transgender woman being housed in men's facility on basis that such housing exposed her to substantial risk of harm, including harassment and inappropriate touching).

The district court in this case did not analyze Ms. Griffith's conditions claim under any of this law, instead finding that she had failed to allege that any named defendant was personally involved in causing these conditions. A.110–11. This was error.[15]

Ms. Griffith alleged that Defendant Elder, as Sheriff, was responsible for the jail's objectively unreasonable policies for the treatment of transgender women. A.29–30, 35. A sheriff or policymaker is personally involved in a constitutional violation where they are responsible for the policies that, when enforced, caused the violation of plaintiff's constitutional rights. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). Under Colorado law, Defendant Elder was responsible for the policies at the jail. *See* Colo. Rev. Stat. § 30-10-511 ("[T]he sheriff shall have charge and custody of the jails of the county."); *see also Dodds*, 614 F.3d at 1203 (concluding, based on similar statutes, that "Oklahoma law made [the sheriff] responsible for the policies that operated and were enforced by his subordinates at the jail."). As this Court recognized in *Dodds*, this is sufficient to allege that Defendant

[15] Ms. Griffith does not appeal the district court's dismissal as to Defendant Gillespie.

Elder "deliberately enforced or actively maintained the policies in question at the jail," *see* 614 F.3d at 1204. And these policies that Defendant Elder intentionally maintained, when enforced, caused Ms. Griffith's suffering. That is sufficient to allege personal involvement. *See id.*; *see also id.* at 1206.

The complaint's allegations as to Defendants Noe, Ford, and O'Neal also plainly satisfy the personal participation standard. Where an officer has knowledge of constitutionally infirm conditions of confinement and denies requests to fix those conditions, that is sufficient for personal involvement. *Thompson v. Lengerich*, 798 F. App'x 204, 211 (10th Cir. 2019); *Conley v. McKune*, 529 F. App'x 914, 922 (10th Cir. 2013) (holding that "intentional unwillingness to address [the challenged condition]" was sufficient to show personal participation); *Jones v. Hansen*, No. 20-cv-3548-PAB-SKC, 2022 WL 4467243, at *5, *9 (D. Colo. Sept. 26, 2022) (finding personal participation where defendants "witnessed" the challenged conditions and "failed to remedy the situation"). Ms. Griffith informed all of them that she feared being housed in a male unit because she is a transgender woman. A.37–38. The risks of housing a transgender woman in a men's facility are obvious and well documented in national

data and reports. *See DeSpain*, 264 F.3d at 975 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994))). Nonetheless, each defendant denied her requests. A.37–38. All of them were therefore aware of Ms. Griffith's plight and refused to help her.

## IV. The district court erred in dismissing Ms. Griffith's claims under the ADA and RA (Claims 10 and 11).

### A. Ms. Griffith plausibly alleged a violation.

To state a claim under Title II of the ADA,[16] a plaintiff must allege that "(1) [she] is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007). One can make this showing by establishing that a public entity failed to

[16] As the district court noted, the ADA and the RA are, for the most part, materially identical. A.118; *see also Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1312 (10th Cir. 2021). Accordingly, this brief will evaluate the claims together, as the court did. A.118.

reasonably accommodate their disability. *Brooks v. Colo. Dep't of Corr.*, 12 F.4th 1160, 1167 (10th Cir. 2021).

As the district court correctly held, A.117–21, Ms. Griffith adequately alleged these three elements. A.68–73. Despite being aware of her diagnosed gender dysphoria, defendants refused Ms. Griffith the reasonable accommodations of appropriate housing, access to female clothing and grooming products, and gender appropriate searches. A.32, 37, 48–50, 72. Instead, El Paso County continued to subject her to daily living conditions that exacerbated the symptoms of her mental impairment. A.72; *see Doe*, 2018 WL 2994403, at *8 (finding plaintiff with gender dysphoria adequately stated a claim under ADA based on biological sex-based housing assignment in prison).

This is sufficient to state a claim. Indeed, defendants advanced only two arguments to the contrary, both of which the district court correctly rejected. First, they argued that gender dysphoria is not a covered disability because, in their view, it falls within the ADA's exclusion of "gender identity disorders." A.118–19. The one court of appeals to consider this argument soundly rejected it. *See Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2414 (2023). The

*Williams* court examined the meaning of "gender identity disorder" at the time of the ADA's enactment and found that it "marked being transgender as a mental illness." *Id.* at 767. The categorization of being transgender as a mental illness has since been rejected, but gender dysphoria remains a clinical diagnosis that some transgender individuals have. *Id.* at 767–68. Gender dysphoria is a mental impairment constituting "*distress* and other disabling symptoms, rather than simply being transgender." *Id.* at 768. Gender dysphoria therefore does *not* fall within the plain meaning of the "gender identity disorder" exclusion; rather, it is comfortably within the ADA's broad definition of a covered disability. *Id.* at 769; *see also* A.119 (adopting this reasoning).[17]

Second, defendants argued Ms. Griffith failed to allege causation because her allegations suggested that her transgender status, not her gender dysphoria, was the reason for the discrimination she suffered. A.120. The district court correctly found there is no merit to this argument. A.120–21. Ms. Griffith plainly alleged that her gender

[17] The *Williams* court also held that even if gender dysphoria were a gender identity disorder, it would fall within the safe harbor for "gender identity disorders . . . resulting from physical impairments." 45 F.4th at 770. Ms. Griffith alleged that her gender dysphoria results from a physical impairment. A.32, 74.

dysphoria is the reason she suffered significant emotional distress in custody, that she requested accommodations that would have alleviated her symptoms, and that El Paso County rejected those requests. A.37–41, 48–50, 72; *see Robertson*, 500 F.3d at 1195–99 (finding analogous allegations sufficient to establish causation on reasonable accommodation claim).

**B. The district court erred in dismissing Ms. Griffith's ADA claim for failure to show intentional discrimination.**

Despite finding that Ms. Griffith stated a plausible claim, the district court dismissed the claim on the ground that she had not shown intentional discrimination, which it believed necessary to obtain the compensatory damages that Ms. Griffith seeks. A.122–23.

This was error. First, Ms. Griffith wasn't required to *plead* intentional discrimination to be entitled to compensatory damages, and neither of the cases the district court relied on stands for the proposition that this is a pleading requirement. The first case the court cited, *Tyler v. City of Manhattan*, 118 F.3d 1400 (10th Cir. 1997), analyzed compensatory damages as requiring the pleading of intentional discrimination merely because the parties had proceeded on that basis.

*Id.* at 1403. Indeed, in *Tyler* the United States argued that plaintiffs are entitled to seek compensatory damages *without* such allegations. *Id.* (citing amicus brief of United States).

In the other case the district court relied on, *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147 (10th Cir. 1999), this Court explained that intent is not part of a plaintiff's prima facie case, suggestive of the fact that it should not be required to be pled. *Id.* at 1152; *see Asabedo v. Kan. State Univ.*, 559 F. App'x 668, 671 (10th Cir. 2014) ("Plaintiffs have no obligation to plead against affirmative defenses."). Accordingly, there was no basis to dismiss Ms. Griffith's claims—after she successfully established a prima facie case—at the pleading stage.

To the extent pleading intentional discrimination is required, the district court erred in its determination that Griffith failed to so plead. "Intentional discrimination against the disabled does not require personal animosity or ill will"; deliberate indifference is sufficient. *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009). To establish deliberate indifference in this context, plaintiffs must show: "(1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *Id.* at

1229 (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)). "When the plaintiff has alerted the public entity to his need for accommodation . . . the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Duvall*, 260 F.3d at 1139. "[I]n order to meet the second element of the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent, and involves an element of deliberateness." *Id.*; *see also Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009) (Defendants' conduct must be "a deliberate choice, rather than negligence or bureaucratic inaction").

Generally, courts have held that this standard is met where a defendant deliberately makes no good faith effort to reasonably accommodate a plaintiff's known disability. *See, e.g.*, *Updike v. Multnomah Cnty.*, 870 F.3d 939, 954 (9th Cir. 2017) ("A denial of a request without investigation is sufficient to survive summary judgment on the question of deliberate indifference."); *Cadena v. El Paso Cnty.*, 946 F.3d 717, 726 (5th Cir. 2020) (finding sufficient facts to survive summary judgment on intentional discrimination where "defendants continued to

refuse the requested accommodation despite indications that [it] was necessary").

Ms. Griffith's pleading satisfied this standard. She repeatedly "alerted [El Paso County] to [her] need for accommodation," *see Duvall*, 260 F.3d at 1139. She informed county officials of her gender dysphoria as soon as she arrived at the jail. A.37. Her diagnosis was also reflected in her medical records. *Id.* She requested accommodation immediately, and then continuously thereafter. A.37, 38–40. She requested appropriate housing, relief from cross-gender pat-down searches, and commissary items available to cisgender women. A.38–40, 44–45, 48–49. She further informed county officials as her symptoms worsened due to her living conditions and the lack of accommodation. A.32, 39–40, 44–45. In particular, she informed them of her increasing thoughts of self-harm. A.32–33, 47. In response, El Paso County denied all of her requests, deliberately choosing not to provide any accommodation. A.37–38, 40, 44, 48–49, 72.

These allegations comfortably state a claim for deliberate indifference at this early state of litigation. El Paso County is free to argue that it in fact took some good faith action in response to these

requests, but the complaint alleges that county officials did nothing but deliberately reject them, even with ample notice of Ms. Griffith's disability and her suffering. *See Phillips ex rel. J.H. v. Prator*, No. 20-30110, 2021 WL 3376524, at *3–*5 (5th Cir. Aug. 3, 2021) (noting that intent is a fact issue not conducive to resolution at pleading stage, and finding allegations sufficient to state a claim where defendant "understood the limitations" imposed by plaintiff's disability and "chose not to accommodate them"). This is not, by contrast, a case where the plaintiff's injury was caused by "bureaucratic slippage" or mere oversight, which would not suffice to establish deliberate indifference, *see Duvall*, 260 F.3d at 1139.

The district court thought a greater showing was necessary. In its view, a plaintiff must show that the defendant knew she was disabled *within the meaning of the ADA*. A.123. But that is the standard for a *willful* statutory violation, rather than intentional discrimination. The Supreme Court in *Kolstad v. American Dental Association*, 527 U.S. 526 (1999), explained the distinction between these standards in the context of another antidiscrimination statute, Title VII. If an entity is unaware of the law, they can still intentionally discriminate, they just can't

commit a willful statutory violation. *Id.* at 536–37 (other examples of intentional discrimination that may not rise to the level of a willful statutory violation include where the employer "discriminates with the distinct belief that its discrimination is lawful" or where the "underlying theory of discrimination [is] novel or otherwise poorly recognized"). Under Title VII, a plaintiff must show intentional discrimination to get compensatory damages. *Id.* at 534. But, notably, this does not require proof of knowledge of the law. Plaintiffs "must prove that the defendants' *conduct* was intentional, but they need not prove that the defendants either knew or should have known that they were *violating the law*." *Id.* at 549–50 (Stevens, J., concurring in part and dissenting in part).

The same reasoning applies here. Ms. Griffith need only show—at most—intentional discrimination, not a willful statutory violation. The relevant question, therefore, is El Paso County officials' state of mind with respect to Ms. Griffith's circumstances—the fact that she has a diagnosis of gender dysphoria, the fact that it causes her significant limitations and suffering, and the fact that she requested accommodation—not their state of mind with respect to the reach of the ADA.

The district court essentially held that because courts have not definitively settled that gender dysphoria is covered by the ADA, no defendant can be liable for compensatory damages for discriminating against people with that disability. In other words, the district court asked whether a defendant would have been on notice, through clearly-established law, that their conduct violated the statute. That is the qualified immunity standard. *See Colbruno*, 928 F.3d at 1165. And porting it over here would give defendants a one-free-ADA-violation pass. There is nothing in the caselaw or common sense that supports that approach.

**C. *Cummings* does not affect Ms. Griffith's claim.**

One other point bears mention, though the district court did not reach it. Defendants argued in their motion to dismiss that the Supreme Court's decision in *Cummings v. Premier Rehab Keller*, 142 S. Ct. 1562 (2022), is another ground for dismissal of the disability discrimination claims. ECF 132 at 36–37. In *Cummings*, the Supreme Court held that emotional distress damages are not recoverable in a private action to enforce the Rehabilitation Act. 142 S. Ct. at 1572. Defendants argued

that this case bars Ms. Griffith's claims for emotional distress damages under both the RA and the ADA.

*Cummings* poses no obstacle to Ms. Griffith's claims, for two reasons. First, *Cummings* does not apply to ADA claims—the case was about the RA. Unlike the ADA, the RA was enacted pursuant to Congress's Spending Clause power, and the reasoning in *Cummings* hinged on that fact. *See* 142 S. Ct. at 1569 (listing the four Spending Clause statutes). Spending Clause statutes "operate[] based on consent": funding recipients agree to comply with federally imposed conditions in return for federal funds. *Id.* at 1570. Therefore, such statutes are construed "with an eye toward 'ensuring that the receiving entity of federal funds had notice that it will be liable.'" *Id.* (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998)). "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Because Congress did not unambiguously establish in the RA that plaintiffs could seek compensatory damages for emotional distress, the Court held that remedy unavailable. *Id.* at 1576.

