No. 23-1135

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

DARLENE GRIFFITH,

*Plaintiff and Appellant,*

*vs.*

EL PASO COUNTY, COLORADO; BILL ELDER, in his individual and official capacities; CY GILLESPIE, in his individual capacity; ELIZABETH O'NEAL, in her individual capacity; ANDREW MUSTAPICK, in his individual capacity; DAWNE ELLISS, in her individual capacity; TIFFANY NOE, in her individual capacity; and BRANDE FORD, in her individual capacity,

*Defendants and Appellees.*

Appeal from the U. S. District Court for the District of Colorado
The Honorable Christine M. Arguello, Senior United States District Judge
Civil Action No. 1:21-CV-00387-CMA-NRN

**BRIEF OF DISABILITY RIGHTS EDUCATION AND DEFENSE FUND
AND THIRTEEN OTHER ORGANIZATIONS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLANT AND
URGING REVERSAL AND REMAND**

Cynthia L. Rice, SBN 87630
Civil Rights Education & Enforcement Center
1245 E. Colfax Avenue, Suite 400
Denver, CO 80218
Email: crice@creeclaw.org
Tel: (303) 551-9389

Maria Michelle Uzeta, SBN 164402
Disability Rights Education & Defense Fund
3075 Adeline Street, Suite 210
Berkeley, CA 94703
Email: muzeta@dredf.org
Tel: (510) 644-2555

*Counsel for Amici Curiae*

# FULL LIST OF *AMICI* CURIAE

1.    Disability Rights Education and Defense Fund

2.    The Arc of the United States

3.    Autistic Self Advocacy Network

4.    Autistic Women and Nonbinary Network

5.    The Judge David L. Bazelon Center for Mental Health Law

6.    The Coelho Center for Disability Law, Policy and Innovation

7.    Civil Rights Education and Enforcement Center

8.    Disability Law Colorado

9.    Disability Rights Advocates

10.   Disability Rights Bar Association

11.   Impact Fund

12.   National Association for Rights Protection and Advocacy

13.   National Disability Rights Network

14.   Transgender Legal Defense and Education Fund

# TABLE OF CONTENTS

FULL LIST OF *AMICI* CURIAE ............................................................i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES...............................................................iv

CONSENT OF THE PARTIES TO THE FILING—FEDERAL RULE OF APPELLATE PROCEDURE 29(a)(2).........................................................1

CORPORATE DISCLOSURE STATEMENT.....................................................1

STATEMENT PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 29(a)(4)(E) .........................................................1

IDENTITY AND INTERESTS OF *AMICI CURIAE* ...........................................2

SUMMARY OF ARGUMENT...............................................................4

ARGUMENT .........................................................................5

I.  Plaintiff Sufficiently Pled Intentional Discrimination Under the ADA and Section 504—The District Court's Dismissal on the Pleadings Must be Reversed...........................................................................5

A.  Plaintiff pled that Defendants had actual notice of her disability and need for accommodation, meeting the knowledge prong of the deliberate indifference test ...........................................................8

B.  Plaintiff pled circumstantial evidence sufficient to show Defendants must have known of her disability and need for accommodation, meeting the knowledge prong of the deliberate indifference test ................................11

C.  Plaintiff pled that Defendants failed to undertake a fact specific investigation to determine if her accommodation requests were reasonable and should have been provided ...................................................12

II.  Defendants Are Not Shielded From Damages for Deliberate Indifference Discrimination Based on a Contention That Plaintiff's Claim Was Legally Unsettled ...........................................................................13

III.  Unlike a Qualified Immunity Analysis, the Intentionality Requirement for Damages Under the ADA and Section 504 Requires a Fact Intensive Review Not Amenable to Resolution on the Pleadings .....................................................18

IV.  The Supreme Court's Opinion in Cummings v. Premier Rehab Keller, P.L.L.C. Does Not Apply to This Case, and Regardless, Need Not be Addressed by this Appeal ....................................................................................20

    A.    Cummings is narrowly focused on damages for emotional distress and does not preclude compensatory damages as a category ...........................20

    B.    A finding that emotional distress damages are unavailable under Title II of the ADA would contradict the statute and undermine its remedial purpose ...............................................................................................24

CONCLUSION ...................................................................................................27

CERTIFICATE OF COMPLIANCE ...................................................................28

ADDENDUM.......................................................................................................29

CERTIFICATE OF DIGITAL SUBMISSION .......................................................36

CERTIFICATE OF SERVICE..............................................................................37

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*A.T. v. Oley Valley Sch. Dist.*,
No. CV 17-4983, 2023 WL 1453143 (E.D. Pa. Feb. 1, 2023) ..........................23

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006)..........................................................................................21

*Bahl v. Cty. of Ramsey*,
695 F.3d 778 (8th Cir. 2012) ............................................................................13

*Barber ex rel. Barber*,
562 F.3d 1222 (10th Cir. 2009) ..................................................................5, 6, 19

*Basta v. Novant Health Inc.*,
56 F.4th 307 (4th Cir. 2022), ..............................................................................5

*Blatt v. Cabela's Retail, Inc.*,
No. 5:14-cv-4822-JFL, 2015 WL 9872493 (E.D. Pa. Nov. 16, 2015) ..........16, 17

*Brownwood v. Wells Trucking LLC*,
No. 16-cv-01264-PAB-NYW, 2017 WL 9289453 (D. Colo. Nov. 9, 2017) ..........
...................................................................................................................14, 15

*Callahan v. Unified Gov't of Wyandotte Cty.*,
806 F.3d 1022 (10th Cir. 2015) .........................................................................19

*Chaitram v. Penn Medicine-Princeton Med. Ctr.*,
No. 21-17583, 2022 WL 16821692 (D.N.J. Nov. 8, 2022) ...............................23

*Colbruno v. Kessler*,
928 F.3d 1155 (10th Cir. 2019) ....................................................................18, 19

*Cook v. R.I . Dep't of Mental Health, Retardation, and Hosps.*,
10 F.3d 17 (1st Cir. 1993)....................................................................................1

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
142 S. Ct. 1562 (2022)................................................................................*passim*

*Doe next friend of Doe v. City of Pawtucket*,
633 F.Supp.3d 583 (D.R.I., 2022) .....................................................................23

*Doe v. Fairfax Cnty. Sch. Bd.*,
    No. 1:18-cv-00614, 2023 WL 424265 (E.D. Va. Jan. 25, 2023) ........................ 23

*Doe v. Massachusetts Dep't of Correction*,
    No. CV 17-12255-RGS, 2018 WL 2994403 (D. Mass. June 14, 2018) ............. 16

*Durrell v. Lower Merion Sch. Dist.,*
    729 F.3d 248 (3d Cir. 2013) ..................................................................................... 5

*Duvall v. County of Kitsap,*
    260 F.3d 1124 (9th Cir. 2001) ............................................................. 5, 6, 7, 12

*Edmo v. Idaho Dep't of Correction*,
    No. 1:17-CV-00151-BLW, 2018 WL 2745898 (D. Idaho June 7, 2018) ...... 15, 16

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ................................................................................................ 11

*George v. Cmty. Health Ctrs*.,
    No. CIV-21-00464-PRW, 2022 WL697787 (W.D. Okla. Mar. 8, 2022) ............ 15

*Havens v. Colorado Dep't of Corr*.,
    897 F.3d 1250 (10th Cir. 2018) .............................................................. 6, 11, 19

