NO. 23-1135

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

DARLENE GRIFFITH,

      Plaintiff-Appellant,

v.

EL PASO COUNTY, COLORADO, et al.,

      Defendants-Appellees.

---

On Appeal from the United States District Court for the District of Colorado
The Honorable Christine M. Arguello
District Court No. 21-cv-00387-CMA-NRN

---

**BRIEF AMICI CURIAE OF THE AMERICAN CIVIL LIBERTIES UNION
AND THE AMERICAN CIVIL LIBERTIES UNION OF COLORADO
IN SUPPORT OF APPELLANT AND REVERSAL**

---

Anna I. Kurtz
Timothy R. Macdonald
ACLU of Colorado
303 E. 17th Avenue, Suite 350
Denver, CO 80203
Telephone: (720) 402-3137
akurtz@aclu-co.org
tmacdonald@aclu-co.org

Harper S. Seldin (admitted only in Pennsylvania)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
hseldin@aclu.org

## IDENTITY AND INTEREST OF *AMICI CURIAE*

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, non-profit organization with nearly two million members and supporters dedicated to the principles of liberty and equality embodied in the Constitution. The ACLU of Colorado, founded in 1952, is a state affiliate of the ACLU with over 45,000 members. Throughout their history, the ACLU and ACLU of Colorado have advocated in courts and legislatures against discrimination in all its forms, including on the basis of sex, sex stereotypes, and transgender status. Discrimination against transgender individuals on all these bases persists, to tremendously harmful effect. It is estimated that at least 31,000 Coloradans identify as transgender.[1] Because *amici* are dedicated to the constitutional rights and civil liberties of all Coloradans, they have a unique interest in ensuring that Ms. Griffith and other transgender Coloradans are not denied the equal protection of the law.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The ACLU and ACLU of Colorado are non-profit entities, not subsidiaries or affiliates of any publicly owned corporation, and do not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this

---

[1] Jody L. Herman et al., Williams Inst., *How Many Adults and Youth Identify as Transgender in the United States?* 9 (2022), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Jun-2022.pdf.

litigation due to the ACLU or ACLU of Colorado's participation.

## STATEMENT PURSUANT TO RULE 29(a)(4)(E)

No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

## STATEMENT PURSUANT TO RULE 29(a)(2)

Counsel for Plaintiff-Appellant and Defendant-Appellee have consented to the filing of this brief.  See Fed. R. App. P. 29(a)(2).

# TABLE OF CONTENTS

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT** ............................ ii

**STATEMENT PURSUANT TO RULE 29(a)(4)(E) and 29(a)(2)** ................... iii

**TABLE OF CONTENTS** ........................................................................ iv

**TABLE OF AUTHORITIES** ................................................................ v

**ARGUMENT** ...................................................................................... 1

**I.** *Brown v. Zavaras*, **63 F.3d 967 (10th Cir. 1995), does not foreclose application of heightened scrutiny to Ms. Griffith's equal protection claim** .......................................................... 3

**II. Ms. Griffith's claim is subject to heightened scrutiny because Defendants discriminated against her based on sex.** ................................................................................ 8

**III. Ms. Griffith's claim is subject to heightened scrutiny because transgender individuals are at least a quasi-suspect class.** ........................................................................ 12

**CONCLUSION** ................................................................................ 16

**RULE 32(g)(1) CERTIFICATE OF COMPLIANCE** ................................... 17

# TABLE OF AUTHORITIES

## Cases

*Adams v. School Bd. of St. Johns Cnty.*, 3 F.4th 1299 (11th Cir. 2021) ..................... 8

*Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005) ..................................... 11

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850 (S.D. Ohio 2016)........................................................................................... 14

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) .......................................... 7, 10, 12

*Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995)............................................... passim

*Doe v. Mass. Dep't of Correction*, CV 17-12255-RGS, 2018 WL 2994403 (D. Mass. June 14, 2018) ........................................................................................................ 9

*Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267 (W.D. Pa. 2017)............ 16

*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) ................................................... 11

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir.)............................ passim

*Hampton v. Baldwin*, 3:18-CV-550-NJR-RJD, 2018 WL 5830730 (S.D. Ill. Nov. 7, 2018) ......................................................................................................................... 9

*Highland,* 208 F. Supp. 3d at 873-74 ....................................................................... 16

