Case No. 23-1135

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

———————————————

DARLENE GRIFFITH,

*Plaintiff-Appellant,*

v.

EL PASO COUNTY, COLORADO, ET AL.,

*Defendants-Appellees.*

———————————————

On Appeal from the United States District Court for the
District of Colorado, Case No. 21-cv-00387-CMA-NRN

———————————————

BRIEF AMICI CURIAE
LEGAL SCHOLARS OF SEX AND GENDER
IN SUPPORT OF PLAINTIFF-APPELLANT

KYLE C. VELTE
UNIVERSITY OF KANSAS SCHOOL OF LAW
1535 West 15th Street
Lawrence, Kansas 66045
kvelte@ku.edu

EZRA ISHMAEL YOUNG
LAW OFFICE OF EZRA YOUNG
210 North Sunset Drive
Ithaca, New York 14850
ezra@ezrayoung.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), counsel for amici curiae certify that none has a parent corporation or issues stock because they are real persons filing this brief in their personal capacities.

August 28, 2023

/s/ Ezra Young
EZRA ISHMAEL YOUNG
LAW OFFICE OF EZRA YOUNG

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iv

INTEREST OF AMICI CURIAE .................................................................. 1

SUMMARY OF ARGUMENT ..................................................................... 4

ARGUMENT ............................................................................................... 5

    I.    Gender classifications are subject to intermediate scrutiny ...... 5

    II.   There is no transgender exception to equal protection .............. 7

    III.  Transgender persons need not separately establish they are a
           suspect class .................................................................................. 13

    IV.  However, this Circuit may separately recognize that
           transgender persons are a suspect class .................................. 15

    V.   This Circuit should not conflate the biological rootedness of
           gender with recent calls to redefine gender in pseudoscientific
           terms ........................................................................................... 17

CONCLUSION .......................................................................................... 20

CERTIFICATION OF COMPLIANCE ...................................................... 22

CERTIFICATE OF SERVICE .................................................................. 24

# TABLE OF AUTHORITIES

<u>Cases</u>

*Adams by and through Kasper v. School Board of St. Johns County*,
  57 F.4th 791 (11th Cir. 2022) ......................................................... 19

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020) ......................................................... 8, 14, 15

*Brown v. Zavaros*,
  63 F.3d 967 (10th Cir. 1995) .................................................... *passim*

*Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*,
  916 F.3d 792 (10th Cir. 2019) ......................................................... 6

*Frontiero v. Richardson*,
  411 U.S. 677 (1973) ......................................................... 6

*Gamble v. United States*,
  139 S. Ct. 1960 (2019) .................................................... 7, 14

*Grimm v. Gloucester County School Board*,
  972 F.3d 586 (4th Cir. 2020) ......................................................... 14

*J.E.B. v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1994) .................................................... 6, 7, 13

*Mississippi Univ. for Women v. Hogan*,
  458 U.S. 718 (1982) ......................................................... 7

*Orr v. Orr*,
  440 U.S. 268 (1979) ......................................................... 7

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017) ......................................................... 6

*Tudor v. Southeastern Oklahoma State University et al.*,
13 F.4th 1019 (10th Cir. 2021) ........................................................ 2

*United States v. Brooks*,
751 F.3d 1204 (10th Cir. 2014) ................................................ 14, 15

*United States v. Virginia*,
518 U.S. 515 (1996) .......................................................................... 6

*Weinberger v. Weinberger*,
420 U.S. 636 (1975) .......................................................................... 7

*Zzyym v. Pompeo*,
958 F.3d 1014 (10th Cir. 2020) ...................................................... 18

Constitutions

U.S. CONST. preamble ................................................................... 4

U.S. CONST. amend. XIV, § 1 .............................................*passim*

Congressional Records

H.R. No. 39–101 (1866) ................................................................ 11

Rules

FRAP 26.1 ...................................................................................... ii

FRAP 29(a)(2) ................................................................................ 1

FRAP 29(a)(4)(A) .......................................................................... ii

FRAP 29(a)(4)(E) ...................................................................... 1, 22

FRAP 32(a)(5) .............................................................................. 22

FRAP 32(a)(6) .............................................................................. 22