The ADA is not a Spending Clause statute, so this reasoning does not apply. Rather, the governing interpretive principle in assessing the scope of available remedies is the "longstanding rule" that "federal courts may use any available remedy to make good the wrong done," *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 66 (1992) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)). Emotional distress damages fall comfortably within this power. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986). The *Cummings* limitation is irrelevant.[18]

Second, *Cummings* does not foreclose Ms. Griffith's claims—even the RA claim—for a second reason, which is that it does not bar claims for nominal damages. *See Hejmej v. Peconic Bay Med. Ctr.*, No. 17-cv-782-JMA-SIL, 2022 WL 4551696, at *1 (E.D.N.Y. Sept. 29, 2022) (finding plaintiff may seek nominal damages under the RA). Ms. Griffith is

[18] That the ADA incorporates "[t]he remedies" from the RA does not change the analysis. *See* 42 U.S.C. § 12133. Congress passed the ADA in 1990, and it would strain credulity—and violate basic separation of powers principles—to conclude that what Congress intended to incorporate includes the holding of a 2022 judicial opinion. *See Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (noting that all legislative powers are vested in Congress (citing U.S. Const. art. I § 1)). This is especially so given that *Cummings* was based on a judicial interpretation of ambiguous, or absent, statutory language and the significance of that omission for funding recipients, rather than anything the Court deduced about congressional intent. 142 S. Ct. at 1570–72.

entitled to nominal damages, and therefore, even if emotional distress damages are unavailable, she still has a viable claim for relief.

### V. Ms. Griffith sufficiently alleged municipal liability.

The district court held that the official capacity claims against Defendant Elder failed necessarily because none of the constitutional claims survived. A.116–17. As explained above, Ms. Griffith adequately stated several constitutional claims, so this Court should reverse that determination and remand to the district court to address her municipal liability claims in the first instance.

## CONCLUSION

For these reasons, this Court should reverse the district court's order dismissing Ms. Griffith's complaint and remand for further proceedings.

Dated: August 21, 2023

Respectfully submitted,

*/s/ Meghan Palmer*
Devi M. Rao
Meghan Palmer
RODERICK & SOLANGE
MACARTHUR JUSTICE CENTER
501 H Street NE, Suite 275
Washington DC 20002
(202) 869-3434
devi.rao@macarthurjustice.org

Andrew McNulty
Mari Newman
KILLMER, LANE & NEWMAN
1543 Champa St., Suite 400
Denver, CO 80202
(303) 571-1000
amcnulty@kln-law.com

*Counsel for Plaintiff-Appellant Darlene Griffith*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Darlene Griffith, through *pro bono* counsel, respectfully requests oral argument. *See* FED. R. APP. P. 34(a)(2); 10TH CIR. R. 28.2(C)(2). This case involves an important question of the interpretation and significance of a previous Tenth Circuit decision, *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995), which is against the overwhelming weight of authority from other courts, and is currently affecting the ability of transgender individuals to bring Equal Protection claims. Additionally, this case raises several other important issues of the scope of constitutional protections for prisoners and statutory interpretation of disability anti-discrimination statutes.

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This Brief complies with type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Circuit Rule 32(b) because it contains 12,786 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

2. This Brief complies with the typeface and type style requirements of Rule 32(a)(5) and (6) of the Federal Rules of Appellate Procedure and Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook font.

Dated: August 21, 2023

*/s/ Meghan Palmer*
Meghan Palmer

**CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2023, I electronically filed the foregoing document through the court's electronic filing system, and that it has been served on all counsel of record through the court's electronic filing system.

Dated: August 21, 2023

*/s/ Meghan Palmer*
Meghan Palmer

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Sophos Endpoint Advanced 2023.1.1.7, last updated on Monday, August 21, 2023, and according to the program are free of viruses.

Dated: August 21, 2023

*/s/ Meghan Palmer*
Meghan Palmer

**10th CIR. R. 28.2(A) ATTACHMENT TO BRIEF**

- Recommendation of the Magistrate Judge to Grant Dismissal of Third Amended Complaint, Dkt. No. 165 (docketed Feb. 27, 2023)
- Order Dismissing Third Amended Complaint, Dkt. No. 173 (docketed Mar. 27, 2023)
- Final Judgment, Dkt. No. 174 (docketed Mar. 27, 2023)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-00387-CMA-NRN

DARLENE GRIFFITH,

Plaintiff,

v.

EL PASO COUNTY, COLORADO,
BILL ELDER, in his individual and official capacities,
CY GILLESPIE, in his individual capacity,
ELIZABETH O'NEAL, in her individual capacity,
ANDREW MUSTAPICK, in his individual capacity,
DAWNE ELLISS, in her individual capacity,
TIFFANY NOE, in her individual capacity,
BRANDE FORD, in her individual capacity,

Defendants.

---

**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT PURSUANT TO Fed. R. Civ. P. 12(b)(1) and (6) (Dkt. #132)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This prisoner civil rights case is before the Court pursuant to an Order (Dkt. #135) issued by Judge Christine M. Arguello referring Defendants El Paso County, Bill Elder, Cy Gillespie, Andrew Mustapick, Dawne Elliss, Tiffany Noe, and Brande Ford's (collectively "Defendants")[1] Motion to Dismiss Third Amended Complaint Pursuant to

[1] Defendant Elder is the El Paso County Sheriff and is sued in his individual and official capacities. (Dkt. #124 ¶ 14.) The other Defendants are sued in their individual capacities and are employed in various positions by the El Paso County Sheriff's Office: Defendant Gillepsie is a Commander (*id.* ¶ 15), Defendant O'Neal is an "official" who

Fed. R. Civ. P. 12(b)(1) and (6) (the "Motion to Dismiss"). (Dkt. #132.) Plaintiff Darlene Griffith ("Plaintiff" or "Ms. Griffith") filed a response (Dkt. #147) and Defendants filed a reply. (Dkt. #155.) The Court heard argument on the subject motion on October 11, 2022. (*See* Dkt. #161.) The Court has carefully considered the motion. The Court has taken judicial notice of the Court's file and has considered the applicable Federal Rules of Civil Procedure and case law. The Court now being fully informed makes the following recommendation.

**PROCEDURAL HISTORY**

Plaintiff is a transgender woman who was housed in an all-male unit in the El Paso County Criminal Justice Center ("CJC"). Initially proceeding pro se, Plaintiff filed a Prisoner Complaint relating to her conditions of confinement on February 8, 2021. (Dkt. #1.) Complying with an order (Dkt. #5) issued the next day by Magistrate Judge Gordon P. Gallagher, Plaintiff filed an Amended Prisoner Complaint on March 4, 2021. (Dkt. #9.) On April 19, 2021, Judge Lewis T. Babcock entered an Order to Dismiss in Part and to Draw Case and the case was randomly reassigned to the undersigned. (Dkt. #16.) The matter was eventually assigned to Judge Arguello as the presiding judge. (*See* Dkt. ##25 & 58.)

On June 8, 2021, the Court entered an Appointment Order (Dkt. #28) and Andrew McNulty of the law firm of Killmer Lane & Newman LLP subsequently entered a notice of appearance on Plaintiff's behalf on September 15, 2021. (Dkt. #41.)

---

apparently processes inmate grievances (*id*. ¶¶ 16, 57), and Defendants Mustapick, Elliss, Noe, and Ford are deputies (*id.* ¶¶ 17–20).

The Court granted Plaintiff leave to file a Second Amended Complaint on October 4, 2021. (*See* Dkt. ##46 & 47.) Plaintiff then moved for a preliminary injunction that would require, among other things, El Paso County to house her in a women's unit. (Dkt. #48.) The day before the December 9, 2021 hearing on the injunction, the parties reached an agreement that resulted in Plaintiff being transferred to a female ward and having access to the same items from the commissary as all female inmates. (*See* Dkt. #91.) The preliminary injunction motion was denied as moot and the hearing vacated. (Dkt. #92.)

On April 8, 2022, the Court conducted a Settlement Conference. (*See* Dkt. #110.) While no settlement was reached at that time, Plaintiff eventually settled her claims with jail's private medical services provider and its employees. (*See* Dkt. ##117, 119, 121, & 122.)

On June 7, 2022, with Defendants' consent, Plaintiff filed a Third Amended Complaint and Jury Demand ("TAC"), the operative pleading. (Dkt. #124.) The subject Motion to Dismiss followed and further discovery was stayed. (*See* Dkt. #162.)

**BACKGROUND**[2]

This lawsuit arises from El Paso County's policy of housing transgender women in male units within the CJC. Plaintiff alleges that, as a result of this policy, she suffered repeated sexual harassment, sexual assault, and discrimination at the hands of jail staff and other inmates.

---

[2] Allegations in this section are taken from the TAC, and all non-conclusory allegations are presumed true for the purposes of the Motion to Dismiss. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

Plaintiff has been diagnosed with gender dysphoria and has been openly living as a transgender woman for over twenty years. (Dkt. #124 ¶ 25.) Gender dysphoria is "the significant distress that may accompany the incongruence between a transgender person's gender identity and assigned sex." (*Id.* ¶ 22.) The symptoms of gender dysphoria can be alleviated by allowing the transgender person "to live, and be treated by others, consistently with the person's gender identity." (*Id.*) To that end, and as part of her medically supervised treatment, Plaintiff has "changed her name and altered her physical appearance to conform to her female gender identity, including dressing in feminine attire and taking feminizing hormones, which caused her to develop female secondary sex characteristics such as breasts, soft skin, a lack of facial hair, and other characteristics typically associated with women." (*Id.* ¶ 25.)

Plaintiff entered the CJC on July 20, 2020. (*Id.* ¶ 47.) On intake, Defendant Noe, in accordance with official El Paso County policy, classified and housed Plaintiff in an all-male unit, despite (1) Plaintiff's explicit request that she be placed in a women's facility "because she feared being sexually abused and assaulted in male facilities by both guards and inmates, along with fearing the humiliation of being constantly searched by male guards in a male unit and the general degradation of being considered a man when she is a transgender woman," and (2) her medical records noting that she has been diagnosed with gender dysphoria.[3] (*Id.* ¶¶ 48–54.) Plaintiff alleges that making facility assignments to people in custody solely on the basis of the individual's genitalia violates accepted World Professional Association for Transgender

[3] Plaintiff is also legally blind. (Dkt. #124 ¶ 50.)

Health ("WPATH") and Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601 *et seq.,* ("PREA") standards. (*Id.* ¶¶ 40–46.)

Also pursuant to the county's policies, when booked into the CJC, Plaintiff was subjected to a visual body-cavity search by a male deputy. (*Id.* ¶ 72.) Plaintiff told Defendant Elliss, a female deputy, that she did not want Defendant Mustapick, a male deputy, present during the search. (*Id.* ¶ 74.) Nevertheless, after examining Plaintiff's breasts, Defendant Elliss left the room (intentionally misgendering Plaintiff on her way out by referring to Plaintiff using male pronouns) and left Plaintiff alone with Defendant Mustapick. (*Id.* ¶ 76.) Defendant Mustapick made lewd and derogatory comments to Plaintiff (telling Plaintiff to "spread [her] sexy cheeks" and that he was "going to go balls deep in that ass" while grabbing his groin) and "aggressively" searched Plaintiff's genitals. (*Id*. ¶ 78.) He then threatened Plaintiff and warned her not to tell anyone what happened. (*Id.* ¶ 79.)

On July 29, 2020, Plaintiff had an ADA interview with Defendant Ford, to whom she repeated her request to be placed into housing that corresponded with her gender identity. (*Id.* ¶ 55.) That request was again denied, and Defendant Ford wrote in Plaintiff's records that that there were no disability concerns related to Ms. Griffith's housing, despite gender dysphoria being a disability under the ADA. (*Id.*)

Over the next year, Plaintiff submitted numerous grievances and kites about her housing assignment and the ongoing harassment. (*See id.* ¶¶ 56–66.) On at least one occasion, it was Defendant O'Neal who conveyed to Plaintiff that one of the grievances was denied, although it is unclear if Defendant O'Neal was responsible for denying the grievance. (*Id.* ¶ 57.) In any event, Plaintiff remained housed in the all-male unit.

Throughout her incarceration, Plaintiff was subjected to cross-gender searches by male deputies, who would intentionally touch her breasts. (*Id.* ¶¶ 89–91.) These searches caused Plaintiff anxiety and exacerbated her gender dysphoria, and she complained about them several times. (*Id.* ¶¶ 91–95.)

Plaintiff was also continuously misgendered. For example, on September 16, 2020, Plaintiff informed Deputy Daniel Holder that, as a transgender woman, she was uncomfortable that other inmates in her unit were not wearing shirts. Deputy Holder walked over to the other inmates and loudly yelled at them, "the blind faggot said you need to put your shirts on." (*Id*. ¶ 100.) She was also frequently referred to as "Sir." (*Id.* ¶ 102.) She consistently complained through the grievance process about being misgendered. (*Id*. ¶¶ 101–04.)