*Iglesias v. True,*
    403 F. Supp. 3d 680 (S.D. Ill. 2019) .................................................................... 16

*J.V. v. Albuquerque Pub. Schs*.,
    813 F.3d 1289 (10th Cir. 2016) .............................................................................. 6

*Johnson v. Sedgwick Cty. Sheriff's Dep't,*
    461 F. App'x 756 (10th Cir. 2012) ....................................................................... 14

*Koon v. North Carolina*,
    50 F.4th 398 (4th Cir. 2022) .................................................................................. 12

*Kulasa v. Wyndham Vacation Rentals N. Am., LLC*,
    No. 20-1402, 2021 WL 3832343 (10th Cir. Aug 27, 2021) ................................. 14

*Liese v. Indian River Cnty. Hosp. Dist*.,
    701 F.3d 334 (11th Cir. 2012) ................................................................................ 5

*Loeffler v. Staten Island Univ. Hosp.*,
 582 F.3d 268 (2d Cir. 2009) ....................................................................5

*Makeen v. State*, No. 14-CV-03452-CMA-CBS,
 2015 WL 1945299 (D. Colo. Apr. 29, 2015).........................................13

*Mauerhan v. Wagner Corp.*,
 649 F.3d 1180 (10th Cir. 2011) ...........................................................15

*McAlindin v. County of San Diego*,
 192 F.3d 1226 (9th Cir. 1999) .............................................................13

*Meagley v. City of Little Rock*,
 639 F.3d 384 (8th Cir. 2011) ..................................................................5

*Miener v. Missouri*,
 673 F.2d 969 (8th Cir. 1982) ................................................................25

*Mitchell v. Forsyth*,
 472 U.S. 511 (1985)...............................................................................19

*Montgomery v. District of Columbia*,
 2022 WL 1618741 (D.D.C. May 23, 2022)....................................22, 23

*Powers v. MJB Acquisition Corp.*,
 184 F.3d 1147 (10th Cir. 1999) ...........................................................19

*Randle v. Aurora*,
 69 F.3d 441 (10th Cir. 1995) ..................................................................7

*Robertson v. Las Animas Cnty. Sheriff's Dep't*,
 500 F.3d 1185 (10th Cir. 2007) ..............................................................7

*Romero v. Union Pac. R.R.*,
 615 F.2d 1303 (10th Cir. 1980) ..............................................................7

*Shorter v. Barr*,
 2020 WL 1942785 (N.D. Fla. Mar. 13, 2020) report and recommendation
 adopted, 2020 WL 1942300 (Apr. 22, 2020)........................................16

*Tabura v. Kellogg USA*,
 880 F.3d 544 (10th Cir. 2018) .............................................................13

*Tate v. Wexford Health Source Inc.*,
  No. 3:16-CV-00092-NJR, 2016 WL 687618 (S.D. Ill. Feb. 19, 2016) ...............16

*Tesone v. Empire Mktg. Strategies*,
  942 F.3d 979 (10th Cir. 2019) .......................................................................6, 15

*Venson v. Gregson*,
  No. 3:18-CV-2185-MAB, 2021 WL 673371 (S.D. Ill. Feb. 22, 2021) ...............16

*Williams v. Kincaid*,
  45 F.4th 759 (4th Cir. 2022) ........................................................................16, 17

*Zayre-Brown v. N. Carolina Dep't of Pub. Safety*,
  No. 3:22-CV-191-MOC-DCK, 2022 WL 4456268 (W.D.N.C. Sept. 23, 2022).....
  ............................................................................................................................16

## Statutes

29 U.S.C. § 794 .......................................................................................................2

29 U.S.C. § 794a ...................................................................................................25

29 U.S.C. § 794a(a)(1) ..........................................................................................25

29 U.S.C. § 794a(a)(2) ..........................................................................................25

42 U.S.C. § 12101(a)(4) ........................................................................................24

42 U.S.C. § 12101(b)(1) ........................................................................................24

42 U.S.C. § 12101(b)(2) ........................................................................................24

42 U.S.C. § 12101(b)(4)....................................................................................24, 26

42 U.S.C. § 12114 ..................................................................................................15

42 U.S.C. § 12133 ..................................................................................................15

42 U.S.C. §§ 12101-12213 ......................................................................................2

42 U.S.C. § 18116 ...............................................................................................4, 20

<u>**Regulations**</u>

28 C.F.R. § 35.108(d) ............................................................14

28 C.F.R. § 35.108(d)(iv) ......................................................14

<u>**Other Authorities**</u>

11 W. Jaeger, Williston on Contracts § 1341 (3d ed. 1968) ...................21

135 Cong. Rec. S10734-02, S10755,
    1989 WL 183115 (daily ed. Sept. 7, 1989)..........................................26

C. McCormick, Law of Damages § 145 (1935) ......................................22

Corbin on Contracts § 55.11 .....................................................22

D. Laycock & R. Hasen, Modern American Remedies (5th ed. 2019)..................21

Department of Justice, Amendment of Americans With Disabilities Act Title II
    and Title III Regulations To Implement ADA Amendments Act of 2008,
    81 Fed. Reg. 53203 (Aug. 11, 2016) .................................14

E. Farnsworth Contracts § 12.17 (1982) ...............................................21

H.R. Rep. No. 101-485 (III) (1990) .......................................................25

J. Perillo, Calamari & Perillo on Contract § 14.5 (6th ed. 2009) ......................21, 22

Letter to State Attorneys General from Kristin Clarke, Assistant Attorney General,
    Department of Justice, Civil Rights Division (March 31, 2022) ........................17

Restatement (Second) of Contracts § 347 ..............................................22

Second Statement of Interest of the United States, *Blatt v. Cabela's Retail, Inc.*,
    No. 5:14-cv-4822-JFL, 2015 WL 9872493 (E.D. Pa. Nov. 16, 2015) ...............17

Statement of Interest of the United States, *Doe v. Arrisi*, No. 3:16-CV-08640
    (D.N.J. July 17, 2017) ...................................................17

Williston on Contracts § 64:1 .....................................................22

## **Rules**

Tenth Cir. R. 25.5 ..........................................................................36

Fed. R. App. P. 26.1 .........................................................................1

Fed. R. App. P. 29(a)(2) ....................................................................1

Fed. R. App. P. 29(a)(4)(E) ...............................................................1

Fed. R. App. P. 29(a)(5) ...................................................................28

Fed. R. App. P. 32(a)(5) ...................................................................28

Fed. R. App. P. 32(a)(6) ...................................................................28

## CONSENT OF THE PARTIES TO THE FILING
## FEDERAL RULE OF APPELLATE PROCEDURE 29(a)(2)

This motion is filed with the consent of Devi Rao, counsel for Plaintiff-Appellant, and Steven W. Martyn, counsel for Defendants-Appellees.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for *Amici Curiae* certifies that no *Amici* has a parent corporation and that no publicly held corporation owns 10 percent or more of any *Amici's* respective stock.

## STATEMENT PURSUANT TO
## FEDERAL RULE OF APPELLATE PROCEDURE 29(a)(4)(E)

The undersigned certifies that no party's counsel authored this brief in whole or in part, and that no party, party's counsel, or any other person other than *Amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief.