*Holloway v. Arthur Andersen & Co.*, 566 F.2d 569 (9th Cir. 1977) ......................... 4

*Iglesias v. Fed. Bureau of Prisons*, 19-CV-415-NJR, 2021 WL 6112790 (S.D. Ill. Dec. 27, 2021) ......................................................................................................... 9

*Norsworthy v. Beard*, 87 F. Supp. 3d 1104 (N.D. Cal. 2015) .................................. 16

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). ................................................ 10

*Ray v. McCloud*, 507 F. Supp. 3d 925 (S.D. Ohio 2020)......................................... 14

*See M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704 (D. Md. 2018) 15, 16

*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) .............................................. 11

*Tay v. Dennison*, 457 F. Supp. 3d 657 (S.D. Ill. 2020)............................................. 9

*Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021). ................. 7, 8

*United States v. Virginia*, 518 U.S. 515, 557 (1996) ....................................... 1, 8, 10

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) .................................................................................... 8, 9, 12

## Other Authorities

Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders  (5th ed. 2013).................................................................................................................. 13

Aruna Saraswat et al., Evidence Supporting the Biologic Nature of Gender Identity, 21 Endocrine Prac. 199 (2015)............................................................................... 14

Christine Michelle Duffy, The Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973, in Gender Identity and Sexual Orientation

v

Discrimination in the Workplace: A Practical Guide (Christine Michelle Duffy ed., 2014) .......................................................................................... 14

Randi Kaufman, Introduction to Transgender Identity and Health, in The Fenway Guide to Lesbian, Gay, Bisexual, and Transgender Health (Harvey J. Makadon et al. eds., 1st ed. 2008) ........................................................................... 14

Wylie C. Hembree et al., Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline, 102 J. Clinical Endocrinology & Metabolism 3869 (2017) ............................................. 14

**ARGUMENT**

"[T]he history of our Constitution . . . is the story of the extension of constitutional rights and protections to people once ignored or excluded." *United States v. Virginia*, 518 U.S. 515, 557 (1996) ("*VMI*"). This case continues that story.

Darlene Griffith is a transgender woman. But when she was booked into the El Paso County Jail, Defendants refused to treat her like other women. They did so because of a policy classifying prisoners based on their sex assigned at birth. Ms. Griffith filed a pro se complaint against the County Jail based on the abusive treatment she experienced, as well as Defendants' refusal to treat her like other women. The district court explained that, if Defendants' conduct was subject to intermediate scrutiny, "then the Court would not hesitate to conclude (at least at the motion to dismiss stage) that Plaintiff's placement as a transgender woman in an all-male unit was not substantially related to an important government interest." *Griffith v. El Paso Cnty., Colorado*, No. 21-CV-00387-CMA-NRN, 2023 WL 2242503, at *11 (D. Colo. Feb. 27, 2023), *report and recommendation adopted*, No. 21-CV-00387-CMA-NRN, 2023 WL 3099625 (D. Colo. Mar. 27, 2023).

But the district court reluctantly concluded that its hands were tied by *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995), which it read to leave it no choice but to apply rational basis review and dismiss Ms. Griffith's equal protection claim. *Brown* does

1

not require that result: in that case, this Court did not even purport to consider—much less reject—a sex discrimination claim. It held merely that the skeletal complaint of the pro se plaintiff before it did not provide sufficient basis to conclude as a matter of law that "transsexuals" were a suspect class. And as to that decision, this Court expressed skepticism of the state of the law, labeling the question a "close call" and suggesting the issue should be revisited given evolving understandings of sexual identity—in 1995. Nearly thirty years later, it would turn *Brown* on its head to construe it as precluding future courts in this Circuit from engaging in more searching judicial scrutiny of classifications based on sex and transgender status.

But even if *Brown* had been correctly decided at the time, subsequent sex discrimination jurisprudence has clarified that heightened scrutiny, not rational basis review, applies: *VMI* and *Sessions v. Morales-Santana*, 582 U.S. 47 (2017), make clear that heightened scrutiny is the appropriate standard for evaluating all sex-based classifications, and *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731 (2020), clarifies that classifications based on transgender status are inherently sex-based.