FRAP 32(a)(7)(B)(i) ................................................................. 22

FRAP 32(f) ................................................................................ 22

10th Cir. Rule 31.5 ................................................................. 22

Other Authorities

Bao A. et al., *Sexual Differentiation of the Human Brain:*
    *Relation to Gender Identity, Sexual Orientation,*
    *and Neuropsychic Disorders,*
    32 FRONTIERS NEUROENDOCRINOLOGY 214 (2011) .......................... 16

BERRY, D. & K. GROSS, *Frances's Sex and the*
    *Dawning of the Black Women's Era, 1876–1915, in*
    A BLACK WOMEN'S HISTORY OF THE UNITED STATES (2020) 10, 11, 12

Buress, A. *Why Families Facing Anti-Transgender Persecution*
    *Are Moving to Colorado,*
    DENVER POST, Mar. 13, 2023 .......................................................... 17

Clarke, J. *Sex Assigned at Birth,*
    122 COLUM. L. REV. 1821 (2021) .................................................... 18

Donald, B. *When the Rule of Law Breaks Down:*
    *Implications of the 1866 Memphis Massacre*
    *for the Passage of the Fourteenth Amendment,*
    98 B.U. L. Rev. 1607 (2018) .......................................................... 10

GARRETT EPPS, DEMOCRACY REBORN: THE FOURTEENTH AMENDMENT
    AND THE FIGHT FOR EQUAL RIGHTS IN POST-CIVIL WAR AMERICA
    (2006) ................................................................................................ 11

Fernández, R. et al., *The (CA)n Polymorphism of ERB Gene is*
    *Associated with FtM Transsexualism,*
    11 J. SEXUAL MED. 720 (2014) ...................................................... 16

Grady, D. *Anatomy Does Not Define Gender*,
    NY TIMES, Oct. 22, 2018 .................................................................. 20

Hare, L. *Androgen Receptor Repeat Length in Polymorphism*
    *Associated with Male-to-Female Transsexualism*,
    65 BIOLOGICAL PSYCH. 93 (2009) .................................................... 16

Karkazis, K. *The Misuses of "Biological Sex,"*
    394 LANCET 1012 (2019) ........................................................... 17, 18

Kruijver, F.P. et al., *Male-to-Female Transsexuals have*
    *Female Neuron Numbers in a Limbic Nucleus*,
    85 J. CLIN. ENDOCR. METAB. 2034 (2000) ...................................... 17

Levasseur, M.D., *Gender Identity Defines Sex:*
    *Updating the Law to Reflect Modern Medical Science*
    *is Key to Transgender Rights*,
    39 VT. L. REV. 943 (2015) ............................................................... 20

McGuire, D. *"It Was Like All of Us Had Been Raped":*
    *Sexual Violence, Community Mobilization,*
    *and the African American Freedom Struggle*,
    91 AM. HIST. 906 (2004) ................................................................ 11

Minter, S. *"Déjà vu All Over Again": The Recourse to Biology*
    *By Opponents of Transgender Equality*,
    95 N.C. LAW REV. 1161 (2017) ...................................................... 19

ROSEN, H. TERROR IN THE HEART OF FREEDOM (2009) ........................... 12

Safer, J. et al., *Care of Transgender Persons*,
    381 NEW ENG. J. MED. 2451 (2019) ................................................ 16

Sarawat, A. et al., *Evidence Supporting the*
    *Biologic Nature of Gender Identity*,
    21 ENDOCR. PRACT. 199 (2015) ...................................................... 16

Spade, D. *Documenting Gender*,
    59 HASTNGS L.J. 731 (2008) ............................................................ 18

Spizzirri, G. et al., *Grey and White Matter Volumes Either in
    Treatment-Naïve or Hormone-Treated Transgender Women:
    A Voxel-Based Morphometry Study*,
    8 SCI. REPS. 736 (2018) .................................................................... 16

*Under False Colors*,
    PULASKI CITIZEN, July 20, 1876 ...................................................... 12

Vanderhorst, B. *Whither Lies the Self: Intersex and Transgender
    Individuals and a Proposal for Brain-Based Legal Sex*,
    9 HARV. L. & POL'Y REV. 241 (2015) ................................................ 20