Defendants denied Plaintiff the ability to dress in accordance with her gender identity as well. She had to go without a bra for over a month and, over her repeated protests, Plaintiff was denied any women's underwear. (*Id.* ¶¶ 110–16.) Plaintiff was not allowed to purchase lipstick at the commissary. (*Id.* ¶¶ 117–19.)

On July 1, 2021, Plaintiff told Raymond Carrington, a mental health provider, that, due to the constant mistreatment, she would remove her penis herself as soon she could figure out how to do. (*Id.* ¶ 31.) Although these concerns were communicated to El Paso County officials, Plaintiff attempted self-castratration by wrapping a rubber band around her genitals. (*Id.* ¶ 32.) Plaintiff has a long history of self-harm, including self-castration behavior, which worsens when she is not permitted to live in accordance with her gender identity and when she is subjected to sexual harassment and misgendering. (*Id.* ¶ 38.)

Finally, on November 18, 2021, Plaintiff was groped and taunted by another inmate while laying on her bunk. (*Id.* ¶ 85.) This was not the first time she had been sexually assaulted by this individual; "[a] witness to the assault told El Paso County officials that he witnessed at least three to four other similar assaults[.]" (*Id.* ¶ 87.) Plaintiff was not moved to a female unit after the incident.

Plaintiff asserts sixteen claims for relief under state and federal law:

- The **First Claim for Relief** is a Fourteenth Amendment equal protection claim for discrimination against all Defendants.
- The **Second Claim for Relief** is a Fourteenth Amendment conditions of confinement claim against all Defendants.
- The **Third Claim for Relief** is a Fourth Amendment unreasonable search claim against Defendants El Paso County, Elder, Mustapick, and Elliss.
- The **Fourth Claim for Relief** is a Fourteenth Amendment substantive due process claim for invasion of bodily privacy and integrity against Defendants El Paso County, Elder, Gillespie, Mustapick, and Elliss.
- The **Fifth Claim for Relief** is brought under Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 25 for unreasonable search against Defendants Elder, Gillespie, Mustapick, and Elliss.
- The **Sixth Claim for Relief** is brought under Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 29 for sex discrimination against Defendants Elder, Gillespie, O'Neal, Mustapick, Elliss, Noe, and Ford.
- The **Seventh Claim for Relief** is a substantive due process claim brought under Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 25 for invasion of

bodily privacy and integrity against Defendants Elder, Gillespie, Mustapick, and Elliss.

- The **Eighth Claim for Relief** is a cruel and unusual punishment conditions of confinement claim brought under Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 20 against Defendants Elder, Gillespie, O'Neal, Mustapick, Elliss, Noe, and Ford.
- The **Ninth Claim for Relief** is a due process conditions of confinement claim brought under Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 25 against Defendants Elder, Gillespie, O'Neal, Mustapick, Elliss, Noe, and Ford.
- The **Tenth Claim for Relief** is a disability discrimination claim brought pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.*, against Defendant El Paso County.
- The **Eleventh Claim for Relief** is a disability discrimination claim brought pursuant to the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 701, *et. seq*., against Defendant El Paso County.
- The **Twelfth Claim for Relief** is a sex and transgender discrimination claim brought pursuant to the Colorado Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. § 24-34-601, *et. seq*., against all Defendants.
- The **Thirteenth Claim for Relief** is a disability discrimination claim brought pursuant to the CADA against all Defendants.
- The **Fourteenth Claim for Relief** is a Fourteenth Amendment failure to protect claim against Defendants El Paso County, Elder, Gillespie, O'Neal, Noe, and Ford.

- The **Fifteenth Claim for Relief** is a cruel and unusual punishment/failure to protect claim brought pursuant to Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 20 against Defendants El Paso County, Elder, Gillespie, O'Neal, Noe, and Ford.
- The **Sixteenth Claim for Relief** is a due process failure to protect claim brought pursuant to Colo. Rev. Stat. § 13-21-131 and Colo. Const. Art. II, Section 25 against Defendants El Paso County, Elder, Gillespie, O'Neal, Noe, and Ford.

*Id.* ¶¶ 123–347.

Defendants now move to dismiss all claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## LEGAL STANDARDS

### I. Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress." *Henry v. Off. of Thrift Supervision*, 43 F.3d 507, 511 (10th Cir. 1994). Statutes conferring subject matter jurisdiction on federal courts are to be strictly construed. *F & S Constr. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964). "[T]he party invoking federal jurisdiction," generally the plaintiff, "bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998). Rule 12(b)(1) allows Defendants to raise the defense of the Court's "lack of subject-matter jurisdiction" by motion. Fed. R. Civ. P. 12(b)(1).

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations

as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). A facial attack "questions the sufficiency of the complaint," and when "reviewing a facial attack . . . a district court must accept the allegations in the complaint as true." *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995) *abrogated on other grounds by Cent. Green Co. v. United States*, 531 U.S. 425, 437 (2001). When reviewing a factual attack, courts cannot "presume the truthfulness of the complaint's factual allegations," and may consider documents outside the complaint without converting the motion to dismiss into a motion for summary judgment. *Ratheal v. United States*, No. 20-4099, 2021 WL 3619902, at *3 (10th Cir. Aug. 16, 2021) (unpublished).

**II. Rule 12(b)(6)**

Rule 12(b)(6) "tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). To survive a Rule 12(b)(6) motion, "[t]he complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support plaintiff's allegations." *Shero v. City of Grove, Okla*., 510 F.3d 1196, 1200 (10th Cir. 2007) (citing Bell *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[P]lausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiff[ ] [has] not nudged [her] claims across the line from conceivable to plausible." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (internal quotations and citations omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). In making a plausibility assessment, the Court first discards those averments in the TAC that are merely legal conclusions or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id*. at 678–79. The Court takes the remaining, well-pled factual contentions, treats them as true, and ascertains whether those facts (coupled, of course, with the law establishing the requisite elements of the claim) support a claim that is "plausible" or whether the claim being asserted is merely "conceivable" or "possible" under the facts alleged. *Id*. "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id*. at 678 (brackets in original; internal quotation marks omitted).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that [a] defendant has acted unlawfully." *Id.* (citation omitted). To survive a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Christy Sports, LLC v. Deer Valley Resort Co*., 555 F.3d 1188, 1191 (10th Cir. 2009). What is required to reach the level of "plausibility" varies from context to context, but generally, allegations that are "so general that they encompass a wide swath of conduct, much of it innocent," will not be sufficient. *Khalik*, 671 F.3d at 1191. And "the mere metaphysical possibility that some plaintiff could prove some set of facts

in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

**III. Qualified Immunity**

Qualified immunity, in certain circumstances, protects government officials from litigation when they are sued in their individual capacities. *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 814-18 (1982). A government official is entitled to qualified immunity from liability for civil damages when the allegedly unlawful conduct did not violate any of the plaintiff's statutory or constitutional rights that (1) were "clearly established" at the time of the conduct, and (2) would have been known to a reasonable person in the official's position. Id. at 818. A government official is entitled to qualified immunity "[i]n all but the most exceptional cases." *Harris v. Bd. of Educ. of Atlanta*, 105 F.3d 591, 595 (11th Cir. 1997).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments . . . [and] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The key to the qualified immunity inquiry is the objective reasonableness of the official's conduct in light of the legal rules that were clearly established at the time the action was taken." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998) (internal quotation marks omitted).

The threshold inquiry is whether the facts taken in the light most favorable to the plaintiff sufficiently allege a constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201

(2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id*. However, "if a violation could be made out on a favorable view of the parties' submissions," a court must "ask whether the right was clearly established." *Id*.; *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that although qualified immunity determination involves a two-part inquiry, if the plaintiff fails either inquiry reviewed in any order, no further analysis need be undertaken and qualified immunity is appropriate).

Raising a qualified immunity defense in a motion to dismiss "subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Sayed v. Virginia*, 744 F. App'x 542, 545–46 (10th Cir. 2018) (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004)). "At the motion to dismiss stage, it is the defendant's conduct as alleged in the complaint that is scrutinized for objective legal reasonableness." *Id.* at 546 (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014)). Accordingly, to survive a motion to dismiss, a plaintiff "need 'only allege enough factual matter' to state a claim that is 'plausible on its face and provide fair notice to a defendant.'" *Id.* (quoting *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013)).

**ANALYSIS**

Defendants move to dismiss all sixteen claims asserted against them. The Court will address Defendants' arguments in turn.

**I. Plaintiff's Claim Against El Paso County**

Defendant contends that the Court cannot exercise jurisdiction over El Paso County because it has not been properly named under Colo. Rev. Stat. § 30-11-105, which states, "In all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be, 'The board of county commissioners of the county of ...............'" As this is the "exclusive method by which jurisdiction over a county can be obtained," *Calahan v. Jefferson Cnty.*, 429 P.2d 301, 302 (Colo. 1967), Plaintiff's naming of the El Paso County as a defendant is defective, and the County can be dismissed due to this jurisdictional defect alone.

Moreover, Defendants point out that El Paso County is not responsible for the CJC's operations, the El Paso Sheriff's Office is, and under Colorado law, the county sheriff is a separate and distinct position from the board of county commissioners. *See Terry v. Sullivan,* 58 P.3d 1098, 1102 (Colo. App. 2002) ("[T]he Board [of County Commissioners] does not exercise managerial control over either the sheriff or the detention center and its staff."); Colo. Rev. Stat. § 30-10-511 ("[T]he sheriff shall have charge and custody of the jails of the county, and of the prisoners in the jails, and shall supervise them himself or herself through a deputy or jailer.").

The Court agrees that El Paso County is not a proper party because Plaintiff only alleges misconduct on the party of employees of the El Paso County Sheriff's Office ("EPSO") working at the CJC. Without more, such misconduct cannot be attributed to El Paso County. While the Court will address Plaintiff's municipal liability claims as asserted against the El Paso Sheriff's Office, her claims against El Paso County should be dismissed.

**II. The § 1983 Claims Asserted Against Defendants Elder and Gillespie**

Next, Defendants argue that Plaintiff fails to adequately allege that Defendants Elder and Gillespie personally participated in violating Plaintiff's constitutional rights.

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 creates a "species of tort liability" that provides relief to persons deprived of rights secured to them by the Constitution. *Carey v. Piphus*, 435 U.S. 247, 253 (1978) (quotations omitted).

"Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)). "Personal participation in the specific constitutional violation complained of is essential" in a § 1983 action. *Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011); *see also Foote*, 118 F.3d at 1423 ("Individual liability . . . must be based on personal involvement in the alleged constitutional violation."). To establish personal participation, a plaintiff must show that each individual defendant caused the deprivation of a federal right. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

Defendants Elder and Gillespie are being sued in their roles of Sheriff and Commander, respectively. But the mere fact that a government official has supervisory or managerial authority does not create § 1983 liability. *Id*. (citing *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008)). Rather, there must be "an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation,

his exercise of control or direction, or his failure to supervise." *Id*. (quoting *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)); *accord Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993) (citing *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988)). "When an official is sued on the basis of his supervisory status and policy-making authority, a plaintiff may establish the affirmative link by demonstrating that the defendant: '(1) promulgated, created, implemented or possessed responsibility for the continued operation of a policy, (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.'" *Est. of Yoemans by & through Ishmael v. Campbell*, 501 F. Supp. 3d 1034, 1053 (D. Colo. 2020) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)).

With respect to Defendant Gillespie, Plaintiff makes several accusations that he was personally responsible for denying Plaintiff female clothing and grooming products. (*See* Dkt. #124 ¶¶ 114, 117.) Thus, Plaintiff has alleged that he personally participated in that alleged violation of Plaintiff's equal protection rights (although, as discussed below, Gillespie is protected by qualified immunity on this claim). However, Plaintiff's allegations regarding Gillespie's role in her housing assignments (*see id.* ¶ 220) and as a policymaker (*see id.* ¶¶ 42, 57, 312, 326, 340) are conclusory. Thus, Plaintiff's claims against Defendant Gillespie should be dismissed

The Court will address Plaintiff's claims against Defendant Elder as a final policymaker in its municipal liability section below.

**III. Plaintiff's Fourteenth Amendment Claims (One, Two, Four, and Fourteen)**

Plaintiff asserts four claims under the Fourteenth Amendment for: (1) violating her equal protection rights; (2) subjecting her to unconstitutional conditions of confinement; (3) violating her substantive due process rights, and (4) failure to protect.

**a. Equal Protection Claim (Claim One)**

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend XIV, § 1. The Fourteenth Amendment's equal protection guarantee "is essentially a directive that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 439 (1985). But the Equal Protection Clause "doesn't guarantee equal results for all, or suggest that the law may never draw distinctions between persons in meaningful dissimilar situations." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012). Rather, "[i]t seeks to ensure that any classifications the law makes are made 'without respect to persons,' that like cases are treated alike, [and] that those who 'appear similarly situated' are not treated differently without, at the very least, a rational reason for the difference.'" *Id*. at 684–85 (quoting *Engquist v. Or. Dep't of Agric*., 553 U.S. 591, 602 (2008)). A plaintiff can assert an equal protection claim either under the "traditional" theory of a class-based claim or under a "class-of-one theory." *See id*. at 685–690 (discussing both theories).