**IDENTITY AND INTERESTS OF *AMICI CURIAE***

*Amici* are organizations that represent and advocate for the rights of people with disabilities, including transgender individuals who have been diagnosed with gender dysphoria. *Amici* have extensive policy and litigation experience and are recognized for their expertise in the interpretation of civil rights laws affecting individuals with disabilities including the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). Collectively and individually, *Amici* have a strong interest in ensuring that these disability rights statutes are properly interpreted and enforced, consistent with Congress's remedial intent to eliminate discrimination and address segregation and exclusion.

Given *Amici's* strong interests, the March 27, 2023, Order of the Honorable Christine M. Arguello granting Defendants-Appellees'[1] Motion to Dismiss is of significant concern. Although the district court correctly held that gender dysphoria is not excluded from the ADA's definition of "disability," its subsequent dismissal of Plaintiff-Appellant's[2] damages claims under the ADA and Section 504 was in error. In the February 27, 2023, Report and Recommendation ("Report") affirmed

---

[1] Defendants-Appellees are collectively referred herein as "Defendants."

[2] Plaintiff-Appellant is referred to herein as "Plaintiff."

and adopted by the district court, Magistrate N. Reid Neureiter opined that the law

is "unsettled" regarding whether discrimination based on gender dysphoria violates

the ADA and Section 504. A.122-123.[3] Based solely on this opinion, the court

concluded that Plaintiff could not plausibly allege that Defendants were

"deliberately indifferent" in their discrimination—*i.e.,* that Defendants "*knew* that

a harm to a federally protected right was substantially likely." A.139, citing A.122-

123 (emphasis in original). In so holding, the court wrongly conflated the ultimate

merits of Plaintiff's disability claims with the factual question of whether

Defendants had notice of Plaintiff's disability-related need for accommodation and

failed to act on the same. Further, the court erroneously posited that a defendant

can be shielded from liability for damages for intentional discrimination based on a

contention that one of the elements of the plaintiff's claim—here, whether the

Plaintiff was legally disabled —was unsettled. If permitted to stand, the district

court's analysis will allow entities free rein to discriminate unless and until all

courts agree a condition is a covered disability. This will severely weaken

enforcement of the ADA.

Of additional concern to *Amici*, Magistrate Neureiter's Report suggests that

the Supreme Court's opinion in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142

---

[3] Citations to Plaintiff-Appellant's Appendix use an "A., [page/paragraph number]" format.

S. Ct. 1562 (2022), may preclude the recovery of compensatory damages under the ADA and Section 504. A.122. However, the *Cummings* opinion is expressly limited to claims for emotional distress damages, and only considered the availability of such damages under Section 504 and the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116. *Cummings*, 145 S. Ct. at 1569. Because the availability of compensatory damages is essential in safeguarding the rights of people with disabilities under disability rights statutes, *Amici* has an interest in ensuring that the *Cummings* decision is not improperly expanded.

The experience, expertise, and unique perspective of *Amici* make them particularly well suited to assist this Court in resolving the important legal issues presented in this case. *Amici* are described in the attached Addendum.

## SUMMARY OF ARGUMENT

The primary question addressed by this brief is whether Plaintiff's complaint[4] sufficiently alleges that Defendants intentionally discriminated against her when they failed to provide her with reasonable accommodations for her gender dysphoria. *Amici* will show that Plaintiff sufficiently pled the intentionality of Defendants' discrimination, both through discriminatory animus and "deliberate

---

[4] "Complaint" means Plaintiff's Third Amended Complaint, filed June 7, 2022.

indifference." Accordingly, Plaintiff's damages claims under the ADA and Section 504 should not have been dismissed at pleadings stage.

Additionally, *Amici* contend that the district court's finding that Defendants are immune from damages because the fact of Plaintiff's disability was legally in dispute is erroneous and entirely novel, upending the ADA and its precedent.

Finally, although this Court need not address the issue of whether the Supreme Court's decision in *Cummings* applies in this case, should it choose to do so *Amici* urge the Court to reject the suggestion that *Cummings* forecloses the availability of compensatory damages to Plaintiff, as *Cummings* is limited in its application to the availability of emotional distress damages and did not consider the availability of damages under the ADA.

## ARGUMENT

### I. Plaintiff Sufficiently Pled Intentional Discrimination Under the ADA and Section 504—The District Court's Dismissal on the Pleadings Must be Reversed

To recover monetary damages under Title II of the ADA or Section 504, Plaintiff must prove intentional discrimination on the part of Defendants. In this Circuit, like most circuits,[5] intentional discrimination may be shown with evidence

---

[5] *See, e.g., Basta v. Novant Health Inc.,* 56 F.4th 307, 316-317 (4th Cir. 2022); *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013); *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012); *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275–276 (2d Cir. 2009); *Barber ex rel. Barber v. Colo.*

of discriminatory animus or that the defendant acted with "deliberate indifference."
*See Havens v. Colorado Dep't of Corr.*, 897 F.3d 1250, 1264 (10th Cir. 2018)
(citations omitted). "'The test for deliberate indifference consists of two prongs:
(1) 'knowledge that a harm to a federally protected right is substantially likely,'
and (2) 'a failure to act upon that ... likelihood.'" *Barber ex rel. Barber*, 562 F.3d
1222, 1229-30 (10th Cir. 2009) (citing *Duvall v. County of Kitsap*, 260 F.3d 1124,
1139 (9th Cir. 2001); *accord J.V. v. Albuquerque Pub. Schs.*, 813 F.3d 1289, 1298
(10th Cir. 2016).

The operative complaint details extensive allegations of discriminatory
animus on the basis of Plaintiff's disabilities, including slurs (*e.g.*, "blind faggot"),
unwanted touchings, threatened and actual sexual assaults, and facially
discriminatory policies and practices. *See generally*, A.26-82. These allegations
sufficiently pled intentionality through discriminatory animus. *See Tesone v.
Empire Mktg. Strategies*, 942 F.3d 979, 995 (10th Cir. 2019) (describing evidence
that may support discriminatory animus including adoption of a facially
discriminatory policy). Yet, the district court did not address animus at all. Rather,
the district court focused solely on whether Plaintiff met the deliberate indifference
test, and exclusively on whether she adequately pled that Defendants had

---

*Dept. of Revenue*, 562 F.3d 1222, 1228–29 (10th Cir. 2009); *Duvall v. County of
Kitsap*, 260 F.3d 1124, 1138-1139 (9th Cir. 2001).

knowledge that a harm to a federally protected right was substantially likely. A.122-123.

The knowledge prong of the deliberate indifference test is satisfied "[w]hen the plaintiff has alerted the public entity to [her] need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation)." *Duvall* at 1139. As described in Sections I.A. and I.B., below, the factual allegations in Plaintiff's complaint make this showing.

Because Plaintiff sufficiently pled intentional discrimination, both through discriminatory animus and deliberate indifference, the district court's dismissal on the pleadings should be reversed. Defendants' knowledge and intent are questions of fact unsuitably decided on a motion to dismiss. "Judgments about intent are best left for trial and are within the province of the jury." *Randle v. Aurora*, 69 F.3d 441, 453 (10th Cir. 1995). *See also, Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1200 (10th Cir. 2007) (reversing and remanding summary judgment entered on the disability claims because genuine issues of material fact existed as to whether the plaintiff was disabled within the meaning of the ADA and whether the detention facility knew of his disability); and *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1309 (10th Cir. 1980) (debatable issues of motive and intent are "particularly inappropriate for summary judgment disposition").