*Amici* respectfully request that this Court reaffirm that heightened scrutiny applies to all sex-based classifications, hold consistent with *Bostock* and its progeny that classifications based on transgender status are necessarily sex-based classifications, and overrule *Brown* to the extent necessary to hold that discrimination

based on transgender status triggers heightened scrutiny both as a form of sex discrimination and independently.

## I. *Brown v. Zavaras* does not foreclose applying heightened scrutiny to Ms. Griffith's equal protection claim.

Ms. Griffith asked the court below to apply heightened scrutiny to her equal protection claim on two bases: first, that her assignment to the male housing unit was sex discrimination, and second, that transgender individuals are a quasi-suspect class. Though the district court agreed with those arguments, it reluctantly concluded they were both precluded by *Brown*. Not so.

This Court's brief examination of the equal protection claim in *Brown* did not analyze sex discrimination doctrine at all. And on the question of whether transgender persons meet the indicia of a suspect class, this Court expressed openness to that conclusion but declined to analyze the question on the pro se pleadings before it. This Court proceeded cautiously in *Brown*; it did not conclusively answer the question in the negative.

### A. *Brown* neither considered a sex discrimination claim nor decided as a matter of law that transgender individuals are not a suspect class.

*Brown* involved a pro se prisoner plaintiff who was denied estrogen treatment to treat their gender dysphoria. *Brown*, 63 F.3d at 970. The plaintiff alleged that the prison was giving estrogen treatment to at least some other inmates and brought an equal protection claim on that basis. *Id.*

This Court devoted a mere two paragraphs to the question of whether Brown's claim should be subject to heightened scrutiny. The first paragraph took note of a now-overruled case out of the Ninth Circuit, *Holloway v. Arthur Andersen & Co.*, 566 F.2d 569 (9th Cir. 1977), which held that "transsexuals are not a protected class." *Brown*, 63 F.3d at 971. The second paragraph expressed reservations about the Ninth Circuit's conclusion, suggesting it was inconsistent with growing understandings of gender identity. *Id.* ("Recent research . . . suggests reevaluating *Holloway*."). And since then, the Ninth Circuit has reversed course. *See Karnoski v. Trump*, 926 F.3d 110, 1201 (9th Cir. 2019) (holding that classification based on transgender status independently triggers heightened scrutiny); *Schwenk v. Hartford*, 204 F.3d 1187, 1201-02 (9th Cir. 2000) (holding that the "initial judicial approach taken in cases such as *Holloway* has been overruled by the logic and language of *Price Waterhouse*" and that the targeting of a transgender inmate triggered heightened scrutiny as sex discrimination).

Ultimately, the Court declined to further consider that issue. The Court reasoned that the unrepresented plaintiff's allegations were "too conclusory to allow *proper analysis of this legal question*." *Brown*, 63 F.3d at 971 (emphasis added). It therefore opted to follow *Holloway* and hold Brown had not shown membership in a protected class "*in this case.*" *Id.* (emphasis added).[2]

---

[2] This Court's narrow, individualized description of its own holding stands in contrast to the categorical way it described the conclusions of both the *Holloway* court and the district court. *Compare Brown*, 63 F.3d at 971 ("[T]he district court observed that

4

This Court's holding in *Brown* was far narrower than its outsized influence in the present case would suggest. As recounted above, the Court did not consider, much less reject, any argument that the denial of estrogen treatment to Brown amounted to sex discrimination. This Court framed the equal protection question before it only as whether Plaintiff had sufficiently demonstrated that "transsexuality" met the traditional indicia of a suspect classification. *Id.* at 971 (noting the relevant queries as whether "transsexuals" are a discrete and insular minority and whether "transsexuality is an immutable characteristic").[3] It did not opine on the role of sex or sex stereotypes in the challenged action.

In resolving Ms. Griffith's sex discrimination claim, then, the proper standard comes not from *Brown*, but rather the well-developed and longstanding modern sex discrimination jurisprudence in this Court and the U.S. Supreme Court. As discussed further in Part II below, the clear upshot of that precedent is that Ms. Griffith's sex discrimination claims are subject to heightened scrutiny, as is all sex discrimination. *See VMI*, 518 U.S. at 532-33.

---

transsexuals are not a protected class."), *and id.* ("The Ninth Circuit has held that transsexuals are not a protected class."), *with id.* ("Mr. Brown is not a member of a protected class *in this case*." (emphasis added)).