Velte, K. *Mitigating the "LGBT Disconnect": Title IX's Protection of
    Transgender Students, Birth Certificate Correction Statutes,
    and the Transformative Potential of Connecting the Two*,
    27 AM. U. J. GENDER SOC. POL'Y & L. 29 (2019) ............................ 20

Young, E. *Transgender Originalism* (2022) ............................................ 9

Zao, J.N. et al. *A Sex Difference in the Human Brain
    and its Relation to Transsexuality*,
    378 NATURE 68 (1995) ............................................................. 16, 17

## INTEREST OF AMICI CURIAE*

Amici curiae are legal scholars of sex and gender. They offer expertise in their personal capacities to assist this Circuit in assessing whether the El Paso County Sheriff officials violated Ms. Griffith's Fourteenth Amendment right to equal protection.

Amici contributing to this brief are as follows:

*Kyle Courtenay Velte* is Associate Dean for Faculty and Professor of Law at the University of Kansas School of Law. Velte's scholarship examines the intersection of sexuality, gender, and the law with a focus on LGBTQ antidiscrimination law. She clerked for Justice Alex Martinez of the Colorado Supreme Court and for the Honorable Roxanne Bailin of the 20th Judicial District in Boulder, Colorado.

*Ezra Ishmael Young* is a legal scholar and impact litigator. His expertise lies in constitutional law and transgender rights. Young has held academic appointments at both Columbia Law School and Cornell Law School, previously served as the director of impact litigation at the

---

\* Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties, through counsel, have consented to the filing of this brief. Pursuant to Rule 29(a)(4)(E), Amici state that no party's counsel authored any portion of this brief and no party, party counsel, or person other than Amici or their counsel contributed money to fund the preparation or submission of this brief.

1

Transgender Legal Defense and Education Fund, and a founding board member and past co-chair of the National Transgender Bar Association. Among other pathbreaking cases, Young served as trial and appellate counsel in *Tudor v. Southeastern Oklahoma State University*, which clarified that "transgender discrimination is discrimination because of sex." 13 F.4th 1019, 1028 (10th Cir. 2021) (cleaned up).

*Jeremiah Ho* is Associate Professor of Law at Saint Louis University School of Law. Ho's scholarship and research focuses on topics relating to law and inequality, with particular respect to sexuality, gender, and race.

*M. Dru Levasseur* is Director of Diversity, Equity, and Inclusion for the National LGBTQ+ Bar Association and a recognized leader in the LGBTQ+ equality movement for more than 25 years. He is a scholar of sex and gender and has served as merits and amici counsel in landmark transgender impact cases in federal courts, including the U.S. Supreme Court.

*Nancy C. Marcus* is an Associate Professor of Law at California Western School of Law, where she teaches a course on Sexuality, Gender Identity and the Law and has produced substantial scholarship over the

years on sexuality and gender issues. She has been a leader in the LGBTQ+ rights movement for two decades, for example, being a co-founder of the national BiLaw organization, and serving as the Chair of the American Bar Association Civil Rights Litigation Section LGBT Rights Subcommittee. She has clerked for Justice Louis Butler on the Wisconsin Supreme Court and Judge Paul Higginbotham on the Wisconsin Court of Appeals.

*Dara E. Purvis* is Associate Dean for Research and Partnerships and Professor of Law at Penn State Law. Professor Purvis's scholarship identifies gendered impacts of the law, particularly the rights of transgender children. She clerked for she clerked for the Honorable Gerard E. Lynch of the Second Circuit and the Honorable Raymond C. Fisher of the Ninth Circuit.

*Eliot T. Tracz* is a faculty fellow at New England School of Law where he teaches courses in sexual orientation and gender identity and the law. His scholarship explores the relationship between sexual orientation, gender identity, and constitutional law, as well as the intersection of bisexuality and the law. He clerked for the Honorable Kathy Wallace of the Minnesota Third Judicial District.