To state an equal protection claim, a plaintiff must allege:

> (1) that similarly-situated individuals were treated differently; and (2) either that the differential treatment was based on a suspect classification or fundamental right and not supported by a compelling government interest, or if the differential treatment was not based on a suspect classification or

> fundamental right, the differential treatment was not justified by a rational connection to a legitimate state interest.

*Buggs v. Trujillo*, No. 13-cv-00300-CMA-MJW, 2014 WL 420005, at *7 (D. Colo. Feb. 4, 2014) (citations omitted).

The Tenth Circuit has explained,

> If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national origin, a court will review that challenged action applying strict scrutiny. *See Johnson v. California,* 543 U.S. 499, 505, 125 S. Ct. 1141, 160 L. Ed. 2d 949 (2005) (addressing racial classification); *Save Palisade FruitLands v. Todd,* 279 F.3d 1204, 1210 (10th Cir. 2002) (addressing classifications that "target a suspect class or involve a fundamental right"). In such a case, "the government has the burden of proving that [its] classifications are narrowly tailored measures that further compelling governmental interests." *Johnson,* 543 U.S. at 505, 125 S. Ct. 1141 (quotation omitted).
>
> If, instead, the challenged government action classifies people according to a quasi-suspect characteristic, such as gender or illegitimacy, then this court will apply intermediate scrutiny. *See Todd,* 279 F.3d at 1210. In those cases, the test would be whether the government can demonstrate that its classification serves "important governmental objectives" and is "substantially related to achievement of those objectives." *Concrete Works of Colo., Inc. v. City and County of Denver,* 321 F.3d 950, 959 (10th Cir. 2003).
>
> Finally, where the challenged government action does not implicate either a fundamental right or a protected class, this court will apply a rational basis test. *See Todd,* 279 F.3d at 1210. In those cases, this court inquires whether the government's classification bears "a rational relation to some legitimate end." *Id.* at 1213 (quotation omitted).

*Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109–10 (10th Cir. 2008).

Plaintiff alleges that "discrimination against transgender people is a form of sex discrimination that is presumptively unconstitutional and subject to heightened scrutiny." (Dkt. #124 ¶ 125.) Defendants disagree, arguing that "[t]ransgender is not a suspect or quasi-suspect class; therefore, the Defendants' classifications are subject to only

rational basis analysis." (Dkt. #132 at 11.) Regretfully, based on binding Tenth Circuit precedent that this Court is obligated to follow, the Court must agree with Defendants.

Over twenty years ago, the Tenth Circuit issued its opinion in *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995). In that case, the court rejected a transgender[4] inmate's claim that by denying her estrogen treatment, the defendants violated her equal protection rights. The court relied on *Holloway v. Arthur Andersen & Co*., 566 F.2d 659 (9th Cir. 1977), where the Ninth Circuit "held that transexuals are not a protected class . . . because transsexuals are not a discrete and insular minority, and because the plaintiff did not establish that 'transsexuality is an immutable characteristic determined solely by the accident of birth' like race, or national origin.'" *Brown*, 63 F.3d at 971 (quoting *Holloway*, 566 F.2d at 663). Despite recognizing that "[r]ecent research concluding that sexual identity may be biological suggests reevaluating *Holloway*," the court determined that the plaintiff's "allegations are too conclusory to allow proper analysis of this legal question." *Id.* Thus, the court decided to "follow *Holloway* and hold that [the plaintiff] is not a member of a protected class in this case." *Id.* Subsequent unpublished Tenth Circuit opinions have confirmed that, "[t]o date, this court has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims." *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015); *see also Qz'etax v. Ortiz,* 170 F. App'x 551, 553 (10th Cir. 2006).

---

[4] The court in *Brown* used the older term "transexual" and, although the plaintiff identified as female, the court used he/him pronouns because the plaintiff "is biologically male and refers to himself with masculine pronouns throughout his pleadings." *Brown,* 63 F.3d at 968 n.1.

This Court has little trouble stating that the Tenth Circuit needs to revisit its holding in *Brown v. Zavaras*. First, the Ninth Circuit authority it followed has since been overruled. *See Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000); *see also Norsworthy v. Beard,* 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015) (recognizing that *Holloway* "is no longer good law" and, applying *Schwenk*, concluding that "discrimination based on transgender status independently qualifies as a suspect classification under the Equal Protection Clause because transgender persons meet the indicia of a 'suspect' or 'quasi-suspect classification' identified by the Supreme Court"); *Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019) (affirming the district court's reasoning as to why transgender people are a quasi-suspect class). Second, it appears that the Tenth Circuit is out-of-step with the "many district courts" that "have analyzed the relevant factors for determining suspect class status and held that transgender people are at least a quasi-suspect class." *Grimm v. Gloucester Cnty. Sch. Bd*., 972 F.3d 586, 610 (4th Cir. 2020) (citing cases). Indeed, in *Grimm*, the Fourth Circuit, pointing to *Brown*, stated "[o]nly one court of appeals decision holding otherwise remains good law." *Id.* The *Grimm* decision also noted that *Brown* "reluctantly followed a since-overruled Ninth Circuit opinion. *Id.* at 611. Thus, it is likely that heightened scrutiny *should* apply to transgender people.

But *Brown* does remain, if not *good* in the normative sense, at least *binding* law on district courts in this district. The Court acknowledges the undeniable truth of Plaintiff's statement that a "growing consensus of courts have held that transgender individuals constitute a suspect or quasi-suspect class." (*See* Dkt. #147 at 9 n.1 (citing cases).) As articulated by one district court, "one would be hard-pressed to identify a

class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people." *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018); *see also Karnoski v. Trump*, No. C17-1297-MJP, 2018 WL 1784464, at *1 (W.D. Wash. Apr. 13, 2018) ("The Court also rules that, because transgender people have long been subjected to systemic oppression and forced to live in silence, they are a protected class.").

Indeed, if this Court were to apply the four-factor test used to determine whether a group constitutes a suspect or quasi-suspect class, in this Court's view, transgender people easily check all the boxes. The group has historically been subject to discrimination. The group has a defining characteristic that bears a relation to its ability to perform or contribute to society. The group may be defined as a discrete group by obvious, immutable, or distinguishing characteristics.[5] And the group is a minority that lacks political power. *See Grimm*, 972 F.3d at 611–13.

But, conspicuously, despite the "growing consensus" seen in district court cases around the country that apply heightened scrutiny to transgender people, none of the cases cited come from this circuit. Even if the Court were to agree with the straightforward holding in *Grimm* that it is "apparent that transgender persons constitute

---

[5] The *Grimm* decision relied on an amicus brief from medical experts to come to a very different conclusion as to the immutability of transgender characteristics from the Tenth Circuit in *Brown:* "As to the third factor, transgender people constitute a discrete group with immutable characteristics: Recall that gender identity is formulated for most people at a very early age, and, as our medical amici explain, being transgender is not a choice. Rather, it is as natural and immutable as being cisgender." *Grimm*, 972 F.3d at 612–13. By contrast, the *Brown* court was presented with a pro se plaintiff whose "conclusory" allegations were inadequate to allow the Tenth Circuit to make a "proper analysis" of the immutability question. *Brown*, 63 F.3d at 971

a quasi-suspect class," 972 F.3d at 611, it cannot ignore or overrule binding Tenth Circuit precedent that says otherwise. As Plaintiff herself says in opposing the motion to dismiss, "this case 'is part of a larger movement that is redefining and broadening the scope of civil and human rights so that they extend to a vulnerable group that has traditionally been unrecognized, unrepresented, and unprotected.'" (Dkt. #147 at 1 (quoting *G.G. v. Gloucester Cnty. Sch. Bd.*, 853 F.3d 729, 730 (4th Cir. 2017) (Davis, J., concurring)). But to the extent that Plaintiff, via this case, wants to "broaden the scope of civil and human rights" by changing Tenth Circuit law, it must be for the Tenth Circuit (or the Supreme Court) to take that step. This Court is bound to follow Tenth Circuit precedent unless it is overturned by the Tenth Circuit or a superseding contrary decision by the Supreme Court. *See Burlington N. & Santa Fe Ry. Co. v. Burton*, 270 F.3d 942, 947 (10th Cir. 2001).

Of course, if a transgender person does not qualify as a member of a suspect or quasi-suspect class, unequal treatment that does not involve a fundamental right or suspect classification must still bear a rational relation to legitimate penal interest. In this circumstance, a state action survives judicial review "if there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Davoll v. Webb*, 194 F.3d 1116, 1145 (10th Cir. 1999) (citing *Spragens v. Shalala*, 36 F.3d 947, 951 n.3 (10th Cir. 1994)). A court "will only strike the [action] down if the state's classification 'rests on grounds *wholly irrelevant* to the achievement of the State's objective.'" *City of Herriman v. Bell*, 590 F.3d 1176, 1194 (10th Cir. 2010) (emphasis in original).

As the Tenth Circuit explained in *Brown*, it is a "perplexing situation . . . when the rational basis standard meets the standard applied to a dismissal." 63 F.3d at 971 (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 459-60 (7th Cir. 1992)). In adopting the framework applied by the Seventh Circuit, the Tenth Circuit instructed that lower courts should "take as true all of the complaint's allegations and reasonable inferences that follow" and "apply the resulting 'facts' in light of the deferential rational basis standard." *Id*. (citing *Wroblewski*, 965 F.2d at 460). Thus, the Tenth Circuit opined, "[t]o survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Id*.

Here, Plaintiff alleges that that the El Paso County Sheriff's Office (via Defendant Elder) has a policy in place to "make facility assignments to people in custody solely on the basis of the individual's genitalia," despite knowing that this "places transgender people at risk for victimization." (Dkt. #124 ¶ 42.) She alleges that the discriminatory placement decisions "were taken without an important or legitimate governmental interest or rational reason, and they had no penological basis to deny Plaintiff a safe and appropriate placement in a female facility, based on her sex, gender identity, characteristics, risk factors, and her history of sexual victimization in male facilities." (*Id.* ¶ 134.) She also alleges that she and other transgender inmates were denied access to items like clothing and grooming products that were available to cisgender female inmates. (*Id.* ¶¶ 110–22.) For their part, Defendants claim only that the "classification of Plaintiff as male, housing Plaintiff in the male ward, and employing

reasonable search procedures were all actions rationally based in the need to provide for the safe and secure function of CJC." (Dkt. #132 at 13.)

If the Tenth Circuit were to recognize transgender people as a quasi-suspect or suspect class whose treatment was subject to intermediate or strict scrutiny, then the Court would not hesitate to conclude (at least at the motion to dismiss stage) that Plaintiff's placement as a transgender woman in an all-male unit was not substantially related to an important governmental interest. *See*, e*.g. Tay v. Dennison,* 457 F. Supp. 3d 657, 682 (S.D. Ill. 2020) (holding that a transgender prisoner's placement in a men's prison was not substantially related to an important government interest even though the prisoner had a history of violent behavior); *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *12 (S.D. Ill. Nov. 7, 2018) (finding that a transgender female inmate's equal protection claim based on her placement in a men's prison had a "greater than negligible chance of success on the merits"). But, this Court is compelled by the Tenth Circuit to apply the rational basis test.

The Court finds that Plaintiff has not adequately alleged that there is no rational reason for Defendants to house transgender women in all-male units and not provide them with feminine products. Plaintiff's claims to the contrary cannot overcome the presumption of rationality that attach to government decision involving a person who is not a member of a suspect class. *See Druley*, 601 F. App'x at 635 ("Ms. Druley did not allege any facts suggesting the ODOC defendants' decisions concerning her clothing or housing do not bear a rational relation to a legitimate state purpose."). Thus, the Court cannot find that there was no rational basis for assigning all prisoners with male

genitalia, including transgender women, to the same housing facility, and Plaintiff's equal protection claim should be dismissed.

**b. Conditions of Confinement/Substantive Due Process Claims (Claims Two and Four)**

"Pre-trial detainees have a Fourteenth Amendment due process right to humane conditions of confinement that is co-extensive with the Eighth Amendment right of convicted prisoners." *Waring v. Storey*, No. 12-cv-01338-BNB, 2012 WL 3245951, at *2 (D. Colo. Aug. 7, 2012). To state a due process claim based on unconstitutional conditions of confinement, a plaintiff must allege facts plausibly establishing both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A plaintiff satisfies the objective component by alleging facts demonstrating that the "conditions [of confinement] were more than uncomfortable, and instead rose to the level of 'conditions posing a substantial risk of serious harm' to inmate health or safety." *DeSpain v. Uphoff*, 264 F.3d 965, 973 (10th Cir. 2001). And with respect to the subjective prong, a claimant makes a sufficient showing by alleging that the defendant "[knew] of and disregard[ed] an excessive risk to inmate health or safety." *Id*. at 975.

Moreover, "a pretrial detainee can establish a due-process violation by 'providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.'" *Colbruno v. Kessler*, 928 F.3d 1155, 1163 (10th Cir. 2019) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 389 (2015)).

Defendants argue in their motion that Plaintiff's claim fails for a variety of reasons. Unhelpfully, Plaintiff ignores these arguments and proceeds to her substantive due process claim. The Court will therefore address the two claims together.