### A. Plaintiff pled that Defendants had actual notice of her disability and need for accommodation, meeting the knowledge prong of the deliberate indifference test

#### i. Plaintiff pled she repeatedly advised Defendants of her disability and need for accommodation

Plaintiff's complaint is replete with allegations establishing that Defendants had actual notice of her disability and need for accommodation. For example, Plaintiff alleges that Defendants were aware of her diagnosis and history of gender dysphoria. A.32, ¶¶ 26-27. Plaintiff alleges that she notified Defendants of her gender dysphoria diagnosis during her intake screening and explicitly requested placement in a women's facility because, among other things, she feared being sexually abused and assaulted in male facilities and feared the humiliation of being searched by male guards. A.37, ¶ 48.

Plaintiff also alleges that Defendants did an "ADA initial interview" of her during which she asked to be placed in housing that corresponded with her gender identity to accommodate her gender dysphoria. A.37-38, ¶ 55.

Plaintiff alleges that after being initially classified into an all-male unit, she repeatedly and continuously requested that she be transferred to housing that corresponds with her gender identity to accommodate her gender dysphoria. A.38, ¶¶ 56-58; A.39, ¶¶ 59, 61, 63; A.40, ¶ 65. Plaintiff further alleges that she filed numerous inmate grievances requesting that she be transferred to housing that

corresponds with her gender identity to accommodate her gender dysphoria. A.38, ¶ 57; A.39, ¶¶ 59, 61, 63.

Plaintiff alleges that she told Defendants on multiple occasions that she had previously been housed in female units at correctional facilities, including the Denver Women's Prison, as an accommodation for her gender dysphoria. A.38, ¶ 57; A.39, ¶59; A.40, ¶65. Plaintiff further alleges that the fact of her prior accommodation was confirmed by Defendants. A.40, ¶65.

Finally, Plaintiff alleges that she filed grievances with Defendants regarding a number of other accommodations she sought for her gender dysphoria and was denied, including access to gender-affirming clothing, that Defendants address her by her proper name and pronouns, that Defendants refrain from harassing her, and that she not be subjected to non-routine cross-gender pat down searches. A.45, ¶¶ 93, 97; A.46, ¶ 101; A.47, ¶¶ 102-104; A.48, ¶¶ 110-112; A.49, ¶¶ 114-116.

### ii. Plaintiff pled that Defendants had notice of the physical symptoms of her disability and the impact of Defendants' failure to accommodate

Plaintiff alleges that Defendants were aware of her history of self-harm, a symptom and manifestation of her gender dysphoria diagnosis. A.32, ¶ 29. Plaintiff further alleges that she alerted Defendants to her self-harming thoughts throughout her incarceration. *Id*. Plaintiff also alleges that Defendants were aware of her history of suicide attempts, and increased suicide risk. *Id.*

Plaintiff alleges that she received mental health services in Defendants'
facility and that on two separate occasions she told her mental health providers of
her plans to cut off her penis. A.32, ¶¶ 30-31. Plaintiff further alleges that her plans
to self-castrate were noted in her records and verbally conveyed to Defendants.
A.32, ¶¶ 30-31; A.33, ¶ 32. And after Defendants continued to deny her
accommodation requests, Plaintiff alleges, she attempted to self-castrate by
wrapping a rubber band around her genitals. A.33, ¶ 32; A.43, ¶ 83.

Plaintiff also alleges she was sexually assaulted and consistently harassed in
Defendants' custody; treatment she grieved about consistently. A.43, ¶¶ 84-86;
A.44, ¶¶ 87-88; A.43, ¶¶ 99-101; A.47, ¶¶ 102-105. She alleges that that she told
jail mental health providers she was suffering from "extreme anxiety,"
experiencing difficulty with her mental health, and that her situation was causing
her "anxiety and depression." A.39, ¶¶ 60, 62.

Finally, Plaintiff alleges she wrote grievances every day stating that she was
"suffering mentally and physically," and that Defendants' failure to provide
accommodations for her gender dysphoria—including moving her to a women's
unit within the jail—was having a "harmful effect on her physical and mental
health," causing her anxiety to go "through the roof," and causing her trauma,
suffering, and "physical and emotional pain." A.39, ¶ 61; A.44, ¶¶ 89-91.

10

**B. Plaintiff pled circumstantial evidence sufficient to show Defendants must have known of her disability and need for accommodation, meeting the knowledge prong of the deliberate indifference test**

The Supreme Court has suggested that circumstantial evidence may create a fact question on deliberate indifference where the alleged rights violations are "longstanding, pervasive, well-documented, or expressly noted by the prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (when considering "substantial risk" in the context of an Eighth Amendment claim, the court held that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious"). *See also Havens*, 897 F.3d at 1266 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ....") (internal citation omitted).

Here, in addition to alleging that Defendants had actual notice of her disability and the symptoms of her disability, actual notice of her need for accommodation, and actual notice of the impact denial of those accommodations would have on her,[6] Plaintiff alleges facts showing that Defendants were exposed

---

[6] *See* Section 1.A.

to considerable information concerning the risks she faced, and thus must have known about those risks. For example, Plaintiff's complaint contains allegations about her medical and incarceration records; records to which Defendants had unfettered access. These records contained information regarding Plaintiff's gender dysphoria diagnosis, blindness, and history of being accommodated by being housed in female units. A.37 ¶¶ 49-50; A.38 ¶ 57. A.40 ¶ 65.

These facts, collectively considered, indicate that Plaintiff can prove that the risk of cognizable harm to her was so great and so obvious that Defendants' failure to respond to that risk alone supports a finding of deliberate indifference. This creates a question of fact that is sufficient to survive a motion to dismiss. *See Koon v. North Carolina*, 50 F.4th 398, 407 (4th Cir. 2022) ("When a risk was so 'obvious' that an official must have had knowledge, that can get a deliberate-indifference question to a jury.")

### C. Plaintiff pled that Defendants failed to undertake a fact specific investigation to determine if her accommodation requests were reasonable and should have been provided

Once a public entity has received an accommodation request, or the need for an accommodation is "obvious," it is incumbent on that entity to undertake a "fact specific investigation" to determine if the request is reasonable and should be provided. *See Duvall*, 260 F.3d at 1139. Whether an entity failed to undertake such an investigation and/or failed to provide a reasonable accommodation is a question

of fact to be decided by the fact finder. *Tabura v. Kellogg USA*, 880 F.3d 544, 555

(10th Cir. 2018) (Title VII religious discrimination). *See also Bahl v. Cty. of*

*Ramsey*, 695 F.3d 778, 784-85 (8th Cir. 2012) ("The reasonable modification

inquiry is highly fact-specific and varies depending on the circumstances of each

case"); *Makeen v. State*, No. 14-CV-03452-CMA-CBS, 2015 WL 1945299, at *2

(D. Colo. Apr. 29, 2015) ("Whether an accommodation under the ADA is

reasonable is a factual issue and depends on the specific circumstances of the

case.") (citing *McAlindin v. County of San Diego*, 192 F.3d 1226, 1238 (9th Cir.

1999)). Here, Plaintiff sufficiently pled the fact that she made numerous

accommodation requests of Defendants and that such requests were flatly denied.[7]

The failure of Defendants to undertake a fact specific investigation to determine

whether Plaintiff's accommodation requests were reasonable and should be

provided constitutes deliberate indifference.

## II. Defendants Are Not Shielded From Damages for Deliberate Indifference Discrimination Based on a Contention That Plaintiff's Claim Was Legally Unsettled

Although the district court properly found that Plaintiff's gender dysphoria

constituted a disability under the ADA, the court's subsequent reasoning that

Defendants are nevertheless immune from damages solely because the fact of

---

[7] *See* Section I.A.