[3] A portion of the *Holloway* opinion did reject a sex discrimination argument under Title VII. But that analysis was neither referenced nor relied on in *Brown*, and in any event, it has long-since been overruled.

Finally, the district court erred in construing *Brown* as holding that transgender individuals are not entitled to heightened scrutiny as a class. Indeed, the *Brown* Court signaled the opposite intuition: that evolving understandings of gender identity merited a closer evaluation of whether transgender individuals ought to be considered a suspect class. It simply concluded it could not engage in that analysis with only the benefit of the pro se complaint before it at the time.

Put differently, this Court judged the *Brown* complaint—in 1995—to be a poor vehicle for drawing categorical conclusions about the requirements of equal protection when it comes to classifications based on gender identity. If the *Brown* plaintiff's allegations were too conclusory to allow proper analysis of the legal question—which even in 1995 the Court believed was a "close question"—then the dead hands of that decision should not be construed to control the analysis today, almost three decades later. As discussed further in Part III below, the intervening caselaw has made the answer clear: classification based on transgender status warrants heightened scrutiny, as do all sex-based classifications.

### B. To the extent *Brown* is construed to foreclose Plaintiff's sex discrimination claim, it is no longer good law.

As discussed above, *Brown* does not foreclose Ms. Griffith's sex discrimination claim. This is true for a second reason: *Brown* is no longer good law, as its holding cannot be squared with recent U.S. Supreme Court caselaw. Discrimination based on transgender status "necessarily entails discrimination based on sex; the first cannot

happen without the second." *Bostock*, 140 S. Ct. at 1747; *see also id.* at 1741–42 ("[I]t is *impossible* to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." (emphasis added)).

This Court has already held as much by recognizing that *Bostock* overruled "this Court's previous holdings . . . that transgender persons 'are not a protected class,' that 'discrimination against a transgender person based on the person's status as a transgender person is not discrimination because of sex,' and that a defendant 'may not claim protection [under nondiscrimination law] based upon her transgender status *per se*." *Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021). True, *Bostock* and *Tudor* involved discrimination claims asserted under Title VII. But the central tenet of the Court's holding in *Bostock* was a conclusion of logic, and there is no principled basis to suggest it should not bear constitutional significance. Moreover, both Title VII and the Fourteenth Amendment unambiguously focus on the discrimination against individual persons, not equal treatment of groups. *Compare Bostock*, 140 S. Ct. 1740-41 (noting Title VII's application to "any individual") *with J.E.B. v. Alabama*, 511 U.S. 127, 152 (1994) (Kennedy, J., concurring) ("The neutral phrasing of the Equal Protection Clause, extending its guarantee to 'any person,' reveals its concern with rights of individuals, not groups.").

Borrowing this Court's words, "[i]n the wake of *Bostock*, it is now clear that transgender discrimination . . . is discrimination 'because of sex,'" *Tudor*, 13 F.4th at 1028, period.

## II.    Heightened scrutiny applies to Ms. Griffith's claims because classification based on transgender status is a sex-based classification.

Supreme Court precedent is clear and unequivocal that "all gender-based classifications today warrant heightened scrutiny." *VMI*, 518 U.S. at 555; *accord Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017). Courts have resoundingly concluded that government policies conditioning access to sex-separated facilities based on an individual's sex assigned at birth present sex classifications warranting heighted scrutiny. *See, e.g.*, *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017) (school policy that "decide[d] which bathroom a student may use based upon the sex listed on the student's birth certificate" was "inherently based upon a sex-classification."); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir.), *as amended* (Aug. 28, 2020), *cert. denied,* 2021 WL 2637992 (June 28, 2021) (policy limiting access to male and female restrooms based on "biological" gender "necessarily rests on a sex classification"); *Adams v. School Bd. of St. Johns Cnty.*, 3 F.4th 1299 (11th Cir. 2021) (school bathroom policy subject to heightened scrutiny because it "categorize[d] on the basis of sex"), *vacated on other*