*Ann E. Tweedy* is Professor of Law at the University of South Dakota Knudson School of Law. Her scholarship focuses on sexuality and the law as well as on federal Indian law and Tribal law. She clerked for the Honorable Ronald M. Gould of the Ninth Circuit and the Honorable Rex Armstrong of the Oregon Court of Appeals. Professor Tweedy joins this brief in her personal capacity and clarifies that the views expressed herein not indicative of those held by the South Dakota Board of Regents.

## SUMMARY OF ARGUMENT

Our great national charter opens with these three words: "We the People." U.S. CONST. preamble. After great turbulence and bloodshed, we the people clarified via the Fourteenth Amendment that every American enjoys equal protection of the law. U.S. CONST. amend. XIV, § 1. It is this Circuit's solemn duty to safeguard that right from derogation. Skepticism is warranted where, as in this case, government officials insist some Americans are less equal than others.

Constitutional challenges to gender classifications are without exception subject to intermediate scrutiny. The fact that Ms. Griffith is a transgender woman neither diminishes nor qualifies her right to equal protection. Sex discrimination experienced by transgender people is sex

discrimination. That interpretation is sensible and aligns with the original intent of the ratifying generation who were especially attentive to the needs of transgender women to be protected from abuses of local police.

This Circuit's opinion in *Brown v. Zavaros*, 63 F.3d 967 (10th Cir. 1995), was wrong when decided. Transgender persons' right to equal protection is not conditioned on separately establishing themselves as members of a suspect class.

Amici also draw this Circuit's attention to a robust body of medical and scientific research substantiating that a transgender woman is a woman full-stop. Because transgender persons' innermost sense of gender is biologically rooted, they additionally qualify as a suspect class meriting heightened scrutiny. However, this Circuit need not decide that issue because it would simply duplicate the protection transgender people are already due.

## ARGUMENT

## I.   GENDER CLASSIFICATIONS ARE SUBJECT TO INTERMEDIATE SCRUTINY.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny any person within its jurisdiction the

equal protection of the laws." U.S. Const. amend. XIV, § 1. The level of judicial scrutiny applied turns on the kind of classification made by the government. The available options are strict, intermediate, and rational basis review.

"Today, heightened scrutiny attends to all gender-based classifications." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 800 (10th Cir. 2019) (citing *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017)) (cleaned up). The burden lies entirely on the government, which must demonstrate that the challenged classification serves important government objectives and the means employed are substantially related to the achievement of those objectives. *United States v. Virginia*, 518 U.S. 515, 533 (1996).

Intermediate scrutiny of gender classifications is necessary in light of our nation's "long and unfortunate history of sex discrimination." *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973). Gender classifications are not neutral. Without exception, gender classifications pose "real danger that government policies that professedly are based on reasonable considerations in fact may be reflective of archaic and overbroad

generalizations about gender or based on outdated misconceptions." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 135 (1994) (cleaned up).

All gender classifications are subject to intermediate scrutiny irrespective of the gender of the challenger. *See, e.g.*, *Mississippi Univ. for Women v. Hogan*, 485 U.S. 718, 723 (1982). This is so because equal protection does not permit governments to make classifications premised on stereotyped understandings of what it means to be a woman or man. *See generally Hogan*, 458 U.S. 718; *Orr v. Orr*, 440 U.S. 268 (1979); *Weinberger v. Weinberger*, 420 U.S. 636 (1975).

## II.   THERE IS NO TRANSGENDER EXCEPTION TO EQUAL PROTECTION.

There is no legitimate reason to construe transgender people as being beyond equal protection's normal reach. Doing so defies the Constitution's text and conflicts with the original meaning of the Fourteenth Amendment.

The Fourteenth Amendment does not expressly except transgender people. Nor does it specially condition their right to equal protection. Reading in such a rule contravenes the judicial power. *Cf. Gamble v. United States*, 139 S. Ct. 1960 (2019) (Thomas, J. concurring) ("The judicial power must be understood in light of the Constitution's status as

7

the supreme legal document over other sources of law. . . . Put differently, because the Constitution is supreme over other sources of law, it requires us to privilege its text over our own precedents when the two are in conflict.").