Defendants first contend, and the Court agrees, that Plaintiff does not allege personal participation as to Defendant O'Neal, who is only alleged to have informed Plaintiff that one of her grievances was denied. (Dkt. #124 ¶ 57.) Plaintiff does not allege that Defendant O'Neal was even the one to deny the grievance and, in any event, a denial of a grievance, by itself and without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009).

Defendants next argue that Plaintiff cannot maintain a claim against Defendant Noe (who made the initial housing assignment) or Ford (who later refused to "re-classify" Plaintiff) because she does not allege either subjective or objective elements of deliberate indifference. Plaintiff does not counter this argument, and the Court must agree with Defendants. Plaintiff does not plausibly allege that Defendants Noe or Ford were aware that Plaintiff would be at risk of substantial harm if placed in the all-male facility or that they disregarded that risk. Moreover, Plaintiff has not demonstrated that her right to be placed in a female unit was clearly established, given the binding Tenth Circuit precedent described above.

Defendants further maintain that Plaintiff's conditions of confinement claim should be dismissed as to Defendants Elliss and Mustapick. Again, Plaintiff chose not to respond to these arguments. As to Defendant Elliss, the Court agrees with Defendants that one instance of misgendering, although no light matter, is not sufficient to state a claim for unconstitutional conditions of confinement. As to Defendant Mustapick, however, Plaintiff does argue that he violated her *substantive due process rights* by

"subject[ing] her to unconstitutional conditions of confinement through the cross-gender visual body-cavity search he performed on her." (Dkt. #147 at 17.)

The Tenth Circuit has recognized that inmates retain a limited right to bodily privacy under the Fourteenth Amendment. *See Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982) ("Although the inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether."); *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988) ("Shielding one's unclothed figure from the view of strangers, particularly strangers of the opposite sex is impelled by elementary self-respect and personal dignity."). An inmate's interest in bodily privacy may be restricted "only to the extent necessary to further the correction system's legitimate goals and policies." *Cumbey*, 684 F.2d at 714.

As an initial matter, the Court disagrees with Defendants that this claim is more properly brought under the Eighth Amendment's cruel and unusual punishment clause rather than the Fourteenth Amendment's substantive due process guarantee. In *Graham v. Connor*, the Supreme Court held that when government conduct is constrained by "an explicit textual source of constitutional protection . . . that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims" because "[a]ny protection that 'substantive due process' affords convicted prisoners against excessive force is . . . at best redundant of that provided by the Eighth Amendment." 490 U.S. 386, 395 n.10 (1989). But the Eighth Amendment applies to those prisoners already convicted of a crime. Plaintiff is (or was at the time of filing) a pretrial detainee, and therefore "finds h[er]self in the criminal justice system somewhere between the two stools of an initial seizure and post-

conviction punishment. *Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010). In these circumstances, the due process clause of the Fourteenth Amendment and its protection against arbitrary governmental action by federal or state authorities applies. *Id.*

Turning to the visual body-cavity search itself, Plaintiff alleges that she was made to strip naked and told to spread her "sexy" butt cheeks to "go balls deep" while Defendant Mustapick grabbed his own penis. (Dkt. #124 ¶¶ 71-83.) Though this is sickening behavior, Plaintiff does not meet her burden in showing that it is clearly established that cross-gender searches of transgender women, even ones accompanied by odious verbal harassment, violate a clearly established constitutional right, nor is the conduct so egregious and the right so obvious that it could be deemed clearly established even without materially similar cases. *C.f. Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017) ("When the public official's conduct is egregious, even a general precedent would apply with obvious clarity. After all, some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing" (citations and quotations omitted)). Despite the alleged abhorrent statements that accompanied the search, Plaintiff has failed to persuade the Court that such a comment in connection with a cross-gender search rises to the point of violating an established constitutional right. Defendant Mustapick is entitled to qualified immunity on Plaintiff's substantive due process claim and, by extension, so is Defendant Elliss on any claim that she failed to intervene.

Finally, the Court agrees with Defendants that Plaintiff's argument that Defendants should be liable for the "near-constant" harassment she was subjected to

and the "repeated" cross-gender pat down search is too generalized and imprecise to adequately allege personal participation as to the specified individual Defendants.

**c. Failure to Protect (Claim Fourteen)**

A failure to protect claim is comprised of two elements. "First, an inmate must show that [s]he is incarcerated under conditions posing a substantial risk of serious harm." *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir.1996) (citation omitted). "Second, the inmate must establish that the prison official has a sufficiently culpable state of mind, i.e., that he or she is deliberately indifferent to the inmate's health or safety." *Id*. (internal quotation marks and citation omitted). "The prison official's state of mind is measured by a subjective, rather than an objective, standard." *Id*. (citation omitted). "In other words, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. *see also Benefield v. McDowell*, 241 F.3d 1267, 1270–71 (10th Cir. 2001) ("[I]n order to establish a cognizable Eighth Amendment claim for failure to protect, a plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm, the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component.") (internal quotation marks and citations omitted).

Plaintiff claims that Defendants were aware that Ms. Griffith is a transgender woman, knew she is blind, and knew, because of these two things, that placing her into an all-male unit would make her particularly vulnerable to sexual assault. The Court is not persuaded.

First, as Defendants' note, Plaintiff does not allege that any Defendants other than Noe and Ford were involved in Plaintiff's housing assignment. Therefore, this failure to protect claim could only be maintained against these two Defendants due to the personal participation requirement.

Second, their mere knowledge of Plaintiff's disabilities (gender dysphoria and blindness) alone is not enough for hold Defendants Noe and Ford liable for failing to prevent Plaintiff's sexual assault. Significantly, both Defendants made their decisions regarding Plaintiff's housing assignment in July 2020, but Plaintiff alleges she was sexually assaulted by a fellow inmate on November 18, 2021. This 16-month span raises evident questions of causation. It strongly suggests that Defendants Noe and Ford had no reason to suspect that Plaintiff was in substantial and immediate danger.

Accordingly, Plaintiff does not state a claim for failure to protect, and Defendants Ford, O'Neal, Noe, Gillespie, and Elder are entitled to qualified immunity.

**III. Fourth Amendment**

Plaintiff asserts that the visual strip search conducted by Defendants Mustapick and Elliss violated her Fourth Amendment right to be free from unreasonable searches and seizures as well as her Fourteenth Amendment substantive due process rights. As both claims require the careful balancing of penological concerns with inmates' right to privacy, the Court's analysis of the two will necessarily overlap.

It has long been recognized that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948). Thus, a prisoner's limited constitutional right to bodily privacy under the

Fourteenth Amendment, as addressed above, and to be free of unreasonable searches and seizures under the Fourth Amendment, must be weighed against the requirements of prison administration. *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). The Court affords deference to the expertise of correctional officials, who "must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 328, (2012) (citing *Bell v. Wolfish,* 441 U.S. 520, 546 (1979). However, as previously, "[a]lthough the inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether." *Cumbey*, 684 F.2d at 714.

"[A] strip search is an invasion of personal rights of the first magnitude." *Chapman v. Nichols*, 989 F.2d 393, 395 (10th Cir.1993); "[T]he greater the intrusion, the greater must be the reason for conducting a search." *Levoy v. Mills*, 788 F.2d 1437, 1439 (10th Cir. 1986) (citing *Blackburn v. Snow*, 771 F.2d 556, 565 (1st Cir.1985)). Determining the reasonableness or "constitutionality of a strip search 'requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.'" *Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002) (quoting *Bell*, 441 U.S. at 559). Although the "test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," in making this determination, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559. These factors aim to "[b]alanc[e] the significant and legitimate security interests of the institution against the privacy interests of the inmates." *Id*. at 560. "[A] regulation impinging on an inmate's constitutional rights must

be upheld if it is reasonably related to legitimate penological interests." *Florence*, 566 U.S. at 326 (internal quotation marks omitted).

Here, the scope of the search was invasive. *See Hyberg v. Enslow,* 801 F. App'x 647, 650 (10th Cir. 2020) (unpublished) *(*labelling strip searches "undeniably invasive"). However, "there are obvious security concerns inherent when an inmate will be placed in the general prison population." *Id.* (citing *Archuleta v. Wagner*, 523 F.3d 1278, 1284 (10th Cir. 2008)). Plaintiff was being processed for placement in the CJC's general population; "[t]here were therefore legitimate security interests served by the search[ ]." *Id.* According to the TAC, the search was performed in a "separate room," away from other inmates and CJC staff. *See Farmer*, 288 F.3d at 1260 (recognizing a strip search may be unreasonable if conducted in the open, "visible to a number of other inmates and staff," and without regard for the inmate's privacy interests); *see also id*. at 1261 ("[I]nfringements on prisoners' constitutional rights must not be arbitrary or irrational, nor an exaggerated response to security needs." (internal quotation marks omitted)). And In the Tenth Circuit, it is established that "the Constitution does not require 'complete privacy' for a strip search." *Smith v. Trapp*, No. 14-3220-JAR-JPO, 2018 WL 587230, *4 (D. Kan. Jan. 29, 2018) (quoting *Daughtery v. Harris*, 476 F.2d 292, 294 (10th Cir. 1973)).

As to the manner in which the search was conducted, a female deputy, Defendant Elliss, examined Plaintiff's bare breasts, and a male deputy, Defendant Mustapick, performed the search of Plaintiff's genitals. "Courts throughout the country have universally frowned upon cross-gender strip searches in the absence of an emergency or exigent circumstances." *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d

1135, 1143 (9th Cir. 2011); *see* also *Hayes v. Marriott*, 70 F.3d 1147 (10th Cir.1995) (recognizing that an inmate's privacy rights may be violated by a single cross-gender strip search); (*Harris v. Miller*, 818 F.3d 49, 59 (2d Cir. 2016) ("Indeed, best-practice standards in prison management typically discourage cross-gender strip searches."). Plaintiff also alleges that Defendant Mustapick made frightening and humiliating comments to her and performed the search "aggressively." A search conducted in an abusive manner can be considered unreasonable and violative of the Fourth Amendment. *See Bell*, 441 U.S. at 560. However, "not . . . every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). In *Hyberg*, the Tenth Circuit cited some examples type of conduct courts have found to be needlessly intrusive or abusive. *See* 801 F. App'x at 650–51 (citing *Hayes*, 70 F.3d at 1147 (reversing grant of summary judgment on Fourth Amendment claim where inmate alleged he was subjected to a video recorded "body cavity search [conducted] in the presence of over 100 people, including female secretaries and case managers from other buildings"); *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003) (holding inmate stated an Eighth Amendment claim by alleging that during search, guards made "ribald comments and sexually explicit gestures," "forced him to perform sexually provocative acts," and female guards "were neither mere passersby nor performing [a] legitimate penological function," but "were instead invited spectators")). The alleged conduct here, reprehensible as it is, does not rise to that level. On balance, then, despite the intrusiveness of the search and offensive manner it was performed, the Court finds that Plaintiff does not state a plausible violation of the Fourth Amendment.

Even if the Court determined that Plaintiff could plausibly state a Fourth Amendment claim, like her Fourteenth Amendment claim, it would necessarily fail based on the "clearly established" prong of qualified immunity. Plaintiff offers no Supreme Court or Tenth Circuit precedent clearly establishing that a visual strip search by a male and female deputy of a transgender inmate who identifies as female, has female breasts, and has male genitals violates the Fourth Amendment's prohibition of unreasonable searches and seizures. Accordingly, this claim should be dismissed.

**IV. Municipal Liability**

Plaintiff asserts claims against Defendant Elder in his personal capacity and his official capacity as El Paso County Sheriff. "An action against a person in his official capacity is, in reality, an action against the government entity for whom the person works." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998). Government entities can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694.

"[A] claim under § 1983 against . . . a municipality cannot survive a determination that there has been no constitutional violation." *Crowson v. Wash. Cnty. Utah*, 983 F.3d 1166 (10th Cir. 2020). "[T]here must be a constitutional violation, not just an unconstitutional policy, for a municipality to be held liable." *Id*. at 1191. As discussed

above, Plaintiff has not alleged facts demonstrating that she suffered a constitutional injury. Therefore, the Court finds that he cannot state a claim against Defendant Elder in his official capacity. Accordingly, the Court respectfully recommends that Plaintiff's municipal liability claims be dismissed.

**V. Plaintiff's ADA and RA Claims (Claims Ten and Eleven)**

Title II of the ADA states, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. ADA regulations require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). To state a claim under Title II, a plaintiff must allege that "(1) [s]he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Id*. at 1193.

Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To state a claim under Section 504, "a plaintiff must allege (1) that [s]he is a 'handicapped individual' under the [ADA], (2) that [s]he is 'otherwise qualified for the [benefit] sought, (3) that [s]he was [discriminated

against] solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance." *Cohon ex rel. Bass v. N.M. Dep't of Health*, 646 F.3d 717, 725 (10th Cir. 2011) (quoting *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1492 (10th Cir.1992)).