13

Plaintiff's disability was legally in dispute is entirely novel. Upholding the court's

analysis would upend the ADA and run afoul of decades of case law.

     The determination of whether a person has a disability—an impairment that

substantially limits a major life activity—requires an individualized assessment. 28

C.F.R. § 35.108 (d)(iv) (2016).[8] Even after the passage of the ADA Amendments

Act of 2008 (clarifying the scope of the definition of disability under the ADA),

defendants may—rightly or wrongly—dispute in court whether a person has a

disability. The dispute may be over whether the impairment—such as an

orthopedic injury[9] or ADHD[10]—is substantially limiting. As in some cases, the

dispute may be whether there is an impairment at all, as can arise in a case alleging

disability discrimination based on "obesity" or higher weight.[11]

---

[8] Department of Justice, Amendment of Americans With Disabilities Act Title II and Title III Regulations To Implement ADA Amendments Act of 2008, 81 Fed. Reg. 53203 (Aug. 11, 2016); 28 C.F.R. § 35.108(d) (2016).

[9] *See Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 999 (10th Cir. 2019) (reversing and remanding grant of summary judgment for employer and directing a case-specific consideration of whether expert evidence was required for plaintiff to show that lower back injury was disability under ADA).

[10] *See Johnson v. Sedgwick Cty. Sheriff's Dep't*, 461 F. App'x 756, 759 (10th Cir. 2012) (affirming summary judgment granted defendant where district court found no evidence that plaintiff's ADHD substantially limited a major life activity); *Kulasa v. Wyndham Vacation Rentals N. Am.*, *LLC*, No. 20-1402, 2021 WL 3832343, at *3 (10th Cir. Aug. 27, 2021) (same).

[11] *See*, *e.g.*, *Brownwood v. Wells Trucking LLC*, No. 16-cv-01264-PAB-NYW, 2017 WL 9289453, at *4 (D. Colo. Nov. 9, 2017) ("Although the Tenth Circuit has not yet addressed this issue, a majority of courts have held that obesity does not

The dispute may also—as here—be over whether an exemption in the ADA applies. *See, e.g., Edmo v. Idaho Dep't of Correction*, No. 1:17-CV-00151-BLW, 2018 WL 2745898, at *8 (D. Idaho June 7, 2018) (denying a motion to dismiss because the question of whether the plaintiff's gender dysphoria diagnosis falls under a specific exclusion of the ADA presents a genuine dispute of material fact). *See also Mauerhan v. Wagner Corp.*, 649 F.3d 1180, 1187-88 (10th Cir. 2011) ("The issue, therefore, is not solely one of the number of days or weeks that have passed since an individual last illegally used drugs. … [A]n individual's eligibility for the safe harbor must be determined on a case-by-case basis, examining whether the circumstances of the plaintiff's drug use and recovery justify a reasonable belief that drug use is no longer a problem.") (construing and applying 42 U.S.C. § 12114, the ADA's substance use exclusion, and denying coverage); and *George v. Cmty. Health Ctrs.*, No. CIV-21-00464-PRW, 2022 WL697787, at *5 (W.D. Okla. Mar. 8, 2022) ("Ms. George has presented evidence and arguments sufficient for fact-finders to conclude that she is a qualified individual with a disability who is within the safe harbor's protections.") (granting coverage).

---

qualify as an impairment, absent evidence of an underlying physiological cause."); *cf. Tesone*, 942 F.3d at 996 (citing *Cook v. R.I. Dep't of Mental Health, Retardation, and Hosps.*, 10 F.3d 17, 23 (1st Cir. 1993) (noting that "the jury could plausibly have found that plaintiff had a physical impairment" because "she presented expert testimony that morbid obesity is a physiological disorder")).

Thus, whether an individual has a disability under the ADA is not always going to be "settled"; the outcome of such a dispute may depend upon the fact finder's review of the law and the evidence. Such a review occurred here. Before the district court were Plaintiff's allegations of gender dysphoria and associated substantial limitations. A.33, ¶¶ 33-36. Plaintiff apprised the court of a series of cases dating back to 2018 holding that gender dysphoria was not excluded from the protections of the ADA and Section 504.[12] ECF 147 at 47. The Appellate Court for the Fourth Circuit had just issued an Opinion confirming that gender dysphoria

---

[12] In fact, there is a run of cases dating back to *2015* holding that gender dysphoria is not excluded from the protections of the ADA and Section 504. *See, e.g., Williams v. Kincaid*, 45 F.4th 759, 769 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2414 (2023) ("as a matter of statutory construction" gender dysphoria is not a gender identity disorder"); *Zayre-Brown v. N. Carolina Dep't of Pub. Safety*, No. 3:22-CV-191-MOC-DCK, 2022 WL 4456268, at *5 (W.D.N.C. Sept. 23, 2022) ("a plaintiff can state a claim for disability discrimination for gender dysphoria as a matter of law"); *Venson v. Gregson*, No. 3:18-CV-2185-MAB, 2021 WL 673371, at *2-3 & n.2 (S.D. Ill. Feb. 22, 2021) (rejecting argument that ADA excludes gender dysphoria); *Shorter v. Barr*, 2020 WL 1942785, at *9 (N.D. Fla. Mar. 13, 2020) report and recommendation adopted, 2020 WL 1942300 (Apr. 22, 2020) (the Rehabilitation Act); *Iglesias v. True*, 403 F. Supp. 3d 680, 688 (S.D. Ill. 2019) (rejecting argument that "gender dysphoria falls within the [Rehabilitation Act's] exclusionary language"); *Doe v. Massachusetts Dep't of Correction*, No. CV 17-12255-RGS, 2018 WL 2994403, at*7 (D. Mass. June 14, 2018) (the ADA's transgender exclusion did not apply to gender dysphoria); *Edmo v. Idaho Dep't of Corr.*, No. 1:17-cv-00151-BLW, 2018 WL 2745898, at *8 (D. Idaho June 7, 2018) (declining to dismiss ADA claim based on gender dysphoria); *Tate v. Wexford Health Source Inc.*, No. 3:16-CV-00092-NJR, 2016 WL 687618, at *5 (S.D. Ill. Feb. 19, 2016) (allowing transgender inmate to proceed on claim under the ADA); and *Blatt v. Cabela's Retail, Inc.*, No. 5:14-cv-04822, 2017 WL 2178123, at *4 (E.D. Pa. Nov. 16, 2015) (holding that gender dysphoria is protected by the ADA).

does not fall within the ADA's exclusions. *Williams v. Kincaid*, 45 F.4th 759, 769
(4th Cir. 2022), *cert. denied*, 143 S. Ct. 2414 (2023). Plaintiff had also apprised the
court of a Statement of Interest of the Department of Justice's Statement opining
that "[i]n light of the evolving scientific evidence suggesting that Gender
Dysphoria may have a physical basis, along with the remedial nature of the ADA
and the relevant statutory and regulatory provisions directing that the terms
'disability' and 'physical impairment' be read broadly, the [ADA's exclusion of
gender identity disorders not resulting from a physical impairment] should be
construed narrowly such that Gender Dysphoria falls outside its scope."[13] A.70, ¶
266, citing Second Statement of Interest of the United States at 5, *Blatt v. Cabela's
Retail, Inc*., No. 5:14-cv-4822-JFL, 2015 WL 9872493 (E.D. Pa. Nov. 16, 2015).