8

*grounds by* 57 F.4th 791 (11th Cir. 2022) (en banc)[4]; *Tay v. Dennison*, 457 F. Supp. 3d 657, 680–81 (S.D. Ill. 2020) (holding that where prison "houses inmates, by default, in the prison of their gender assigned at birth, . . . a sex-based classification is used, and intermediate scrutiny will be applied."); *Iglesias v. Fed. Bureau of Prisons*, 19-CV-415-NJR, 2021 WL 6112790, at *24 (S.D. Ill. Dec. 27, 2021), *modified*, 598 F. Supp. 3d 689 (S.D. Ill. 2022) (same); *Doe v. Mass. Dep't of Correction*, CV 17-12255-RGS, 2018 WL 2994403, at *10 (D. Mass. June 14, 2018) (concluding "prison assignment policy as it applies to transgender inmates is a sex-based classification that warrants heightened, intermediate scrutiny"); *see also Hampton v. Baldwin*, 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *11 (S.D. Ill. Nov. 7, 2018) (holding that "inmates are, by default, placed in a facility based on their genitalia, a sex-based classification is used, and intermediate scrutiny must be applied.").

Such policies are subject to heightened scrutiny because they cannot be enforced—indeed, "cannot be stated[,] without referencing sex." *Whitaker*, 858 F.3d at 1051. If one must know the sex of a person to know whether or how a policy applies to the person, the policy draws a line based on sex.[5] *Doe v. Ladapo*, 4:23CV114-RH-

---

[4] In ultimately upholding a sex-separated restroom policy, the Eleventh Circuit still recognized the policy unequivocally as a sex-based classification and analyzed whether it satisfied heightened scrutiny. *See Adams*, 57 F.4th at 801.

[5] Defendants cannot escape heightened scrutiny by claiming that their policy is premised on physical differences between the sexes. *See Nguyen v. I.N.S.*, 533 U.S. 53, 63-64 (2001); *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 801(10th Cir. 2019). The existence of "physical differences" may be relevant to

MAF, 2023 WL 3833848, at *8 (N.D. Fla. June 6, 2023). That is true here: in rejecting Ms. Griffith's various requests to be housed and generally treated as a woman, Defendants cited policies that turned exclusively on her sex assigned at birth. *See, e.g.*, ECF No. 124 at ¶¶ 51, 74, 117.

Defendants' alleged conduct here was "inextricably bound up with sex." *Bostock*, 140 S. Ct. at 1742. The sex classification in this case is straightforward—it involves Ms. Griffith's *literal* classification during booking based on sex. Because Ms. Griffith was assigned the male sex at birth, she was excluded from housing with other women inmates; denied women's undergarments and grooming products; mocked with improper pronouns; and subjected to a strip search by an unsupervised male guard. From the beginning, Defendants conditioned all aspects of Ms. Griffith's incarceration based on her sex assigned at birth.

Moreover, Defendants conditioned all aspects of Ms. Griffith's incarceration on a host of impermissible stereotypes about how men and women "should feel, act, and look." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989). But one of the very reasons sex-based classifications trigger heightened scrutiny is to guard against the risk that such classifications "reflect archaic and overbroad generalizations about gender."

---

whether a law *survives* heightened scrutiny, but it does not transform an explicit sex classification into a sex-neutral one. *VMI*, 518 U.S. at 533. Courts must apply heightened scrutiny to all sex classifications, including "gender specific terms [that] take[] into account a biological difference" between sexes. *Nguyen*, 533 U.S. at 64, 73.

*Free the Nipple*, 916 F.3d at 799–800. Courts consistently have recognized discrimination against transgender people as impermissible sex stereotyping under both the equal protection clause and civil rights statutes. *See, e.g.*, *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011) ("[A] government agent violates the Equal Protection Clause's prohibition of sex-based discrimination when he or she fires a transgender employee because of his or her gender non-conformity."); *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005) (demoting transgender police officer for not "conform[ing] to sex stereotypes concerning how a man should look and behave" violates Title VII); *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004) (suspending transgender firefighter "based on [her] failure to conform to sex stereotypes by expressing less masculine, and more feminine mannerisms and appearance" violates equal protection clause and Title VII). Indeed, Ms. Griffith failed to conform to the core stereotypes that one's gender identity should match one's sex assigned at birth and present through particular physical or anatomic features. Had Ms. Griffith arrived at booking without characteristics Defendants ascribed to men, she would have been treated differently. Similarly, had Ms. Griffith matched Defendants' expectations of how a woman should present, she would have been treated differently.