The Supreme Court's recent opinion in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) (Gorsuch, J.) well illustrates this point. At issue in *Bostock* was whether Title VII's proscription of discrimination "because of . . . sex" protects transgender people. While *Bostock* is a statutory case, its sound logic applies with equal force here.

In *Bostock* the employer contended Ms. Aimee Stephens was unprotected because she is a transgender woman. While the employer admitted nontransgender women are protected by Title VII, it insisted that affixing a transgender label on Ms. Stephens transformed her claim into something other than sex discrimination. Observing that there was no textual exception to transgender coverage, the Supreme Court refused to judicially rewrite the law. *See* 140 S. Ct. 1737 ("When the express terms of a statute give us one answer and extratextual considerations give us another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit.").

8

The original meaning of the Fourteenth Amendment also strongly weighs against depriving transgender people of the full promise of equal protection. *See generally* Ezra Ishmael Young, *Transgender Originalism*, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3967605 (2022) (arguing transgender rights are supported by originalism).

The Fourteenth Amendment was ratified in the early stages of Reconstruction. It was necessary because without it, our Constitution provided no recourse for state government violations of individual rights. But demonstrating how our Constitution fell short, let alone convincing Americans to push for constitutional amendment proved difficult.

As it turns out, an indomitable transgender woman, Ms. Frances Thompson, played a critical role in making the case for the Fourteenth Amendment. In May 1866, a white supremacist mob led by the local sheriff and Tennessee Attorney General William Wallace, rampaged through Memphis' Black neighborhood in what would later be called the Memphis Massacre of 1866. After three days of violence, federal troops were able to restore order. But not before the mob succeeded in virtually destroying Memphis' only Black neighborhood. Ninety-one homes along with all four churches and all eight schools were burned to the ground.

The human toll was even more horrendous. Forty-six Black people were murdered, seventy-five were injured, more than one hundred were robbed, and five women including Ms. Thompson were raped. *See generally* Hon. Bernice Bouie Donald, *When the Rule of Law Breaks Down: Implications of the 1866 Memphis Massacre for the Passage of the Fourteenth Amendment*, 98 B.U. L. Rev. 1607 (2018).

Just a few months after the Memphis Massacre, amidst debates about the newly proposed Fourteenth Amendment, Congress convened hearings in aid of an investigation of the cause and toll of the rampage. Ms. Thompson and the four other women raped during the rampage were the only witnesses to testify before Congress. They testified because, under existing law, they had no federal recourse and, for obvious reasons, local fora were inhospitable. It was their sincerest hope that sharing their pain would move the nation to amend the Constitution so that individual rights were enforceable against the states. *See generally* DANIA RAMEY BERRY & KALI NICOLE GROSS, *Frances's Sex and the Dawning of the Black Women's Era, 1876–1915, in* A BLACK WOMEN'S HISTORY OF THE UNITED STATES 104 (2020).

Ms. Thompson's testimony in particular demonstrated in painful and heart-wrenching detail precisely why a constitutional amendment securing equal protection was necessary. H.R. Rep. No. 39–101 at 196–97 (1866) (Thompson's testimony). *See also* GARRETT EPPS, DEMOCRACY REBORN: THE FOURTEENTH AMENDMENT AND THE FIGHT FOR EQUAL RIGHTS IN POST-CIVIL WAR AMERICA 223–39 (2006) (observing the Memphis Massacre's role in rallying support for the Fourteenth Amendment); Danielle L. McGuire, *"It Was Like All of Us Had Been Raped": Sexual Violence, Community Mobilization, and the African American Freedom Struggle*, 91 AM. HIST. 906, 908–09 (2004) (contextualizing Ms. Thompson's sexual assault and testimony within the Black women's freedom struggle during Reconstruction).

Frances Thompson's story has an additional lesson to teach this Circuit. The insistence that a transgender woman is not a woman is more than offensive. It is the very device that anti-Reconstruction southerners employed to undermine the legitimacy of the Fourteenth Amendment.