It has been commonly observed that "[t]he Rehabilitation Act is materially identical to and the model for the ADA," *Crawford v. Ind. Dep't of Corr*., 115 F.3d 481, 483 (7th Cir. 1997) (citing *Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir. 1996*)); see also McDonald v. Penn. Dep't of Pub. Welfare*, 62 F.3d 92, 94 (3d Cir. 1995); *Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir. 1996)), "except that it is limited to programs that receive federal financial assistance." *Crawford*, 115 F.3d at 483. However, the Tenth Circuit recently clarified that the causation standards of the statutes are different: "the ADA merely requires the plaintiff's disability be a but-for cause (i.e., "by reason of") of the discrimination, rather than—as the Rehabilitation Act requires—its sole cause (i.e., "solely by reason of")." *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1313 (10th Cir. 2021). With this in mind, the Court will evaluate Plaintiff's ADA claim and RA claim together. *See Jarvis v. Potter*, 500 F.3d 1113, 1121 (10th Cir. 2007) (citing 29 U.S.C. § 794(d)).

**a. Whether Plaintiff Alleges a Disability**

Defendants argue that Plaintiff fails to allege a disability. While the ADA defines the term "disability" broadly to include "a physical or mental impairment that substantially limits one or more major life activities of such individual," 42 U.S.C. § 12102(1)(A), it excludes "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, *gender identity disorders not resulting from physical impairments*, [and]

other sexual behavior disorders," Id. § 12211(b) (emphasis added). It is Defendants' position that gender dysphoria falls squarely within this exclusion.

Defendants acknowledge that there is significant disagreement amongst district courts across the country regarding whether gender dysphoria is a "gender identity disorder" and categorically excluded from the ADA's definition of "disability." They cite a case from this district where the court found that "gender dysphoria, as a gender identity disorder, is specifically exempted as a disability by the Rehabilitation Act." *Michaels v. Akal Sec., Inc.*, No. 09-cv-01300-ZLW-CBS, 2010 WL 2573988, at *6 (D. Colo. June 24, 2010). The Court is not bound by this ruling. It was decided over a decade ago and dealt with the issue summarily.

Instead, the Court finds persuasive a recent thorough and closely-reasoned decision issued by the Fourth Circuit in *Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022). There, after careful analysis, the court held that "as a matter of statutory construction, gender dysphoria is not a gender identity disorder." *Id.* at 769. The court also held that a plaintiff need not plead by specific words that her gender dysphoria "result[ed] from a physical impairments") in order to state a claim. *Id.* at 771. Absent any Tenth Circuit authority to the contrary, the Court is likewise convinced that gender dysphoria is a disability included in the ADA's protections. *See Gibson v. Cmty. Dev. Partners*, No. 3:22-CV-454-SI, 2022 WL 10481324, at *7 (D. Or. Oct. 18, 2022) (citing *Williams* for the proposition that "nothing in the ADA compels the conclusion that gender dysphoria is excluded from ADA protection").

**b. Causation**

Nevertheless, Defendants argue that Plaintiff's ADA and RA claims fail because she fails to allege that her gender dysphoria was the "but for" (much less "sole") cause of the alleged discrimination. Specifically, Defendants contend that Plaintiff complains that the discrimination was a result of her gender identity and transgender status—not gender dysphoria—and transgenderism ("transexualism") is specifically excluded from the definition of a disability. Defendants cite several allegations from the TAC that refer to EPSO's treatment of transgender women.

This argument misses the mark. First, Plaintiff alleges that the symptoms of gender dysphoria can be alleviated by, among other things, "outwardly presenting in a manner consistent with one's gender identity" (Dkt. #123 ¶ 24), and that placing her "in housing that does not conform with her gender identity has exacerbated symptoms of her Gender Dysphoria leading her to suffer significant emotional distress and have increased ideation of self-harm." (*Id.* ¶ 68.) Plaintiff also alleges that, pursuant to WPATH guidelines, part of the treatment of gender dysphoria is to "be treated as the woman she is." (*Id.* ¶ 97.) She also states she requested accommodations for her gender dysphoria. (*Id.* ¶¶ 48, 55, 61, 63, 92, 110, 111.)

A public entity must provide a reasonable accommodation under the ADA when it knows that the individual is disabled and "requires an accommodation of some kind to participate in or receive the benefits of its services." *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007). "[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an

accommodation." *Id*. at 1197–98. Thus, Plaintiff's gender identity is relevant to the reasonable accommodation of her disability.

Moreover, the cherry-picked excerpts Defendants cite from the pleading ignore the numerous references Plaintiff makes to the EPSO's consistent failure to accommodate her gender dysphoria. (*See, e.g.,* Dkt. #124 ¶¶ 70 ("El Paso County's decision to house Ms. Griffith in housing that does not conform with her gender identity was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria."); 81 ("El Paso County officials' threatening, intimidating and harassing visual body-cavity search of Ms. Griffith, . . . conducted by an unaccompanied male deputy, was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria."); 107 ("El Paso County officials' actions in constantly mis-gendering Ms. Griffith was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria."); 119 ("El Paso County officials' actions in denying Ms. Griffith access to female undergarments and lipstick was a discriminatory action and a failure to reasonably accommodate Ms. Griffith's diagnosed Gender Dysphoria."); 280 ("By confining Plaintiff in the men's unit at the El Paso County Jail, a facility where staff members referred to Plaintiff using a male pronoun and her male given name and staff refused to permit Plaintiff to wear her own gender's clothes and underwear, El Paso County subjected Plaintiff to discrimination based on Gender Dysphoria.").

For these reasons, the Court rejects Defendant's contention that Plaintiff asserts that her transgender status—not gender dysphoria—was the reason for her exclusion from certain programs and services within CJC.

**c. Damages**

In *Cummings v. Premier Rehab Keller, P.L.L.C*., 142 S. Ct. 1562, 1565 (2022), the Supreme Court held that emotional distress damages are not recoverable in a private action to enforce . . . the Rehabilitation Act of 1973." Instead, "victims of discrimination to recover damages only if they can prove that they have suffered economic harm." *Id.* at 1562 (Breyer, J., dissenting). Defendants therefore posit that other types of damages that are generally unavailable in breach of contract claims, like those for pain and suffering, should also be unavailable as a remedy under the RA. Defendants also claim that *Cummings*' damage limitation should also apply with equal force to claims asserted under Title II of the ADA.

Plaintiff argues that *Cummings* does not apply to other damages or ADA claims, and contends that the Supreme Court's holding should not apply retroactively. These are interesting arguments, but in the end, they need not be decided now because even pre-*Cummings*, the Tenth Circuit required a showing of intentional discrimination before a plaintiff may recover compensatory damages for mental or emotional injury. *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403–4 (10th Cir. 1997); *Powers v. MJB Acquisition Corp*., 184 F.3d 1147, 1152 (10th Cir. 1999). "Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person; rather, 'intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights.'" *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1229 (10th Cir. 2009) (quoting *Powers*., 184 F.3d at 1153). "The test for deliberate indifference in the context of intentional discrimination comprises two prongs: (1)

'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.'" *Id.* (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) (alteration omitted).

While the Court believes that discrimination based on gender dysphoria violates the ADA and RA, this is not remotely settled law. Indeed, it appears that the "majority approach[ ] views the [ADA]'s language as expressing Congress's intent to exclude from the ADA's protection both disabling and non-disabling gender identity disorders that do not result from a physical impairment." *Doe v. Pa. Dep't of Corr*., No. 120CV00023SPBRAL, 2021 WL 1583556, at *8 (W.D. Pa. Feb. 19, 2021), *report and recommendation adopted,* No. CV 20-23, 2021 WL 1115373 (W.D. Pa. Mar. 24, 2021). A court from this district took this tack. *See Michaels*, 2010 WL 2573988, at *6. Under these circumstances, the Court cannot say that the EPSO was deliberately indifferent to the "strong likelihood" of harm to a right that may not even be protected by the ADA and RA. *See Roberts v. City of Omaha*, 723 F.3d 966, 975–76 (8th Cir. 2013) ("Roberts can only prevail on his ADA and Rehabilitation Act claims by showing the city's deliberate indifference to his alleged right to be free from discrimination in the circumstances of this case, but the city, like the individual officers, lacked notice the officers' actions might have violated Roberts's asserted rights.").

Plaintiff cannot obtain compensatory damages for mental or emotional injury, and any injunctive relief is moot because she has been moved to a female facility and given access to feminine clothing and grooming items. Accordingly, Claims Twelve and Thirteen should be dismissed.

**VI. State Law Claims (Claims Five, Six, Seven, Eight, Nine, Twelve, and Thirteen)**

Plaintiff asserts various claims under the Colorado Constitution and state statute. "If federal claims are dismissed before trial, leaving only issues of state law, 'the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.'" *Bauchman for Bauchman v. W. High Sch*., 132 F.3d 542, 549 (10th Cir. 1997) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988)). "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Thatcher Enters. v. Cache Cnty. Corp*., 902 F.2d 1472, 1478 (10th Cir. 1990). Because this Court has recommended dismissal of the federal claims, the Court further recommends that the presiding judge decline to exercise supplemental jurisdiction over Plaintiff's state-law claims and dismiss those claims without prejudice.

**CONCLUSION**

In light of the foregoing, it is hereby **RECOMMENDED** that Defendants' Motion to Dismiss (Dkt. #132) be **GRANTED**, and that Plaintiff's Third Amended Complaint (Dkt. #124) be **DISMISSED**.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge, *Thomas v. Arn*, 474 U.S. 140, 148–53**

**(1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412–13 (10th Cir. 1996).**

BY THE COURT

Date: February 27, 2023
Denver, Colorado

N. Reid Neureiter
United States Magistrate Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 21-cv-00387-CMA-NRN

DARLENE GRIFFITH,

Plaintiff,

v.

EL PASO COUNTY, COLORADO,
BILL ELDER, in his individual and official capacities,
CY GILLESPIE, in his individual capacity,
ELIZABETH O'NEAL, in her individual capacity,
ANDREW MUSTAPICK, in his individual capacity,
DAWNE ELLISS, in her individual capacity,
TIFFANY NOE, in her individual capacity, and
BRANDE FORD, in her individual capacity,

Defendants.

---

**ORDER AFFIRMING AND ADOPTING RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

This matter is before the Court on the February 27, 2023 Recommendation of United States Magistrate Judge (Doc. # 165), wherein Judge N. Reid Neureiter recommends this Court grant Defendants' Motion to Dismiss the Third Amended Complaint (Doc. # 132). Plaintiff timely filed an Objection to the Recommendation. (Doc. # 169.) For the following reasons, the Court overrules Plaintiff's Objection and affirms and adopts the Recommendation as an order of this Court.

## I. BACKGROUND

The factual background of this case is set out at length in Judge Neureiter's Recommendation, which the Court incorporates herein by reference. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Accordingly, the Court will provide only a brief summary of the relevant facts of this case.

Plaintiff Darlene Griffith is a transgender woman who has been diagnosed with gender dysphoria.[1] (Doc. # 124 at ¶ 2.) She has been living as a transgender woman for more than 20 years. (*Id.* at ¶ 25.) As part of her treatment, Plaintiff has "changed her name and altered her physical appearance to conform to her female gender identity, including dressing in feminine attire and taking feminizing hormones, which caused her to develop female secondary sex characteristics such as breasts, soft skin, a lack of facial hair, and other characteristics typically associated with women." (*Id.*)

Plaintiff arrived at El Paso County Jail as a pretrial detainee on July 20, 2020. (*Id.* at ¶¶ 47, 141.) At that time, Plaintiff was an openly transgender woman with a feminine appearance. (*Id.* at ¶ 47.) During Plaintiff's intake she notified jail personnel that she is a transgender woman with a diagnosis of gender dysphoria and explicitly requested placement in a women's facility. (*Id.* at ¶ 48.) Plaintiff also informed jail officials that she is legally blind. (*Id.* at ¶ 50.)

Plaintiff alleges that when she was booked into the jail, Defendant Andrew Mustapick sexually harassed her during an unconstitutional cross-gender, visual body-

[1] Gender dysphoria is "the significant distress that may accompany the incongruence between a transgender person's gender identify and assigned sex." (Doc. # 124 at ¶ 22.)

cavity search while Defendant Dawne Elliss stood by and did nothing to intervene. (*Id.* at ¶¶ 71–83.) When Plaintiff saw that both a male and female deputy would be conducting her search, Plaintiff protested and asked that only Elliss, a female deputy, conduct the search. (*Id.* at ¶ 74.) However, Elliss left Plaintiff alone in the room with Mustapick and intentionally mis-gendered Plaintiff on her way out, telling Mustapick "*he* is all yours now to strip out." (*Id.* at ¶ 76.) Mustapick then ordered Plaintiff to take off her socks, pants, and panties, place her hands on the wall, bend over, and "spread [her] sexy cheeks." (*Id.* at ¶ 77.) He told Plaintiff that he was "going to go balls deep in that ass" while grabbing his own penis in view of Plaintiff. (*Id.* at ¶ 78.) Mustapick was "extremely aggressive" while conducting the search and threatened Plaintiff that if she told anyone, she would be brutalized by the guards at the jail. (*Id.* at ¶ 79.)