Considering these facts and law, the district court properly found that
Plaintiff's gender dysphoria constituted a disability under the ADA. It was error,

---

[13] Notably, through the last three Administrations, the Department of Justice has
consistently opined that gender dysphoria falls within the statutory protections of
the ADA and Section 504. In addition to the Second Statement of Interest of the
United States in *Blatt*, the Department submitted a Statement of Interest in *Doe v.
Arrisi*, No. 3:16-CV-08640 (D.N.J. July 17, 2017), Doc 49, filed July 17, 2017,
opining that gender dysphoria "falls within the statutory protections of the ADA";
and penned a March 31, 2022 letter to State Attorneys General stating that Section
504 of the Rehabilitation Act "protects people with disabilities, which can include
individuals who experience gender dysphoria." Letter to State Attorneys General
from Kristin Clarke, Assistant Attorney General, Department of Justice, Civil
Rights Division, available at https://www.justice.gov/media/1215916/dl?inline
(last viewed August 18, 2018).

however, for the court to subsequently conclude that the fact Plaintiff's disability was in dispute shields Defendants from any possibility of an intentionality finding and liability for damages.[14] Defendants' knowledge and intent in subjecting Plaintiff to their discriminatory policies, and Plaintiff's entitlement to damages as the result of Defendants' discrimination, are independent questions of fact, unsuitably decided on a motion to dismiss.

## III. Unlike a Qualified Immunity Analysis, the Intentionality Requirement for Damages Under the ADA and Section 504 Requires a Fact Intensive Review Not Amenable to Resolution on the Pleadings

The district court improperly conflates case law analyzing qualified immunity—which is not a defense, but an exclusion from liability—with the intentionality requirement for damages under the ADA and Section 504. Intentionality, unlike qualified immunity, is a factual determination improper for disposition on the pleadings.

Qualified immunity "'protects government officials from liability for civil damages insofar as their conduct does not violate <u>clearly established statutory or constitutional rights</u> of which a reasonable person would have known.'" *Colbruno*

---

[14] This is particularly true because there is no evidence in the record that Defendants relied upon any legal construction of the ADA or Section 504, or a review of applicable case law when denying Plaintiff's accommodation requests or deciding not to undertake the fact specific investigation required to determine whether her accommodation requests were reasonable and should be provided.

*v. Kessler*, 928 F.3d 1155, 1160 (10th Cir. 2019), citing *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1026 (10th Cir. 2015) (emphasis added). It has been characterized as necessary to protect public officials, not only from liability, but from the burden of litigation. Unlike factual questions of intent, qualified immunity is appropriately addressed at the pleading stage, as it reflects "an entitlement not to stand trial or face the other burdens of litigation.'" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Deliberate indifference, on the other hand, turns on a factual determination as to whether there is a "strong likelihood that pursuit of [an entity's] questioned policies will likely result in a violation of federally protected rights." *Barber ex rel. Barber*, 562 F.3d at 1229-30 (emphasis added), citing *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999). The deliberate indifference standard is applied in place of a direct showing of intentional discrimination "…consistent with the purposes animating the Rehabilitation Act. … not only to curb 'conduct fueled by discriminatory animus,' but also to right 'the result of apathetic attitudes rather than affirmative animus.'" *Havens* at 1264, internal quotes and citations omitted. Whether this standard, discussed in Section I, has been met in a particular case is a fact intensive review not amenable to resolution on the pleadings.

IV. **The Supreme Court's Opinion in** *Cummings v. Premier Rehab Keller,*
   *P.L.L.C.* **Does Not Apply to This Case, and Regardless, Need Not be**
   **Addressed by this Appeal**

In *Cummings*, the Supreme Court addressed the very limited question of
whether emotional distress damages are available under Section 504 and Section
1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116
("Section 1557"). Although the Magistrate's Report foreshadows an improper
potential expansion of the *Cummings* opinion to bar all compensatory damages
under Section 504 and the ADA, *see* A.122, this Court need not address that issue.
Should it nonetheless choose to do so, *Amici* urge this Court to find—for the
reasons set forth below—that *Cummings* is narrowly focused on emotional distress
damages under Section 504 and does not have a broader application to the facts of
this case.

A. **Cummings is narrowly focused on damages for emotional distress**
   **and does not preclude compensatory damages as a category**

In *Cummings*, a deaf and legally blind individual was denied a sign language
interpreter when receiving physical therapy services. *Cummings*, 142 S. Ct. at
1568–69. She brought suit under Section 504 and Section 1557. *Id.* at 1569. The
"only compensable injuries" claimed by the plaintiff were "humiliation, frustration,
and emotional distress." *Id.* (internal quotation marks omitted). The Supreme Court
thus considered only the narrow question of whether "compensatory damages <u>for</u>

emotional distress are available under the implied Title VI cause of action." *Id.* at
1576 (Kavanaugh and Gorsuch, J.J., concurring) (emphasis added).

The majority's analysis in *Cummings* began and ended with the
Rehabilitation Act's enactment as Spending Clause legislation. *Id.* at 1570.
Because Spending Clause legislation operates as a quasi-contract between the
federal government and recipients of federal aid, the Court considered whether "a
prospective funding recipient, at the time it 'engaged in the process of deciding
whether to accept federal dollars, [would] have been aware that it would face such
liability.'" *Id.* at 1570–71 (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v.
Murphy*, 548 U.S. 291, 296 (2006)). The Court answered this question, with
respect to the specific statutes at issue, by looking to treatises on contract law in
which it found that "emotional distress is generally <u>not</u> compensable in contract."
*Id.* at 1571 (emphasis added). *See* D. Laycock & R. Hasen, Modern American
Remedies 216 (5th ed. 2019) ("<u>emotional distress</u> is generally not compensable in
contract") (emphasis added); 11 W. Jaeger, Williston on Contracts § 1341, p. 214
(3d ed. 1968) ("<u>Mental suffering</u> caused by breach of contract, although it may be
a real injury is not generally allowed as a basis for compensation in contractual
actions") (emphasis added); E. Farnsworth Contracts § 12.17, p. 894 (1982) (rule
of "generally denying recovery for <u>emotional disturbance or 'mental distress'</u>
resulting from breach of contract") (emphasis added); J. Perillo, Calamari & Perillo

on Contract § 14.5, p. 495 (6th ed. 2009) (Calamari & Perillo) ("As a general rule, no damages will be awarded for the mental distress or emotional trauma that may be caused by a breach of contract.") (emphasis added); C. McCormick, Law of Damages § 145, p. 592 (1935) ("It is often stated as the 'general rule' that, in actions for breach of contract, damages for mental suffering are not allowable.") (emphasis added).

Notably, each of the Court's cited sources is narrowly focused on damages for emotional distress and not the category of compensatory damages more broadly. Rightfully so, as other compensatory damages are traditionally awarded for breaches of contract. *See, e.g.,* Restatement (Second) of Contracts § 347: "[T]he injured party has a right to damages based on his expectation interest as measured by (a) the loss in value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform."; Williston on Contracts § 64:1: "The fundamental principle that underlies the availability of contract damages is that of compensation"; Corbin on Contracts § 55.11: "Compensatory Damages – The General Standard."