11

Because sex played "an unmistakable role" in Defendants' alleged conduct, *Bostock*, 140 S. Ct. at 1741–42, Ms. Griffith's claims must be examined under heightened scrutiny.[6]

### III. Heightened scrutiny applies to Ms. Griffith's claims because transgender persons constitute a quasi-suspect class.

Heightened scrutiny not only applies because of the sex-based classification intrinsic to any classification based on transgender status, but also because transgender persons are a quasi-suspect class. *See Grimm*, 972 F.3d at 611.

*First*, transgender persons have been subject to historical discrimination. *See Whitaker*, 858 F.3d at 1051 (transgender people "face discrimination, harassment, and violence because of their gender identity."); *accord Grimm*, 972 F.3d at 611-12 (citing to national survey showing that "[t]ransgender people frequently experience harassment in places such as schools (78%), medical settings (28%), and retail stores (37%)," "experience physical assault in places such as schools (35%) and places of public accommodation (8%)," and "are more likely to be the victim of violent crimes");

---

[6] Recent decisions from the Sixth and Eleventh Circuits confuse the issue of whether heightened scrutiny *applies* with whether heightened scrutiny is *satisfied*. *See Eknes-Tucker v. Governor of Alabama*, No. 22-11707, 2023 WL 5344981, at *1 (11th Cir. Aug. 21, 2023) (applying rational basis review); *L.W. by & through Williams v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023) (noting the many other courts that have applied heightened scrutiny but expressing skepticism). The government's reasoning for creating any particular sex-based classification goes to whether the classification survives a more searching judicial review; the justification itself cannot be used to avoid intermediate scrutiny in its entirety. *See, e.g.*, *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 670 (8th Cir. 2022).

*Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020) (finding transgender people have been subject to discrimination in education, employment, housing, and access to healthcare).

*Second*, being transgender is a defining characteristic with no relation to an ability to perform or contribute to society. *See Grimm*, 972 F.3d at 611-12. Courts have rejected the argument that "a transgender person, simply by virtue of transgender status, is any less productive than any other member of society." *Adkins*, 143 F. Supp. 3d at 139; *Ray*, 507 F. Supp. 3d at 937; *Highland*, 208 F. Supp. 3d at 874. Although some transgender people experience gender dysphoria, not all do, and gender dysphoria is treatable.[7] *See Grimm*, 972 F.3d at 612.

*Third*, transgender persons constitute a discrete group with immutable characteristics. *See Grimm*, 972 F.3d at 612-13. The research that the *Brown* Court found lacking, *see* 63 F.3d at 97, has now been replaced by mainstream scientific understanding that biological factors—including sexual differentiation in the brain— play a role in gender identity development, and in any event that a person's gender identity is innate and cannot be voluntarily controlled or changed.[8] *See Brandt v.*

---

[7] Gender dysphoria is the medical diagnosis used to describe the clinically significant distress that arises from the conflict between a transgender person's assigned birth sex and gender identity when they are not able to live consistent with their gender identity. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013).

[8] *See, e.g.*, Christine Michelle Duffy, *The Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973, in* Gender Identity and Sexual Orientation

13

*Rutledge*, No. 4:21CV00450 JM, 2023 WL 4073727, at *3 (E.D. Ark. June 20, 2023).

Indeed, "being transgender is not a choice. Rather, it is as natural and immutable as

being cisgender." *Grimm*, 972 F.3d at 612-13; *see also Ray*, 507 F. Supp. 3d at 937;

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d

850, 874 (S.D. Ohio 2016) (quoting *Lyng v. Castillo*, 477 U.S. 635, 638 (1986)). And

even if transgender status were not immutable, it is at a minimum among the kinds of

traits "so fundamental to one's identity that a person should not be required to abandon

them." *Latta v. Otter*, 771 F.3d 456, 464 n.4 (9th Cir. 2014); *accord Baskin v. Bogan*,

766 F.3d 648, 655 (7th Cir. 2014); *Golinski v. U.S. Off. of Pers. Mgmt.*, 824 F. Supp.

2d 968, 987 (N.D. Cal. 2012).