After ratification, Ms. Thompson was ruthlessly hounded by local police for daring to bear witness to the cruelties she endured. DANIA RAMEY BERRY & KALI NICOLE GROSS, *Frances's Sex and the Dawning of*

*the Black Women's Era, 1876–1915*, *in* A BLACK WOMEN'S HISTORY OF THE UNITED STATES 104, 105 (2020). Among other indignities, Ms. Thompson was charged with cross-dressing. Anti-Reconstruction newspapers caught wind of Ms. Thompson's persecution. Seizing on antitransgender sentiments of the day, they ran stories accusing Ms. Thompson of lying about being a woman, on that pretense proclaimed she lied about being raped to Congress, and on that basis suggested the Fourteenth Amendment was illegitimate. *See, e.g.*, *Under False Colors*, PULASKI CITIZEN, July 20, 1876; HANNAH ROSEN, TERROR IN THE HEART OF FREEDOM 235–41 (2009).

In light of Ms. Thompson's critical role in galvanizing our nation to ratify the Fourteenth Amendment, it strains credulity to construe equal protection to not fully and equitably embrace transgender persons. Indeed, it would be cruelly ironic for this Circuit to deprive Ms. Griffith of the full promise of equal protection. Ms. Griffith stands today in Ms. Thompson's shoes, asking that she be protected from sexual violence and harassment that local government officials allowed to be perpetrated by their own hands and under their watch. Because of Ms. Thompson's

tenacity and courage, Ms. Griffith can do what Ms. Thompson was denied—beseech a federal court to do justice by her.

## III.   TRANSGENDER PERSONS NEED NOT SEPARATELY ESTABLISH THEY ARE A SUSPECT CLASS.

*Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995) is stale-dated and irreconcilable with binding precedent. This Circuit should not hesitate to clarify that all gender classifications are subject to intermediate scrutiny, irrespective of the transgender status of the challenger.

*Brown* involved a pro se challenge of gender classifications made by a Colorado prison. Ms. Josephine Brown argued that the prison's decision to withhold from her medical care and feminine personal items which they provided to nontransgender women violated equal protection. Rather than follow binding precedent which requires intermediate scrutiny of all gender classifications, this Circuit erroneously applied rational basis review. This was done on the pretense that transgender people must separately establish themselves as a suspect class. 63 F.3d at 970–71.

*Brown* was wrong when decided. All gender classifications are subject to intermediate scrutiny. *See, e.g.*, *J.E.B.*, 511 U.S. at 135. This was established long before *Brown*, and thus this Circuit had no power

subject transgender person's challenges of gender classifications to rational basis review. *Cf. Gamble*, 139 S. Ct. at 1985 (Thomas, J., concurring) ("there is no legitimate reason a court may privilege a demonstrably erroneous interpretation of the Constitution over the Constitution itself").

*Brown* can be cast aside because the prior panel fundamentally misapprehended the judicial task at hand. Whether transgender persons may additionally qualify as a suspect class is irrelevant and makes no meaningful difference in the analysis. Both sex discrimination and transgender status discrimination would be subject to the same heightened scrutiny. *See, e.g., Grimm v. Gloucester County School Board*, 972 F.3d 586, 613 (4th Cir. 2020) ("Whether because the policy constitutes sex-based discrimination or because transgender persons are a quasi-suspect class, we apply heightened scrutiny.").

This Panel may also deem *Brown* bad law because its logic is invalidated by *Bostock*. It is true that *Brown* is an equal protection case and *Bostock* is a Title VII case. However, an intervening opinion of the Supreme Court need not be "on all fours" with a prior Circuit precedent to require reexamination. *United States v. Brooks*, 751 F.3d 1204, 1209–

10 (10th Cir. 2014). The inquiry is instead "whether the subsequent Supreme Court decision *contradicts* or *invalidates* this Circuit's prior analysis." *Id.*

*Bostock* settles once and for all that discrimination against a transgender person for being transgender is sex discrimination. 140 S. Ct. at 1741 ("It is impossible to discriminate against a person for being transgender without discriminating against that individual based on sex.") (cleaned up). Because there is no way to square *Brown*'s logic with *Bostock*'s, this panel is empowered to recognize *Brown* is obliterated by intervening Supreme Court precedent.