Despite Plaintiff's request on intake, Defendant Tiffany Noe placed Plaintiff into an all-male unit. (*Id.* at ¶ 54.) On July 29, 2020, Defendant Brande Ford conducted an Americans with Disabilities Act ("ADA") interview of Plaintiff and wrote in Plaintiff's records that there were no disability concerns related to Plaintiff's housing. (*Id.* at ¶ 55.) Ford did not reclassify Plaintiff or place her into a unit that corresponded with her gender identity. (*Id.*) Over the next several months, Plaintiff repeatedly requested to be moved to a female unit by filing inmate grievances and reporting to jail mental health officials. (*Id.* at ¶¶ 57–66.) In response to one grievance, Defendant Elizabeth O'Neal stated that El Paso County had reviewed Plaintiff's request and denied her the accommodation of housing her in a facility that corresponded with her gender identity. (*Id.* at ¶ 57.) Plaintiff alleges that Defendants Ford, O'Neal, Noe, Gillespie, and Elder

violated her constitutional and statutory rights by intentionally disregarding her repeated requests to be housed in a female unit despite knowing that Plaintiff suffered from gender dysphoria and was at risk of sexual harassment and assault. (*Id.* at ¶¶ 47–70.)

Plaintiff further alleges that Defendants Elder, Gillespie, Ford, O'Neal, and Noe failed to protect Plaintiff by housing her in an all-male unit. (*Id.* at ¶¶ 84–88.) On November 18, 2021, after Plaintiff had been housed in the all-male unit for over a year, she was sexually assaulted by another male inmate. (*Id.* at ¶ 84.) The inmate approached Plaintiff while she was laying in her bunk, groped Plaintiff's right breast, and said, "you know you want this dick." (*Id.* at ¶ 85.) Defendants did not move Plaintiff to a unit that corresponded to her gender identity after this incident. (*Id.* at ¶ 88.)

Plaintiff also alleges that she was subject to continuous cross-gender pat-down searches. (*Id.* at ¶¶ 89–96.) Male deputies repeatedly touched Plaintiff's breasts and groin when patting her down. (*Id.* at ¶ 90.) El Paso County officials also regularly mis-gendered Plaintiff throughout her incarceration, including by calling her "Sir." (*Id.* at ¶¶ 97–109.) In one instance, on September 16, 2020, Plaintiff complained to a deputy about male inmates not wearing shirts, and the deputy responded by loudly yelling at the inmates, "the blind faggot said you need to put your shirts on." (*Id.* at ¶ 100.) Plaintiff wrote grievances and complained to jail officials several times about the pat-down searches, mis-gendering, and verbal harassment she was experiencing. In addition, despite Plaintiff's repeated requests for gender affirming clothing, jail officials denied Plaintiff the ability to dress in accordance with her gender identity, including prohibiting her from purchasing panties or lipstick at the commissary. (*Id.* at ¶¶ 110–122.)

Plaintiff reported to mental health providers that she was suffering severe anxiety and depression as a result of being placed in the all-male unit and experiencing harassment and mis-gendering. (*Id.* at ¶¶ 60, 62.) On July 1, 2021, Plaintiff told a mental health provider that due to the constant mistreatment, she would remove her own penis. (*Id.* at ¶ 31.) Plaintiff attempted to self-castrate by wrapping a rubber band around her genitals. (*Id.* at ¶ 32.) Plaintiff has a history of self-harm, including self-castration behavior, when her gender dysphoria has not been accommodated and treated. (*Id.* at ¶ 38.)

In her Third Amended Complaint (Doc. # 124), Plaintiff asserts 16 constitutional and statutory claims against Defendants. Her claims under federal law are:

- **First Claim**: Fourteenth Amendment equal protection discrimination, against all Defendants;
- **Second Claim**: Fourteenth Amendment conditions of confinement, against all Defendants;
- **Third Claim**: Fourth Amendment unreasonable search, against El Paso County, Elder, Mustapick, and Elliss;
- **Fourth Claim**: Fourteenth Amendment substantive due process claim for invasion of bodily privacy and integrity, against El Paso County, Elder, Gillespie, Mustapick, and Elliss;
- **Tenth Claim**: Disability discrimination pursuant to the ADA, 42 U.S.C. § 12101, *et. seq.*, against El Paso County;
- **Eleventh Claim**: Disability discrimination pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et. seq.*, against El Paso County; and
- **Fourteenth Claim**: Fourteenth Amendment failure to protect, against El Paso County, Elder, Gillespie, O'Neal, Noe, and Ford.

Plaintiff's remaining claims for relief constitute parallel or similar claims under the Colorado Constitution and Colorado state laws.

Defendants filed a Motion to Dismiss the Third Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (Doc. # 132), which the Court referred to Judge Neureiter (Doc. # 135). Judge Neureiter heard argument on the Motion in a hearing on October 11, 2022. *See* (Doc. # 163). On February 27, 2023, Judge Neureiter issued his Recommendation. (Doc. # 165.) Plaintiff filed an Objection (Doc. # 169), and Defendants submitted a Response (Doc. # 172). The matter is now ripe for review.

## II. LEGAL STANDARDS

### A. REVIEW OF A RECOMMENDATION

When a magistrate judge issues a recommendation on a dispositive matter, Federal Rule of Civil Procedure 72(b)(3) requires that the district judge "determine *de novo* any part of the magistrate judge's [recommended] disposition that has been properly objected to." In conducting the review, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3). "In the absence of timely objection, the district court may review a magistrate [judge's] report under any standard it deems appropriate." *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991) (citing *Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings.")).

In order to be properly made and, therefore, to preserve an issue for *de novo* review by the district judge, an objection must be both timely and specific. *United States v. One Parcel of Real Property Known As 2121 East 30th Street*, 73 F.3d 1057, 1059–60 (10th Cir. 1996). An objection is proper if it is specific enough to enable the "district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Id.* at 1059 (internal quotation marks omitted).

## B. FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) permits a party to move to dismiss a complaint for "lack of subject matter jurisdiction." A Rule 12(b)(1) challenge generally takes one of two forms: (1) a facial attack, where the moving party may "attack the complaint's allegations as to the existence of subject matter jurisdiction"; or (2) a factual attack, where the moving party may "go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)). When reviewing a facial attack, the Court must accept the allegations in the complaint as true. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). By contrast, in reviewing a factual attack, the district court has "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule (12)(b)(1)." *Id.*

**C. FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of [a] plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, the Court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc. v. Tex. Waste Mgmt.*, 161 F.3d 1259, 1262 (10th Cir. 1998). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Nor does the complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and brackets omitted).

**D. QUALIFIED IMMUNITY**

The doctrine of qualified immunity protects government officials from individual liability in the course of performing their duties so long as their conduct does not violate clearly established constitutional or statutory rights. *Washington v. Unified Gov't of Wyandotte Cnty.*, 847 F.3d 1192, 1197 (10th Cir. 2017). To overcome the defense of qualified immunity, a plaintiff must present enough facts in the complaint, taken as true, to show (1) a violation of a constitutional or statutory right, and (2) that the right was clearly established when the alleged violation occurred. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). The bar is higher for Defendants because they assert a qualified immunity defense in a Rule 12(b)(6) motion instead of a Rule 56 motion. *See Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004) ("Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment."). To determine whether a right was "clearly established," courts ask "whether the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (internal quotation marks omitted).

## III. DISCUSSION

This is a challenging case. It raises sensitive and important constitutional issues during a time period of shifting jurisprudence among the circuit courts. As she states in her Objection, Plaintiff brought this case to protect the rights of transgender people in public spaces. (Doc. # 169 at 1.) She asserts that this is a case that is, at its core,

"about governmental validation of the existence and experiences of transgender people, as well as the simple recognition of their humanity." (*Id.*) (quoting *G.G. v. Gloucester Cnty. Sch. Bd.*, 853 F.3d 729, 730 (4th Cir. 2017) (Davis, J., concurring)). The Court is sympathetic to Plaintiff and cognizant of the harms that she has suffered during her detention at the El Paso County Jail. However, the Court agrees with Judge Neureiter that existing Tenth Circuit precedent binds the Court's hands in this case. Regretfully, Plaintiff's claims must be dismissed.

**A. THE RECOMMENDATION**

In a thoughtful and well-reasoned Recommendation, which the Court adopts in full, Judge Neureiter carefully analyzed each of Plaintiff's federal claims. First, Judge Neureiter determined that Plaintiff's claims against El Paso County should be dismissed because (1) Plaintiff failed to properly name the Board of County Commissioners of El Paso County as the defendant pursuant to Colo. Rev. Stat. § 30-11-105; and (2) the Complaint alleges misconduct only on the part of employees of the El Paso County Sheriff's Office, a separate and distinct entity from the County. (Doc. # 165 at 14). However, because Plaintiff asserted claims against Sheriff Bill Elder and Commander Cy Gillespie in their official capacities, Judge Neureiter considered Plaintiff's municipal liability claims as asserted against the El Paso County Sheriff's Office. (*Id.*) Next, Judge Neureiter evaluated whether the Complaint adequately alleges Gillespie's personal participation. (*Id.* at 15–16.) Judge Neureiter concluded that the Complaint sufficiently alleges that Gillespie was personally responsible for denying Plaintiff female clothing and grooming products, with respect to her equal protection claim, but Judge Neureiter

found that the allegations were insufficient to establish Gillespie's role in Plaintiff's housing assignments or as a final policymaker. (*Id.* at 16.)

Moving to Plaintiff's Fourteenth Amendment claims, Judge Neureiter considered whether discrimination against transgender people should be subject to heightened scrutiny or rational basis analysis. (*Id.* at 17–24.) Judge Neureiter determined that despite the "growing consensus" in courts around the country that transgender people constitute at least a quasi-suspect class, district courts in this circuit remain bound by the Tenth Circuit's decision in *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995), in which the court held that a transgender plaintiff "is not a member of a protected class" for purposes of an equal protection claim.[2] (Doc. # 165 at 19–20.) Although Judge Neureiter expressed strongly that the Tenth Circuit should revisit *Brown*, he acknowledged that *Brown* remains "if not *good* in the normative sense, at least *binding* law on district courts in this district." (*Id.*) Thus constrained to apply rational basis review, Judge Neureiter concluded that Plaintiff has not adequately alleged that there is no rational reason for Defendants to house transgender women in all-male units and not provide them with feminine clothing and grooming products. (*Id.* at 24.) Accordingly, he found that Plaintiff's equal protection claim must be dismissed for failure to state a claim.

Judge Neureiter next considered Plaintiff's conditions of confinement and substantive due process claims. (*Id.* at 25–26.) He first found that the Complaint fails to state a claim against Defendant O'Neal, for lack of allegations establishing personal

---

[2] The *Brown* court used the older term "transsexual" instead of "transgender." 63 F.3d at 971.

participation, and against Defendants Noe and Ford, for lack of allegations showing deliberate indifference. (*Id.* at 26.) Further, Judge Neureiter found that all of these Defendants were entitled to qualified immunity because Plaintiff did not demonstrate that her right to be placed in a female unit was clearly established. (*Id.*) As to Defendant Elliss, Judge Neureiter found that "one instance of misgendering, although no light matter, is not sufficient to state a claim for unconstitutional conditions of confinement." (*Id.*) With respect to Defendant Mustapick, Judge Neureiter noted that Mustapick's alleged behavior during the visual body-cavity search was "sickening," but Judge Neureiter concluded that Plaintiff had not met her burden of showing that it is "clearly established that cross-gender searches of transgender women, even ones accompanied by odious verbal harassment, violate a clearly established constitutional right, nor is the conduct so egregious and the right so obvious that it could be deemed clearly established even without materially similar cases." (*Id.* at 28.)

Judge Neureiter next determined that the Complaint fails to state a claim for failure to protect because (1) the Complaint alleges personal participation only of Noe and Ford in Plaintiff's housing assignment, and (2) the allegations that Noe and Ford knew of Plaintiff's disabilities, alone, are insufficient to show that they had reason to suspect that Plaintiff was in substantial and immediate danger, particularly given that Defendants made their decisions regarding Plaintiff's housing in July 2020 and the alleged assault by another inmate did not occur until November 18, 2021. (*Id.* at 30.)

Regarding Plaintiff's Fourth Amendment unreasonable search claim and Fourteenth Amendment substantive due process claim arising from the visual strip

search conducted by Defendants Mustapick and Elliss, Judge Neureiter carefully balanced Plaintiff's right to bodily privacy and right to be free from unreasonable searches against the requirements of prison administration. (*Id.* at 30–34.) Although he acknowledged that Mustapick's alleged comments and behavior during the search were "reprehensible," Judge Neureiter concluded that, on balance, the Complaint did not state a plausible violation of the Fourth or Fourteenth Amendment in relation to the search. (*Id.* at 33.) Moreover, Judge Neureiter observed that both claims would necessarily fail based on the "clearly established" prong of qualified immunity because Plaintiff offers no binding precedent clearly establishing that a visual strip search by a male and female deputy of a transgender inmate, even with harassing comments, violates the inmate's constitutional rights. (*Id.* at 34.) Having determined that the Complaint fails to plausibly allege any constitutional violation, Judge Neureiter determined that Plaintiff could not establish municipal liability and that her claims against Defendant Elder in his official capacity as Sheriff must be dismissed. (*Id.* at 35.)