The availability of other forms of compensatory damages after *Cummings* has been acknowledged by multiple courts. *See, e.g., Montgomery v. District of*

*Columbia*, 2022 WL 1618741, at *25 (D.D.C. May 23, 2022) (holding that while *Cummings* barred damages for emotional distress, other injuries could support an award of compensatory damages, including damages arising from plaintiff's loss of an opportunity to engage in interrogations); *Doe next friend of Doe v. City of Pawtucket*, 633 F.Supp.3d 583, 590 (D.R.I., 2022) (compensatory damages in the form of medical expenses resulting from physical injuries permitted under *Cummings*); *Chaitram v. Penn Medicine-Princeton Med. Ctr.*, No. 21-17583, 2022 WL 16821692, at *2 (D.N.J. Nov. 8, 2022) (holding plaintiff had "an expectation interest in the ability to fully participate in her own medical care through effective communication" and that compensatory damages under a loss of opportunity theory were therefore recoverable); *Doe v. Fairfax Cnty. Sch. Bd.*, No. 1:18-cv-00614, 2023 WL 424265, at *4 (E.D. Va. Jan. 25, 2023) (holding that "losses of educational opportunities remain recoverable post-*Cummings*" and observing that "[s]everal post-*Cummings* district courts have allowed plaintiffs to seek recovery for lost opportunities they suffered as a result of discrimination in violation of Spending Clause statutes."); and *A.T. v. Oley Valley Sch. Dist.*, No. CV 17-4983, 2023 WL 1453143, at *4 (E.D. Pa. Feb. 1, 2023) (nothing in the *Cummings* decision bars a plaintiff from seeking other forms of compensatory damages). This Court should similarly find that *Cummings* is narrowly focused on emotional distress damages and does not bar compensatory damages generally.

### B. A finding that emotional distress damages are unavailable under Title II of the ADA would contradict the statute and undermine its remedial purpose

The expansion of *Cummings'* bar on emotional distress damages to Title II of the ADA would eliminate an essential remedy that Congress intended to make available to victims of disability discrimination when the ADA was enacted.

Congress codified its purposes in enacting the ADA: "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;" "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;" and "to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101 (b)(1), (2), (4). Congress specifically found that "individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination." *Id.* at § 12101(a)(4). In other words, Congress found that current laws were inadequate to prevent and remedy the discrimination experienced by people with disabilities.

To achieve its remedial purpose, Congress tied the remedies for Title II to Section 504 of the Rehabilitation Act based on its then-understanding of the broad

scope of remedies available under that statute.[15] In so doing, Congress

demonstrated its intent to include emotional-distress damages as part of the "full

panoply of remedies" available to plaintiffs for violations of the ADA. H.R. Rep.

No. 101- 485 (III, at 52 (1990).[16] Indeed, Section 504—at that time—provided for

that full range of potential damages, and Congress unmistakably meant to make

that full range available to ADA plaintiffs. In floor debates, Senator Harkin, the

ADA's chief Senate sponsor, stated: "Title II of the bill makes available the rights

---

[15] *See* 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."). Differently stated, Title II's enforcement provision incorporates the remedy provision of Section 505 of the Rehabilitation Act of 1973. In turn, 29 U.S.C. § 794a incorporates selected remedy provisions of the Civil Rights Act of 1964, including remedies available under Titles VI and VII of the 1964 Act. *See* 29 U.S.C. § 794a (a)(1) and (2) ("The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 . . . shall be available, with respect to any complaint under section 791 of this title" and "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available.").

[16] In contemplating the range of remedies available, Congress expressly looked to *Miener v. Missouri*, 673 F.2d 969 (8th Cir. 1982), a case in which the court held that a student with disabilities had stated a valid claim for damages under Section 504 of the Rehabilitation Act based on the denial of access to educational resources. See H.R. Rep. No. 101-485 (III), "The Rehabilitation Act provides a private right of action, with a full panoply of remedies available, as well as attorney's fees" at 52, see also n.62 (discussing *Miener*); *Miener*, 673 F.2d at 978 (concluding "damages are awardable under [Section] 504" based on the "presumption . . . that a wrong must find a remedy, and in light of the inadequacy of administrative remedies").

and remedies also available under section 504 of the Rehabilitation Act, <u>and</u>
<u>damages remedies are available</u> under that provision enforcing section 504 of the
Rehabilitation Act and, therefore, also under title II of this bill." 135 Cong. Rec.
S10734-02, S10755, 1989 WL 183115 (daily ed. Sept. 7, 1989) (emphasis added).

Moreover, unlike the Rehabilitation Act, Congress did not enact the ADA
under the Spending Clause. Instead, the ADA was enacted as a "nonspending
statute" through Congress's broader powers under the Fourteenth Amendment and
Commerce Clause. 42 U.S.C. § 12101(b)(4) (congressional purpose "invok[ing]
the sweep of congressional authority, including the power to enforce the fourteenth
amendment and to regulate commerce in order to address the major areas of
discrimination faced day-to-day by people with disabilities."). Title II, therefore, is
not subject to the same limitations as Spending Clause acts like Section 504.

Based on the foregoing, the contract analogy that the Supreme Court relied
on in Cummings—and which served as the basis for preclusion of emotional
distress damages—has no direct application to the ADA. The ADA's national
mandate to prevent discrimination would be undermined and replaced with a
patchwork of state laws if *Cummings* was expanded in such a manner.

# CONCLUSION

For the foregoing reasons, *Amici* respectfully request that the judgment of

the district court be reversed, and this matter be remanded for further proceedings.


Respectfully Submitted,

DISABILITY RIGHTS EDUCATION AND DEFENSE FUND

By:    s/ Michelle Uzeta
_____
     Michelle Uzeta
     *Attorneys for Amici Curiae*


Dated: August 25, 2023

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the word limitation of Fed. R.

App. P. 29(a)(5) and the typeface and type style requirements of Fed. R. App. P.

32(a)(5) and (6). The brief contains 6108 words, excluding the items exempted by

Fed. R. App. P. 32(f), as counted using Microsoft Word for Mac, Version 16.76,

and uses a proportionally spaced typeface and 14-point font.


Respectfully Submitted,

DISABILITY RIGHTS EDUCATION AND DEFENSE FUND

By:     s/ Michelle Uzeta
_____
        Michelle Uzeta
        *Attorneys for Amici Curiae*


Dated: August 25, 2023

**ADDENDUM**

**Disability Rights Education & Defense Fund:** The Disability Rights Education & Defense Fund (DREDF), based in Berkeley, California, is a national nonprofit law and policy center dedicated to protecting and advancing the civil and human rights of people with disabilities. Founded in 1979 by people with disabilities and parents of children with disabilities, DREDF remains board- and staff-led by members of the communities for whom we advocate. DREDF pursues its mission through education, advocacy and law reform efforts. DREDF is nationally recognized for its expertise in the interpretation of federal disability civil rights laws and has participated as amicus in numerous high court matters involving those laws. As part of its mission, DREDF works to ensure that people with disabilities have the legal protections, including broad legal remedies, necessary to vindicate their right to be free from discrimination.

**The Arc of the United States:** The Arc of the United States (The Arc), founded in 1950, is the Nation's largest community-based organization of and for people with intellectual and developmental disabilities (IDD). Through its legal advocacy and public policy work, The Arc promotes and protects the human and civil rights of people with IDD and actively supports their full inclusion and participation in the community throughout their lifetimes.