---

Discrimination in the Workplace: A Practical Guide 16-1, 16-77 (Christine Michelle Duffy ed., 2014) (discussing recent medical studies pointing to biological etiology for transgender identity); Randi Kaufman, *Introduction to Transgender Identity and Health, in* The Fenway Guide to Lesbian, Gay, Bisexual, and Transgender Health, 331, 337-38 (Harvey J. Makadon et al. eds., 1st ed. 2008) ("The predominating biological theory suggests that a neurohormonal disturbance takes place in the brain during embryological development. While the genitalia of the human embryo become differentiated as male or female during the 12th week of fetal development, the gender identity portion of the brain differentiates around the 16th week. If there is a hormonal imbalance during this four-week period, gender identity may not develop along the same lines as the genitalia."); Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869, 3874 (2017); ("Results of studies from a variety of biomedical disciplines--genetic, endocrine, and neuroanatomic--support the concept that gender identity and/or gender expression likely reflect a complex interplay of biological, environmental, and cultural factors."); Aruna Saraswat et al., *Evidence Supporting the Biologic Nature of Gender Identity*, 21 Endocrine Prac. 199, 199-202 (2015) (reviewing data suggesting "fixed, biologic basis for gender identity" and "biological etiology for transgender identity").

*Fourth*, transgender persons constitute a minority lacking political power. Already a small percentage of the population, transgender people are still "underrepresented in every branch of government." *See Grimm*, 972 F.3d at 613 (comparing data on transgender population in the United States and representation in judicial, executive, and legislative branches). While the number of openly transgender elected officials is growing, they still represent a small fraction of office holders. *Id.* Indeed, Colorado is home to one of only eight transgender legislators in the nation. *See* Alex Burness, *Brianna Titone and the weight of being Colorado's first out transgender lawmaker*, The Denver Post (Jan. 24, 2022), available at https://www.denverpost.com/2022/01/24/brianna-titone-transgender-colorado-lawmaker/. Finally, the proliferation of proposed and enacted legislation aimed at restricting the rights of transgender minors and adults is definitive evidence of the limited political power of the transgender community and the need for meaningful judicial scrutiny when they are subjected to differential treatment. *See M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 721 (D. Md. 2018) (noting that courts have had to enjoin numerous laws because they violated the rights of transgender individuals).

For all these reasons, this Court should join the growing chorus of courts that have recognized that transgender people are at least a quasi-suspect class and that classifications based on transgender status are subject to heightened scrutiny, in any

15

event, because such classifications are sex-based. *See, e.g.*, *Grimm*, 972 F.3d at 611, 613; *Ray*, 507 F. Supp. 3d at 937; *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018), *decision clarified sub nom. F.V. v. Jeppesen*, 477 F. Supp. 3d 1144 (D. Idaho 2020); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951-53 (W.D. Wisc. 2018); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719 (D. Md. 2018); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Highland,* 208 F. Supp. 3d at 873-74; *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-140 (S.D.N.Y. 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015).

## CONCLUSION

Amici respectfully urge this Court to hold that heightened scrutiny applies to discrimination on the basis of transgender status because, as set forth in *Bostock* and *Tudor*, it is impossible to discriminate on the basis of transgender status without discriminating on the basis of sex, and because transgender status is itself a quasit-suspect classification.

Date: August 28, 2023

*/s/ Anna I. Kurtz*

Anna I. Kurtz
Timothy R. Macdonald
ACLU Foundation of Colorado
303 E. 17th Avenue, Suite 350
Denver, CO 80203
Telephone: (720) 402-3137

akurtz@aclu-co.org
tmacdonald@aclu-co.org

Harper S. Seldin
(admitted only in Pennsylvania)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
hseldin@aclu.org

*Counsel for Proposed Amici Curiae*

## RULE 32(g)(1) CERTIFICATE OF COMPLIANCE

This brief complies with the length and type-volume limitations of Fed. R.

App. P. 29(a)(5) and 32(a)(7)(B) because it contains 4,018 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)

and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has

been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-

point Times New Roman.

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2023, I electronically filed the foregoing

**BRIEF AMICI CURIAE OF THE AMERICAN CIVIL LIBERTIES UNION**

**AND THE AMERICAN CIVIL LIBERTIES UNION OF COLORADO IN**

**SUPPORT OF APPELLANT AND REVERSAL** with the Clerk of the Court for

the United States Court of Appeals for the Tenth Circuit by using the appellate

CM/ECF system.

17

Date: August 28, 2023

*s/ Sara R. Neel*

_____