## IV. HOWEVER, THIS CIRCUIT MAY SEPARATELY RECOGNIZE THAT TRANSGENDER PEOPLE ARE A SUSPECT CLASS.

In *Brown*, this Circuit observes that if presented with evidence that transgender persons' gender is biologically rooted, suspect class status is warranted. 63 F.3d at 971. Amici do not believe it necessary to establish transgender persons are doubly protected under equal protection. But for sake of completeness, Amici apprise this Circuit that there is sufficient evidence establishing the biological rootedness of transgender people's gender.

A growing body of evidence point to a biologic underpinning of gender identity programmed from birth. Joshua Safer et al., *Care of Transgender Persons*, 381 NEW ENG. J. MED. 2451, 2451 (2019). One's internal sense of gender as being male, female, or other, is deeply held, intrinsic, and biologically based. Aruna Saraswat et al., *Evidence Supporting the Biologic Nature of Gender Identity*, 21 ENDOCR. PRACT. 199 (2015).

Evidence includes endocrine variation, developmental differences in utero, brain structure and development, and genetic variation. *See, e.g.*, Rosa Fernández et al., *The (CA)n Polymorphism of ERB Gene is Associated with FtM Transsexualism*, 11 J. SEXUAL MED. 720 (2014); Ai-Min Bao et al., *Sexual Differentiation of the Human Brain: Relation to Gender Identity, Sexual Orientation, and Neuropsychic Disorders*, 32 FRONTIERS NEUROENDOCRINOLOGY 214 (2011); Giancarlo Spizzirri et al., *Grey and White Matter Volumes Either in Treatment-Naïve or Hormone-Treated Transgender Women: A Voxel-Based Morphometry Study*, 8 SCI. REPS. 736 (2018); Lauren Hare, *Androgen Receptor Repeat Length in Polymorphism Associated with Male-to-Female Transsexualism*, 65 BIOLOGICAL PSYCH. 93 (2009); J.N. Zou et al., *A Sex Difference in the*

*Human Brain and its Relation to Transsexuality*, 378 NATURE 68 (1995);

F.P. Kruijver et al., *Male-to-Female Transsexuals have Female Neuron*

*Numbers in a Limbic Nucleus*, 85 J. CLIN. ENDOCR. METAB. 2034 (2000).

## V. THIS CIRCUIT SHOULD NOT CONFLATE THE BIOLOGICAL ROOTEDNESS OF GENDER WITH RECENT CALLS TO REDEFINE GENDER IN PSEUDOSCIENTIFIC TERMS.

Our nation is amidst an unprecedented onslaught of legislation

targeting transgender Americans. *See, e.g.*, Alex Burness, *Why Families*

*Facing Anti-Transgender Persecution are Moving to Colorado*, DENVER

POST,                          Mar.                          14,                          2023,

https://www.denverpost.com/2022/03/14/transgender-flee-texas-idaho-

child-abuse-law-to-colorado/. Most of these laws impose unequal

treatment on the pretext that there are neutral, objective reasons to

exclude transgender persons from participating in public life. The

animus behind them can, at times, be difficult to identify because they

appear to turn on natural facts, giving them the patina of neutrality and

objectivity. Katrina Karkazis, *The Misuses of "Biological Sex,"* 394

LANCET 1898, 1899 (2019).

It is imperative that this Circuit take a critical eye to classification

schemes which purport to define one's gender in terms of "sex assigned

at birth" or "biological sex." Science does not drive these policies, the desire to exclude does. Karkazis, *Misuses of "Biological Sex"* at 1899; Jessica A. Clarke, *Sex Assigned at Birth*, 122 COLUM. L. REV. 1821, 1859 (2022).

"Sex assigned at birth" schemes fix gender based on the classification made at birth. In most versions, the gender marker on one's first issued birth certificate (irrespective of whether it was ever amended) is deemed to forever fix one's gender. This is despite birth certificates not being intended to be used in this manner. Dean Spade, *Documenting Gender*, 59 HASTINGS L.J. 731, 764 (2008). As this Circuit observed recently, sex assigned at birth regimes force the misclassification of persons who are incontrovertibly members of gender different than that recorded at birth. *Zzyym v. Pompeo*, 958 F.3d 1014, 1029 (10th Cir. 2020) (observing this problem in the context of an intersex person's challenge to passport rule premised on "sex assigned at birth").