Judge Neureiter next evaluated Plaintiff's ADA and Rehabilitation Act claims. (*Id.* at 35–41.) He acknowledged that there is significant disagreement amongst district courts across the country regarding whether gender dysphoria is a "gender identity disorder" and categorically excluded from the ADA's definition of "disability." (*Id.* at 37.) In the absence of any controlling Tenth Circuit authority, Judge Neureiter followed the approach of the Fourth Circuit in *Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022), and determined that, as a matter of statutory construction, gender dysphoria is not excluded from the ADA's protections. (Doc. # 165 at 37.) Judge Neureiter further found that

Plaintiff plausibly alleges that her gender dysphoria was the "but for" cause of the alleged discrimination. (*Id.* at 38–39.) Judge Neureiter concluded, however, that Plaintiff's ADA and Rehabilitation Act claims are subject to dismissal because the Complaint fails to make a showing of intentional discrimination such that Plaintiff would be able to recover compensatory damages for mental or emotional injury. (*Id.* at 40.) Stated differently, Judge Neureiter found that because the law is unsettled as to whether discrimination based on gender dysphoria violates the ADA and Rehabilitation Act, the Complaint could not plausibly allege that Defendants were "deliberately indifferent" in that they *knew* that a harm to a federally protected right was substantially likely. (*Id.* at 40–41.) Given that Plaintiff could not obtain compensatory damages and that any injunctive relief is moot because Plaintiff has been moved to a female facility, Judge Neureiter determined that her ADA and Rehabilitation Act claims must be dismissed.

Lastly, Judge Neureiter recommended that because all of Plaintiff's federal claims are subject to dismissal, this Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims and should dismiss those claims without prejudice. (*Id.* at 42.)

**B. THE OBJECTION**

Plaintiff timely filed a 30-page Objection to Judge Neureiter's Recommendation. (Doc. # 169.) The Court has carefully reviewed Plaintiff's Objection and finds that it is largely a restatement—often verbatim—of Plaintiff's arguments presented in her Response to the Motion to Dismiss (Doc. # 147) and elsewhere in the record of this

case (Docs. ## 124, 156, 163). Rather than identifying specific legal or factual errors in the Recommendation, Plaintiff merely reargues her positions and asks the Court to interpret the facts and authorities differently in order to arrive at a more favorable result. Although the Court understands Plaintiff's intention to preserve her objection to the entirety of the Recommendation, such an objection does not enable the Court "to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Thomas*, 474 U.S. at 147; *see also One Parcel of Real Property Known as 2121 East 30th St.*, 73 F.3d at 1060 (observing that "the filing of objections" is meant to "advance[] the interests that underlie the Magistrate's Act, including judicial efficiency").

Nonetheless, the Court has carefully reviewed *de novo* the applicable law and the relevant materials in this case, including the Objection, the Recommendation (Doc. # 165), the Motion to Dismiss (Doc. # 132) and associated briefing (Docs. # 147, 155, 156, 163), and Plaintiff's Third Amended Complaint (Doc. # 124). *See* Fed. R. Civ. P. 72(b). Having reviewed the issues *de novo*, the Court is satisfied that it would reach the same conclusions as Judge Neureiter and that there is little to add to Judge Neureiter's comprehensive and correct analysis. *See, e.g.*, *In re Griego*, 64 F.3d 580, 584 (10th Cir. 1995) (affirming the "common practice among district judges in this circuit" to "adopt the magistrate judges' recommended dispositions when they find that magistrate judges have dealt with the issues fully and accurately and that they could add little of value to that analysis"); *see also Northington v. Marin*, 102 F.3d 1564, 1570 (10th Cir. 1996) (observing that "a brief order expressly stating the court conducted de novo review is sufficient"). The Court therefore will address only a few points raised in the Objection.

1. Fourteenth Amendment Equal Protection

Plaintiff argues that Judge Neureiter erred by determining that this Court is bound to apply rational basis review by the Tenth Circuit's decision in *Brown*. (Doc. # 169 at 7–13.) In *Brown*, the Tenth Circuit followed the Ninth Circuit's decision in *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 663 (9th Cir. 1977), and held that "transsexuals are not a protected class" for purposes of the Fourteenth Amendment. *Brown*, 63 F.3d at 971. The Tenth Circuit therefore applied rational basis review to the plaintiff's equal protection claim. *Id.* Since *Brown*, the Tenth Circuit has not disturbed this holding. *See, e.g.*, *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015) (unpublished) ("To date, this court has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims."). Now, nearly 28 years after *Brown* was issued, Plaintiff contends that *Brown* is not controlling for several reasons.

First, Plaintiff argues that the *Brown* court did not address whether discrimination against transgender individuals constitutes sex- or gender-based discrimination. Accordingly, she avers that *Brown* has been overruled by the Supreme Court's decision in *Bostock v. Clayton County, Ga.*, 140 S. Ct. 1731, 1741 (2020), in which the Supreme Court analyzed the statutory language of Title VII and held that, within the meaning of Title VII, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." While the Court agrees with Plaintiff that *Bostock* plainly calls into question whether discrimination against transgender individuals is sex-based discrimination in the equal protection context, the Court cannot conclude that *Bostock* clearly overruled *Brown*. The *Bostock*

opinion was expressly focused on interpreting the text of Title VII—nowhere did the Supreme Court address equal protection, rational basis review versus heightened scrutiny, or whether transgender individuals constitute a protected class for purposes of the Fourteenth Amendment. Given these differences, it would be too great a leap for this Court to conclude that *Bostock* constitutes "an intervening Supreme Court decision" justifying this Court's departure from *Brown*. *See Lincoln v. BNSF Railway Co.*, 900 F.3d 1166, 1183 (10th Cir. 2018) (stating that a decision by a panel of the Tenth Circuit is binding precedent and cannot be overruled "[a]bsent an intervening Supreme Court or en banc decision justifying such an action").

Plaintiff next argues that *Brown* itself failed to apply binding precedent because it did not engage in the requisite four-factor analysis for determining whether transgender individuals are a suspect or quasi-suspect class. (Doc. # 169 at 12–13); *see, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020) (describing the four-factor analysis). As such, Plaintiff argues that Brown is "inapplicable." (Doc. # 169 at 13.) However, Plaintiff cites no authority for her proposition that a district court may find error in a binding decision of a federal court of appeals and decline to follow it.

Finally, Plaintiff contends that *Brown* is "no longer applicable" because *Holloway*, the Ninth Circuit decision upon which Brown rests, has been overruled. (*Id.*); *see Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000). Similarly, Plaintiff argues that *Brown* is "inapposite to nearly every single case that has been decided since, which 'have analyzed the relevant factors for determining suspect class status and held that transgender people are at least a quasi-suspect class.'" (Doc. # 169 at 13) (quoting

*Grimm*, 972 F.3d at 610). As such, Plaintiff asserts that Brown "should be discarded on the scrap heap of past decisions, like *Plessy*, *Korematsu*, and *Bowers*, that allowed for state-sanctioned discrimination." (*Id.*) Although the Court agrees with Plaintiff that *Brown* should be reconsidered based on the overruling of *Holloway*, the weight of authority from other circuits, and the Supreme Court's decision in *Bostock*, this Court lacks the authority to make that determination. Bound by *Brown*, the Court must apply rational basis review to Plaintiff's equal protection claim.

If the Court were to consider the issue untethered by *Brown*, the Court would not hesitate to find that heightened scrutiny is warranted for Plaintiff's equal protection claim because transgender-based discrimination constitutes sex-based discrimination triggering intermediate scrutiny. *See, e.g.*, *Grimm*, 972 F.3d at 608. Moreover, applying the four-factor test for determining whether a group constitutes a protected class, the Court would find it "apparent that transgender persons constitute a quasi-suspect class." *Id.* at 611. Transgender people (1) have "historically been subject to discrimination"; (2) have "a defining characteristic that bears a relation to [their] ability to perform or contribute to society"; (3) are "a discrete group by obvious, immutable, or distinguishing characteristics"; and (4) are "a minority lacking political power." *Id.*; *see also Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018) ("[O]ne would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people."). Applying heightened scrutiny, the Court would find that the Complaint plausibly alleges that Defendants' actions in placing

Plaintiff in an all-male unit constituted discrimination not substantially related to an important government interest.

Regretfully, the Court is unable to engage in that analysis or arrive at those conclusions. Directed by binding precedent in *Brown*, the Court agrees with Judge Neureiter that the Complaint fails to plausibly allege that the El Paso County Jail lacked a rational basis for housing Plaintiff in an all-male unit and declining to give her feminine clothing and grooming products. Plaintiff's equal protection claim must be dismissed.

2. Sexual Harassment as an Equal Protection Claim

Plaintiff also objects that Judge Neureiter erred by not considering the second basis for Plaintiff's equal protection claim: that she was subjected to significant verbal and physical harassment by staff and other inmates. (Doc. # 169 at 16.)

Sexual harassment can constitute unlawful sex discrimination in violation of the Fourteenth Amendment's Equal Protection Clause. *See Shepherd v. Robbins*, 55 F.4th 810, 816–17 (10th Cir. 2022) (observing that the Tenth Circuit has "discussed Fourteenth Amendment equal protection claims involving sexual harassment a handful of times" in the employment and education contexts). However, as noted by *Barney v. Pulsipher*, 143 F.3d 1299, 1312 n.15 (10th Cir. 1998), the Tenth Circuit opinions addressing sexual harassment as an equal protection violation have primarily dealt with charges of sexual harassment "in the *employment* context." *Cf. Shepherd*, 55 F.4th at 818 (observing that the Tenth Circuit has also extended such claims to the educational context and to situations where state agents abused their permit or licensing authority to attempt to derive sexual favors). In declining to consider two inmates' sexual

harassment claims as violations of the equal protection clause, the *Barney* court stated that claims "of sexual harassment and assault of inmates by prison guards are more properly analyzed under the Eighth Amendment." Similarly, in *Women Prisoners v. District of Columbia*, cited by *Barney*, the court declined to analyze sexual harassment claims brought by pretrial detainees and inmates as equal protection violations because the court found that the harassment violates the Eighth Amendment and, "*a fortiori* . . . the Fifth Amendment rights of pretrial detainees." 877 F. Supp. 634, 664 n.38 (D.D.C. 1994), *vacated in part, modified in part*, 899 F. Supp. 659 (D.C. 1995), *vacated in part and remanded* 93 F.3d 910 (D.C. Cir. 1996).[3]

In line with the above logic, Judge Neureiter appropriately analyzed Plaintiff's allegations of sexual harassment she experienced as a pretrial detainee as a violation of her due process rights. (Doc. # 165 at 27); *see Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2000). Plaintiff has provided no authority from within this Circuit, and the Court has found none, demonstrating that it is clearly established that a pretrial detainee may assert a cognizable equal protection claim on the basis of sexual harassment. The Court is satisfied that Judge Neureiter adequately addressed Plaintiff's sexual harassment allegations elsewhere in the Recommendation via her other claims.

[3] On appeal, the Federal Circuit considered the sexual harassment claims as asserting violations of the Eighth Amendment and did not address sexual harassment through the lens of equal protection. *See Women Prisoners v. District of Columbia*, 93 F.3d 910, 927, 929 (D.C. Cir. 1996).

## IV. CONCLUSION

In sum, the Court finds Judge Neureiter's Recommendation to be thorough, well-reasoned, and correct. For the reasons stated above, the Court ORDERS as follows:

- The February 27, 2023 Report and Recommendation (Doc. # 165) is AFFIRMED and ADOPTED as an Order of this Court;
- Defendants' Motion to Dismiss Third Amended Complaint (Doc. # 132) is GRANTED; and
- Plaintiff's Third Amended Complaint (Doc. # 124) is DISMISSED WITHOUT PREJUDICE.

The Clerk of Court is directed to close this case.

DATED: March 27, 2023

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 21-cv-00387-CMA-NRN

DARLENE GRIFFITH,

Plaintiff,

v.

EL PASO COUNTY, COLORADO,
BILL ELDER, in his individual and official capacities,
CY GILLESPIE, in his individual capacity,
ELIZABETH O'NEAL, in her individual capacity,
ANDREW MUSTAPICK, in his individual capacity,
DAWNE ELLISS, in her individual capacity,
TIFFANY NOE, in her individual capacity, and
BRANDE FORD, in her individual capacity,

Defendants.

---

## FINAL JUDGMENT

---

In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

Pursuant to the Order Adopting and Affirming (Doc. 173) Recommendation of United States Magistrate Judge of Judge Christine M. Arguello entered on March 27, 2023, it is

ORDERED that the Recommendation of United States Magistrate Judge Neureiter (Doc.165) is AFFIRMED and ADOPTED as an order of this Court. Pursuant to the Recommendation, it is

FURTHER ORDERED that Defendants' Motion to Dismiss Third Amended Complaint (Doc. # 132) is GRANTED; and Plaintiff's Third Amended Complaint (Doc. # 124) is DISMISSED WITHOUT PREJUDICE. It is

FURTHER ORDERED that Defendants shall have their costs by the filing of a Bill of Costs with the Clerk of this Court within fourteen (14) days of entry of judgment, and pursuant to the procedures set forth in Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1

Dated at Denver, Colorado this 27th day of March, 2023.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By: s/ M. Smotts

M. Smotts
Deputy Clerk