**Autistic Women & Nonbinary Network:** The Autistic Women &
Nonbinary Network (AWN)provides community support, and resources for
Autistic women, girls, transfeminine and transmasculine nonbinary people, trans
people of all genders, Two Spirit people, and all people of marginalized genders or
of no gender. AWN is committed to recognizing and celebrating diversity and the
many intersectional experiences in our community. AWN's work includes
solidarity aid, community events, publications, fiscal support, and advocacy to
empower disabled and autistic people in their fight for disability, gender, and racial
justice.

**Autistic Self Advocacy Network:** The Autistic Self-Advocacy Network
(ASAN) is a national, private, nonprofit organization, run by and for autistic
individuals. ASAN provides public education and promotes public policies that
benefit autistic individuals and others with developmental or other disabilities.
ASAN's advocacy activities include combating stigma, discrimination, and
violence against autistic people and others with disabilities; promoting access to
health care and long-term supports in integrated community settings; and educating
the public about the access needs of autistic people. ASAN takes a strong interest
in cases that affect the rights of autistic individuals and others with disabilities to

participate fully in community life and enjoy the same rights as others without disabilities.

**The Judge David L. Bazelon Center for Mental Health Law:** Founded in 1972 as the Mental Health Law Project, the Judge David L. Bazelon Center for Mental Health Law (Bazelon Center) is a national non-profit advocacy organization that advocates for the rights of individuals with mental disabilities. Through litigation, public policy advocacy, public education, and technical assistance, the Bazelon Center works to advance the rights and dignity of individuals with mental disabilities in all aspects of life, including health care, community living, employment, education, housing, voting, parental and family rights, and other areas. The Americans with Disabilities Act and Section 504 of the Rehabilitation Act are the foundation for most of the Center's legal advocacy.

**The Coelho Center for Disability Law, Policy and Innovation:** The Coelho Center for Disability Law, Policy and Innovation (Coelho Center) collaborates with the disability community to cultivate leadership and advocate innovative approaches to advance the lives of people with disabilities. We envision a world in which people with disabilities belong and are valued, and their rights are upheld. The Coelho Center was founded in 2018 by former Congressman Anthony "Tony" Coelho, original sponsor of the Americans with Disabilities Act.

**Civil Rights Education and Enforcement Center:** The Civil Rights Education and Enforcement Center (CREEC) is a nonprofit legal organization that fights for liberation through the lens of intersectional disability justice with a combination of education, legal advocacy, direct services, and impact litigation. CREEC has successfully enforced both state and federal anti-discrimination laws protecting the disabled in multiple jurisdictions, bringing both individual actions and class actions challenging access restrictions.

**Disability Law Colorado:** Disability Law Colorado ("DLC") is a non-profit organization designated by the Governor of the state of Colorado as the federally-mandated Protection and Advocacy System for the state. Through its federal grants and authority, DLC works to protect the rights of people with disabilities in facilities – including correctional facilities and jails – and in the community through direct advocacy, systemic litigation and policy development. DLC works with individuals with all types of disabilities from birth through death on issues including abuse, neglect, discrimination in employment and housing, physical accessibility in public accommodations, special education services in school and generally seeking to ensure that people with disabilities are included in the community to the maximum extent possible. DLC is part of a nation-wide system of Protection and Advocacy Systems.

**Disability Rights Advocates:** Disability Rights Advocates (DRA) is based in Berkeley, California with offices in New York City, New York and Chicago, Illinois. DRA is a national nonprofit public interest legal center recognized for its expertise on issues affecting people with disabilities. DRA is dedicated to ensuring dignity, equality, and opportunity for people with all types of disabilities, and to securing their civil rights. To accomplish those aims, DRA represents clients with disabilities who face discrimination or other violations of federal or state civil rights or federal constitutional protections in complex, system changing class action and impact litigation. DRA is generally acknowledged to be one of the leading public interest disability rights litigation organizations in the country, taking on precedent-setting disability rights class actions across the nation.

**Disability Rights Bar Association:** The Disability Rights Bar Association (DRBA) was started by a group of disability rights counsel, law professors, legal nonprofits and advocacy groups who share a commitment to effective legal representation of individuals with disabilities. Members of DRBA commonly believe that the fundamental civil rights of people with disabilities are inadequately represented in our society and that litigation and other legal advocacy strategies play a highly effective and necessary role in enforcing and advancing the rights of people with disabilities.

**Impact Fund:** The Impact Fund is a non-profit legal foundation that provides funding for impact litigation, offers innovative training and support, and acts as counsel in impact litigation across the country. The Impact Fund has an interest in ensuring that class actions remain a robust vehicle for individuals with disabilities and other underserved communities to vindicate their rights and enable greater access to justice.

**National Association of Rights Protection and Advocacy:** The National Association of Rights Protection and Advocacy ("NARPA") was formed in 1981 to provide support and education for advocates working in the mental health arena. It monitors developing trends in mental health law and identifies systemic issues and alternative strategies in mental health service delivery on a national scale. Members are attorneys, people with psychiatric histories, mental health professionals and administrators, academics, and non-legal advocates -- with many people in roles that overlap. Central to NARPA's mission is the promotion of those policies and strategies that represent the preferred options of people who have been diagnosed with mental disabilities. Approximately 40% of NARPA's members are current or former patients of the mental health system.

**National Disability Rights Network:** The National Disability Rights Network ("NDRN") is the non-profit membership organization for the federally

mandated Protection and Advocacy (P&A) and Client Assistance Program (CAP) agencies for individuals with disabilities. The P&A and CAP agencies were established by the United States Congress to protect the rights of people with disabilities and their families through legal support, advocacy, referral, and education. There are P&As and CAPs in all 50 states, the District of Columbia, Puerto Rico, and the U.S. Territories (American Samoa, Guam, Northern Mariana Islands, and the US Virgin Islands), and there is a P&A and CAP affiliated with the Native American Consortium which includes the Hopi, Navajo and San Juan Southern Paiute Nations in the Four Corners region of the Southwest. Collectively, the P&A and CAP agencies are the largest provider of legally based advocacy services to people with disabilities in the United States.

**Transgender Legal Defense and Education Fund:** The Transgender Legal Defense and Education Fund (TLDEF) is a non-profit organization that advocates on behalf of transgender individuals across the United States. TLDEF is committed to ensuring that transgender individuals receive the same rights and protections under the law as cisgender individuals. TLDEF seeks to coordinate with other civil rights organizations to address key issues affecting transgender individuals in the areas of identity recognition, safety, access to health care, and freedom from discrimination. It also provides public education on transgender rights.

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that (1) all required privacy redactions have been made from this brief per 10th Cir. R. 25.5; (2) this ECF submission is an exact copy of the hard copies that will be submitted to the Court; and (3) this brief has been scanned for viruses by XProtect Version 2169 last updated on July 7, 2023, and, according to the program, is free of viruses.


Respectfully Submitted,

DISABILITY RIGHTS EDUCATION AND DEFENSE FUND

By:     s/ Michelle Uzeta
          Michelle Uzeta
          *Attorneys for Amici Curiae*


Dated: August 25, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2023, I electronically filed the foregoing AMICUS CURIAE BRIEF OF THE DISABILITY RIGHTS EDUCATION AND DEFENSE FUND AND THIRTEEN OTHER ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT AND URGING REVERSAL AND REMAND with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

I certify that all the participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.


Respectfully Submitted,

DISABILITY RIGHTS EDUCATION AND DEFENSE FUND

By:     s/ Michelle Uzeta
_____
        Michelle Uzeta
        *Attorneys for Amici Curiae*


Dated: August 25, 2023