"Biological sex" schemes are deceptively named. They perniciously define one's gender tautologically to deny transgender persons legal recognition of their gender and attach the "biological" label without any basis in medicine or science. This is achieved by defining "biological sex"

such that the only legally pertinent indicia of gender point in one direction—transgender persons are always considered to be a gender different that that with which they identify. *See, e.g.*, *Adams by and through Kasper v. School Board of St. Johns County*, 57 F.4th 791, 807–08 (11th Cir. 2022) (declaring gender identity to be irrelevant to "biological sex," defining "biological sex" in terms of "sex determined at birth," proffering both that "biological sex is determined solely by the accident of birth" and it is impossible "to change an individual's immutable characteristic of biological sex," and concluding a transgender boy legally recognized by the state of Florida as male is a "biological girl").

Amici respectfully remind this Circuit that pseudoscientific appeals to biology have a sordid history in our nation. "Biological arguments have been used to justify many types of discrimination, from slavery to coverture, to the forced sterilization of people with disabilities." Shannon Price Minter, *"Déjà vu All Over Again": The Recourse to Biology by Opponents of Transgender Equality*, 95 N.C. LAW REV. 1161, 1162 (2017).

If medicine and science play any role in how the law defines gender at all, pseudo-science should not be countenanced. For that reason, a growing chorus of scholars now urge that if legal sex is to be defined in

scientific and medical terms, transgender persons' gender is most accurately defined by that with which they identify since identity is biologically rooted. *See, e.g.,* Denise Grady, *Anatomy Does Not Define Gender*, NY TIMES, Oct. 22, 2018, https://www.nytimes.com/2018/10/22/health/transgender-trump-biology.html; Kyle C. Velte, *Mitigating the "LGBT Disconnect": Title IX's Protection of Transgender Students, Birth Certificate Correction Statutes, and the Transformative Potential of Connecting the Two*, 27 AM. U. J. GENDER SOC. POL'Y & L. 29 (2019); Blaise Vanderhorst, *Whither Lies the Self: Intersex and Transgender Individuals and a Proposal for Brain-Based Legal Sex*, 9 HARV. L. & POL'Y REV. 241 (2015); M. Dru Levasseur, *Gender Identity Defines Sex: Updating the Law to Reflect Modern Medical Science is Key to Transgender Rights*, 39 VT. L. REV. 943 (2015).

## CONCLUSION

For all of the foregoing reasons, Amici respectfully ask that this Circuit reverse and remand this case to the District of Colorado with the clarification that all constitutional challenges to gender classifications are afforded intermediate scrutiny.

Respectfully submitted this 28th day of August 2023.

/s/ Kyle C. Velte
UNIVERSITY OF KANSAS
SCHOOL OF LAW
1535 West 15th Street
Lawrence, Kansas 66045
kvelte@ku.edu

/s/ Ezra Young
EZRA ISHMAEL YOUNG
LAW OFFICE OF EZRA YOUNG
210 North Sunset Drive
Ithaca, New York 14850

*Counsel for Amici Curiae*

## CERTIFICATION OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 3,722 words.

The brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Century, 14-point font.

I further certify that pursuant to 10th Cir. CM/ECF User Manual, Sec. II, Part I(c), that this ECF submission has been scanned for viruses with the most recent version of a commercial virus scanning program and, according to the program, is free of viruses.

I also certify that pursuant to 10th Cir. R. 31.5 and 10th Cir. CM/ECF User Manual, Sec. III, Part 5, that seven hard copies of the foregoing Brief will be provided to the Clerk's office within two business days. Those hard copies are exact copies of the ECF filing.

August 28, 2023

/s/ Ezra Young_____
EZRA ISHMAEL YOUNG
LAW OFFICE OF EZRA YOUNG

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on August 28, 2023, I electronically filed the foregoing Brief for Amici Curiae Legal Scholars of Sex and Gender using the Court's CM/ECF systems, which constitutes service under the Court's rules.

/s/ Ezra Young
Ezra Ishmael Young
LAW OFFICE OF EZRA YOUNG

*Counsel for Amici Curiae*